UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- x
                                                                       :
In re OSG SECURITIES LITIGATION                                        :
                                                                       :        Master File No. 12 Civ. 7948
                                                                       :
                                                                       :
                                                                       :
                                                                       :
                                                                       :
                                                                       :
--------------------------------------------------------------------- x

**MEMORANDUM OF LAW IN SUPPORT OF THE INDIVIDUAL DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 2

I.      OSG and the Individual Defendants .................................................................... 2

II.     OSG's Public Notes Offering ............................................................................. 2

III.    Statements Regarding OSG's Taxes .................................................................. 3

IV.    Withdrawal of Financial Statements, Economic Challenges, and
Bankruptcy Filing ............................................................................................... 4

V.      OSG's Credit Agreements ................................................................................... 5

VI.    Alleged Tax Liability .......................................................................................... 6

VII.   Scienter Allegations Against Arntzen and Itkin ............................................... 6

ARGUMENT ........................................................................................................................ 9

I.      Plaintiffs' Section 10(b) Claims Fail To Satisfy The Heightened Pleading
Requirements of the PSLRA ............................................................................... 9

     A.    Legal Standard ....................................................................................... 9

     B.    Plaintiffs Have Failed To Allege Particularized Facts Giving Rise To A
Strong Inference Of Scienter ............................................................... 11

           1.    Plaintiffs Fail To Allege Particularized Facts Showing That
Defendants Had A Concrete, Personal Motive To Commit
Securities Fraud ...................................................................... 12

                a.    Plaintiffs' Generic Motive Allegations Are Insufficient ............. 12

                b.    Plaintiffs' Insider Stock Sale Allegations Weigh *Against* A
Strong Inference Of Scienter ....................................................... 13

           2.    Plaintiffs Fail To Allege Circumstantial Evidence Giving Rise To A
Strong Inference Of Scienter ................................................... 15

                a.    OSG's Potential Restatement Does Not Give Rise To An
Inference Of Scienter .................................................................. 15

i

        **b.**    Defendants' General Awareness Of U.S. Tax Law Does Not Give Rise To An Inference Of Scienter ........................................ 16

        **c.**    Defendants' SOX Certifications Do Not Give Rise To An Inference Of Scienter ................................................................. 18

    3.    The Most Cogent And Compelling Inference Is That Defendants Did Not Act With Scienter....................................................... 18

**II.**    Plaintiffs' Section 20(a) Claims Fail For Lack Of A Primary Violation ......................... 20

**III.**    Plaintiffs' Section 11 and 12(a)(2) Claims Fail Under Rule 9(b) ................................... 21

    A.    Plaintiffs' Securities Act Claims Against Arntzen And Itkin Are Subject To Rule 9(b) ............................................................................................................ 21

    B.    Plaintiffs' Securities Act Claims Fail To Allege Fraudulent Intent..................... 22

**IV.**    Plaintiffs' Section 12(A)(2) claim Fails Against All The Individual Defendants Because The Individual Defendants Are Not Statutory Sellers..................... 23

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

C ASES

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)........................................................................................................12

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...............................................................................................4, 9, 20

*Avon Pension Fund v. GlaxoSmithKline PLC*,
  343 F. App'x 671 (2d Cir. 2009) ..........................................................................................13

*Briarwood Invs. Inc. v. Care Inv. Trust Inc.*,
  No. 07 Civ 8159, 2009 WL 536517 (S.D.N.Y. Mar. 4, 2009) ...............................................24

*Caiafa v. Sea Containers Ltd.*,
  331 F. App'x 14 (2d Cir. 2009) .......................................................................................21, 23

*Capri v. Murphy*,
  856 F.2d 473 (2d Cir. 1988)....................................................................................................23

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
  701 F. Supp. 2d 506 (S.D.N.Y. 2010)......................................................................................24

*City of Brockton Ret. Sys. v. Shaw Grp. Inc*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008)...............................................................................15, 18

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  No. 12 Civ. 0256, 2013 WL 775434 (S.D.N.Y. Feb. 28, 2013) ............................................24

*Coronel v. Quanta Capital Holdings Ltd.*,
  No. 07 Civ. 1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009)..............................................22

*Craftmatic Sec. Litig. v. Kraftsow*,
  890 F.2d 628 (3d Cir. 1989)....................................................................................................25

*Credit Suisse First Bos. Corp. v. ARM Fin. Grp.*,
  No. 99 Civ. 12046, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ..........................................25

*Davidoff v. Farina*,
  04 CIV. 7617, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005)................................................15

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009).......................................................................9, 12, 14, 15, 23

iii

*Emps' Ret. Sys. of the Gov. of the V.I. v. J.P. Morgan Chase,*
  804 F. Supp. 2d 141 (S.D.N.Y. 2011).................................................................25

*Gissin v. Endres,*
  739 F. Supp. 2d 488 (S.D.N.Y. 2010)..............................................9, 10, 12, 19

*In re eSpeed, Inc. Sec. Litig.,*
  457 F. Supp. 2d 266 (S.D.N.Y. 2006)...................................10, 13, 14, 16, 17, 20

*In re GeoPharma, Inc. Securities Litigation,*
  399 F. Supp. 2d 432 (S.D.N.Y. 2005)...............................................................19

*In re JP Morgan Chase Securities Litigation,*
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)...............................................................17

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.,*
  No. 03 Civ. 8208, 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006)..........................23

*In re Westinghouse Sec. Litig.,*
  90 F.3d 696 (3d Cir. 1996)..............................................................................25

*Kalnit v. Eichler,*
  264 F.3d 131 (2d Cir. 2001)...........................................................................10

*Kushner v. Beverly Enters., Inc.,*
  317 F.3d 820 (8th Cir. 2003)..........................................................................20

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.,*
  576 F.3d 172 (4th Cir. 2009) .........................................................................20

*McKenna v. Smart Techs. Inc.,*
  No. 11 Civ. 7673, 2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012).............................24

*Pinter v. Dahl,*
  486 U.S. 622 (1988)........................................................................23, 24, 25

*Rombach v. Chang,*
  355 F.3d 164 (2d Cir. 2004)......................................................................21, 22

*Rosenzweig v. Azurix Corp.,*
  332 F.3d 854 (5th Cir. 2003) ..........................................................................25

*Russo v. Bruce,*
  777 F. Supp. 2d 505 (S.D.N.Y. 2011)...............................................................14

*S. Cherry St., LLC v. Hennessee Grp.,*
  573 F.3d 98 (2d Cir. 2009).........................................................................10, 13

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996) ............................................................................25

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) .............................................................................20

*Steed Fin. v. Nomura Sec. Int'l, Inc.*,
    No. 00 Civ. 8058, 2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) ....................24, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ....................................................................................10, 22

*Zirkin v. Quanta Capital Holdings Ltd.*,
    No. 07 Civ. 851, 2009 WL 185940 (S.D.N.Y. Jan. 23, 2009) .............................22

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................................18

## STATUTES

15 U.S.C. § 77k ........................................................................................ *passim*

15 U.S.C. § 77*l* ........................................................................................ *passim*

15 U.S.C. § 77o ......................................................................................... 1, 23

15 U.S.C. § 78j(b) .................................................................................... *passim*

15 U.S.C. § 78t(a) ...................................................................................... 1, 20

15 U.S.C. § 78u-4(b)(3)(A) ............................................................................. 9

IRC § 955 ..................................................................................................... 17

IRC § 956 ................................................................................................ *passim*

## OTHER AUTHORITIES

17 C.F.R. § 240.10b-5 ............................................................................... 1, 9, 21

Fed. R. Civ. P. 9(b) ............................................................................ 1, 9, 21, 22, 23

Defendants Morten Arntzen, Myles R. Itkin, G. Allen Andreas III, Alan R. Batkin, Thomas B. Coleman, Charles Fribourg, Stanley Komaroff, Solomon N. Merkin, Joel I. Picket, Ariel Recanati, Oudi Recanati, Thomas F. Robards, Jean-Paul Vettier, and Michael Zimmerman (collectively, the "Individual Defendants") hereby submit this joint memorandum of law in support of their motion to dismiss the Consolidated Amended Complaint (the "Amended Complaint"). All the Individual Defendants move to dismiss the claims asserted against them under Section 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77*l*. Defendants Arntzen and Itkin also move to dismiss the claims asserted against them under Section 11 of the Securities Act, 15 U.S.C. § 77k; Section 15 of the Securities Act, 15 U.S.C. § 77o; Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).[1]

## PRELIMINARY STATEMENT

This securities case concerns the application of technical provisions of the Internal Revenue Code to a set of publicly disclosed facts regarding Overseas Shipholding Group, Inc. ("OSG" or the "Company"). Plaintiffs allege that because OSG announced that its previously issued financial statements for the three years prior to December 31, 2011 and the first two quarters of 2012 should no longer be relied upon as a result of a tax issue that is still under review, Defendants Arntzen and Itkin, acting with fraudulent intent, must have violated federal securities laws. But Plaintiffs' securities claims against these Defendants—all of which sound in fraud—cannot withstand scrutiny under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform

---

[1]   All the Individual Defendants believe that they will ultimately establish, at the summary judgment stage, a due diligence defense with respect to all claims of liability under the Securities Act. However, because only Defendants Arntzen and Itkin have been sued under the Exchange Act, the other Individual Defendants (collectively, the "Outside Director Defendants") do not assert on this motion that the Securities Act claims against them sound in fraud.

Act ("PSLRA").  Plaintiffs have failed to allege a motive or opportunity to commit fraud or circumstantial evidence giving rise to a cogent inference of scienter.  Indeed, the scienter allegations are so weak that they border on nonsensical when compared with competing inferences.  Moreover, none of the Individual Defendants qualifies as a "statutory seller" for the purposes of Section 12(a)(2) of the Securities Act and thus cannot be held liable under that provision.

## FACTUAL BACKGROUND

### I.      OSG AND THE INDIVIDUAL DEFENDANTS

Non-party OSG owns and operates a fleet of more than 100 U.S. Flag and International Flag vessels that primarily transport crude oil and refined petroleum products worldwide.  Am. Compl. ¶ 9.  The Company's international vessels are all owned or operated by foreign corporations that are subsidiaries of OSG International, Inc. ("OIN"), a wholly owned subsidiary of the Company incorporated in the Marshall Islands.  *Id.* ¶ 25.

During the time frame at issue in the Amended Complaint—March 1, 2010 through October 19, 2012 (the "Putative Class Period")—Morten Arntzen was OSG's president and Chief Executive Officer, and a member of the Company's Board of Directors ("Board").  *Id.* ¶ 10.  Myles Itkin was OSG's Vice President, Chief Financial Officer, and Treasurer.  *Id.*  The other Individual Defendants—the Outside Director Defendants—served as OSG Board members during all or part of the Putative Class Period.  *Id.*

### II.     OSG'S PUBLIC NOTES OFFERING

On March 24, 2010, OSG conducted a public offering (the "Offering") of $300 million of unsecured notes ("Notes").  *Id.* ¶¶ 1, 49.  In connection with the Offering, OSG filed with the SEC an initial registration statement on Form S-3 dated March 4, 2010; a Shelf Registration Statement and Prospectus dated March 22, 2010 (the "Registration Statement"); a Preliminary Prospectus

Supplement dated March 22, 2010; and a Prospectus Supplement dated March 24, 2010 (the "Prospectus").  *Id.* ¶ 48.

Defendant Ernst & Young ("E&Y") served as OSG's independent registered public accounting firm from 1969 until June 15, 2009.  *Id.* ¶ 12.  Since June 17, 2009, PricewaterhouseCoopers LLP ("PwC") has served as OSG's independent registered public accounting firm.  *Id.* ¶ 13.  "E&Y and PwC expressly consented to having their unqualified audit opinions for OSG's financial statements incorporated by reference into the Registration Statement. As such, E&Y and PwC expressly consented to serve as accounting experts with respect to the Offering of the Notes."  *Id.* ¶ 97.[2]

## III.   STATEMENTS REGARDING OSG'S TAXES

The Registration Statement and Prospectus, which incorporated by reference OSG's 2009 Form 10-K, contained statements about the Company's "credit for federal income taxes, its then current and deferred income tax asset and liability amounts and its related income tax disclosures." *Id.* ¶ 51.  The 2009 10-K disclosed that "[a]s a result of changes made by the American Jobs Creation Act of 2004 . . . the Company is no longer required to report taxable income on a current basis the undistributed foreign shipping income earned by OIN under the 'Subpart F' provisions of the [Internal Revenue] Code."  *Id.* ¶ 59.  Furthermore, the 2009 10-K explained that:

> Effective January 1, 2005, the earnings from shipping operations of the Company's foreign subsidiaries are not subject to U.S. income taxation as long as such earnings are not repatriated to the U.S.  The Company intends to permanently reinvest these earnings, as well as

---

[2]   Plaintiffs have asserted claims against E&Y and PwC for violations of Section 11 of the Securities Act.  Plaintiffs have also asserted claims under Section 11 and Section 12(a)(2) against Citigroup Global Markets Inc., Deutsche Bank Securities Inc., DnB NOR Markets, Inc., Goldman, Sachs & Co., HSBC Securities (USA) Inc., ING Financial Markets LLC, and Morgan Stanley & Co. Inc. (collectively, the "Underwriter Defendants").  The claims against E&Y, PwC, and the Underwriter Defendants are the subject of separate motions to dismiss and memoranda of law.

> the undistributed income of its foreign companies accumulated
> through December 31, 1986, in foreign operations.

*Id.* ¶ 57.  Nonetheless, the 2009 10-K explicitly warned that "[t]he Company's views should not be considered official, and no assurance can be given that the conclusions discussed below would be sustained if challenged by taxing authorities."  *Id.* ¶ 59.

## IV.    WITHDRAWAL OF FINANCIAL STATEMENTS, ECONOMIC CHALLENGES, AND BANKRUPTCY FILING

On October 3, 2012, OSG announced in a Form 8-K filed with the SEC that Board member G. Allen Andreas III was resigning because of his disagreement with the Board over the process that the Board was taking in reviewing a "tax issue."  *Id.* ¶ 40.  OSG explained that the tax issue referred to by Andreas arose "from the fact that the Company is domiciled in the United States and has substantial international operations," and related "to the interpretation of certain provisions contained in the Company's loan agreements."  OSG, Current Report (Form 8-K) (Oct. 3, 2012)[3] (Ex. A to Declaration of Scott B. Schreiber dated Apr. 19, 2013 ("Schreiber Decl.")[4]; *see also* Am. Compl. ¶ 40.  The Company stated that it was continuing to review the tax issue.  Am. Compl. ¶ 41.

A few weeks later, on October 22, 2012, OSG filed another Form 8-K with the SEC announcing that as a result of its continuing review of the tax issue, "the Company's previously issued financial statements for at least the three years ended December 31, 2011 and associated interim period, and for the fiscal quarters ended March 31 and June 30, 2012, should no longer be relied upon."  *Id.*  OSG further disclosed that it was determining whether a restatement may be required.  *Id.*  In addition, the October 22, 2012 8-K mentioned other difficulties the Company was

---

[3]    On a motion to dismiss, the Court is not limited to the face of the complaint, but "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[4]    All exhibits are to the Schreiber Decl. unless otherwise noted.

4

facing, including negotiations with its bank creditors.  *See* OSG, Current Report (Form 8-K) (Oct. 22, 2012) (Ex. B).  As discussed in OSG's prior disclosures, the highly cyclical shipping industry had experienced a severe downswing in recent years and the Company's cash flow had been under intense pressure.  *See, e.g.*, OSG, Current Report (Form 8-K) (Aug. 2, 2012) (Ex. C); Annual Report (Form 10-K) at 35, 37-39 (Feb. 29, 2012) (Ex. C) (discussing market conditions, OSG finances, and OSG stock decline).

In connection with these various challenges, OSG announced that it was evaluating strategic options, including voluntary bankruptcy.  Am. Compl. ¶ 42.  Following the Company's October 22 announcement, the price of OSG's common stock dropped from $3.50 to $1.40 per share, and OSG's Notes declined from $50 to $33.50 per Note.  *Id.* ¶ 176.  On November 14, 2012, OSG filed for protection under Chapter 11 of the United States Bankruptcy Code.  *Id.* ¶ 9.

## V.   OSG'S CREDIT AGREEMENTS

Prior to and during the Putative Class Period, OSG entered into various credit facilities with third parties.  *Id.* ¶ 37.  Some of these agreements (collectively, the "Credit Agreements") provided that OIN—the Company's wholly owned international subsidiary—was party to the agreement in a "joint and several" capacity.  *Id.* ¶ 38.  For example, a $500 million facility that OSG, OIN, and another OSG subsidiary entered into in 2005 (the "$500 Million Credit Agreement") stated that the three entities were joint and several borrowers.  *Id.*  OSG filed a Current Report with the SEC disclosing, in the very first sentence, that the Company had entered into the $500 Million Credit Agreement with two of its subsidiaries as "joint and several borrowers."  OSG, Current Report (Form 8-K) (Jan. 21, 2005) (Ex. D).  The $500 Million Credit Agreement, which OSG included as an exhibit to the Current Report, itself contained this "joint and several" language.  Ex. 10.1 to *id*. Moreover, OSG's Annual Report for 2005 made several references to the $500 Million Credit

Agreement as a "joint and several" obligation.  *See* OSG, Annual Report (Form 10-K) (Mar. 1, 2006), at 112, 119, Schedule III to Ex. 4(e)(6) (Ex. E).[5]

## VI.   ALLEGED TAX LIABILITY

The Amended Complaint alleges that a U.S. borrower's act of causing a controlled foreign corporation ("CFC") "to *guarantee* the U.S. parent company's debt obligation, *may* cause the U.S. parent company to incur income tax liability under Section 956 [within Subpart F of the Internal Revenue Code]."  *Id.* ¶ 36 (emphases added).  According to Plaintiffs, OIN—by agreeing to be "jointly and severally liable" on OSG's debt arrangements—in effect guaranteed OSG's debt obligations.  *See, e.g.*, *id.* ¶ 60.  In Plaintiffs' view, these "guarantees" resulted in "a deemed distribution of OIN's then current and accumulated earnings and profits to OSG," and "subjected OSG to tens of millions of dollars in undisclosed federal income taxes" under Section 956.  *See, e.g.*, *id.*  The Complaint alleges that as a result of OSG's disclosures, the Internal Revenue Service has now claimed that the Company owes more than $435 million in corporate income tax for the years 2004 through 2011.  *Id.* ¶¶ 46-47.

## VII.   SCIENTER ALLEGATIONS AGAINST ARNTZEN AND ITKIN

In purported support of their fraud claims, Plaintiffs allege in conclusory fashion that Defendants Arntzen and Itkin "disseminated or approved . . . materially false and misleading statements . . . , which they knew or deliberately disregarded were misleading."  *Id.* ¶ 205.  However, the Amended Complaint fails to assert any facts establishing this knowledge or deliberate disregard.

---

[5]   OSG also appended the full text of a $1.5 billion credit agreement as an exhibit to the Company's 2005 Form 10-K.  *See* Ex. 4(e)(6) to OSG, Annual Report (Form 10-K) (Mar. 1, 2006) (Ex. E).  The very first recital in that agreement states that the lenders are making credit available to OSG, OIN, and another subsidiary "on a joint and several basis."  *See id.* at 1-2.

According to the Amended Complaint, Arntzen and Itkin made false and misleading statements "to maximize the amount of money that the Company could raise in the Offering . . . at a time when the Company was recording hundreds of million[s] of dollars in annual losses and its operations were consuming tens of million[s] of dollars in cash." *Id.* ¶ 187.  These Defendants also purportedly made fraudulent statements to cause "OSG's securities to trade at artificially inflated prices." *Id.* ¶ 189.  The Amended Complaint alleges that "Defendants were further motivated to engage in this course of conduct in order to allow certain Company insiders to collectively sell shares of their personally-held OSG common stock for gross proceeds of approximately $2.7 million during the Class Period." *Id.* ¶ 191.  Notably, however, neither Arntzen nor Itkin sold OSG stock during the putative class period.  Indeed, on June 7, 2011, Arntzen *bought* 3,987 shares at $26.55 for a total of $105,854.85.  *See* OSG, Statements of Changes in Beneficial Ownership of Securities (Form 4) ("Form 4") (June 8, 2011) (Ex. F).

The only Individual Defendants alleged to have sold stock during the putative class period are certain Outside Director Defendants, and Plaintiffs do not explain how these sales are relevant to their allegations of scienter against Arntzen and Itkin.  Furthermore, each of the Outside Director Defendants alleged to have sold stock in fact acquired more stock during the putative class period than he sold.  For example, Michael Zimmerman bought $100,200 of OSG shares on June 3, 2011, *see* Form 4 (June 3, 2011) (Ex. G); $97,500 of OSG shares on August 4, 2011, *see* Form 4 (Aug. 4, 2011) (Ex. G); and $51,129.80 of OSG shares on November 22, 2011, *see* Form 4 (Nov. 22, 2011) (Ex. G).  Between March 16, 2010 and November 22, 2011, Zimmerman's ownership of OSG common stock increased from 5,000 to 19,000 shares.  *See* Form 4 (Mar. 16, 2010) (Ex. G); Form 4 (Nov. 22, 2011) (Ex. G).  Moreover, while Alan R. Batkin owned 1,000 shares of OSG common stock on June 16, 2010, Form 4 (June 16, 2010) (Ex. H), by October 1, 2012, Batkin's holdings had

increased to 25,551 shares, Form 4 (Oct. 1, 2012) (Ex. H).  Similarly, as of December 8, 2010,

Stanley Komaroff owned 924 shares, Form 4 (Dec. 9, 2010) (Ex. H), but by June 29, 2012,

Komaroff was the owner of 16,302 shares, Form 4 (July 3, 2012) (Ex. H).

Other Outside Director Defendants added substantially to their holdings of OSG common

stock during the Putative Class Period as well.  For instance, on August 23-24, 2011 alone, Oudi

Recanati purchased more than 150,000 shares.  Form 4 (Aug. 25, 2011) (Ex. I).  In addition,

Charles Fribourg purchased 193,000 shares, Form 4 (Nov. 23, 2011) (Ex. J), and Thomas Coleman

purchased 100,000 OSG shares, Form 4 (Aug. 6, 2012) (Ex. K).

Another allegation of scienter is that Arntzen and Itkin "were aware of the principal U.S.

tax laws applicable to the Company, the subjectivity of foreign source income to U.S. federal

income taxes and the 'critical' nature of OSG's policy of accounting for income taxes."  Am.

Compl. ¶ 183.  As purported evidence, Plaintiffs cite these Defendants' signature of

Sarbanes-Oxley ("SOX") mandated certifications.  Id. ¶ 190.  Plaintiffs also point to OSG's efforts

to obtain favorable changes in the tax law.  Id. ¶ 184.  For example, Arntzen acknowledged that

OSG helped convince Congress to pass legislation in 2004 that allowed OSG to defer

foreign-source shipping income and thereby reduce its tax liability.  Id. ¶ 132.  Arntzen also

acknowledged that the Company had lobbied Congress to change the tax law regarding the

repatriation of cash.  Id. ¶¶ 163, 184.  Moreover, OSG's Head of Government Affairs provided a

Congressional subcommittee with a written statement noting that Subpart F of the tax code "may

[sic] triggered if a company issues debt to invest in nonshipping operations."  Id. ¶ 185.

Plaintiffs further allege that Arntzen and Itkin knew about a $42 million tax recovery

resulting from the Workers, Homeowners, and Business Assistance Act of 2009.  Id. ¶¶ 118, 143.

In that regard, Itkin stated in a conference call with analysts and investors that although the 2009 refund was a one-time event, OSG expected to get a $3 million tax benefit in 2010.  *Id.* ¶ 118.

**ARGUMENT**

**I.    PLAINTIFFS' SECTION 10(B) CLAIMS FAIL TO SATISFY THE HEIGHTENED PLEADING REQUIREMENTS OF THE PSLRA**

**A.    Legal Standard**

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, the "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI*, 493 F.3d at 105; *accord Gissin v. Endres*, 739 F. Supp. 2d 488, 501 (S.D.N.Y. 2010).[6] "Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss."  *ATSI*, 493 F.3d at 99.  "[A] complaint alleging securities fraud must satisfy Rule 9(b), which requires that 'the circumstances constituting fraud . . . shall be stated with particularity, [and] must also meet the PSLRA's pleading requirements or face dismissal."  *Id.* (citing 15 U.S.C. § 78u-4(b)(3)(A)).

A plaintiff can plead scienter under the PSLRA by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.*  To proceed under the first theory, a plaintiff must allege that defendants "benefitted in some concrete and personal way from the purported fraud."  *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  "This requirement [is] generally met when corporate insiders

---

[6]    Internal quotations omitted except where otherwise noted.

[a]re alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." *S. Cherry St., LLC v. Hennessee Grp.*, 573 F.3d 98, 108-09 (2d Cir. 2009). By contrast, motives possessed by virtually all corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, are not a sufficient basis for scienter. *Id.* at 109.

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). Under this alternative theory of scienter, a plaintiff must show that the defendant's conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.*; *accord In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 282 (S.D.N.Y. 2006).

To determine whether plaintiffs have alleged a strong inference of scienter, the Supreme Court has held that courts must look at the complaint as a whole and "must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). It is not sufficient to "allege[] facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." *Id.* at 324. Rather, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*; *accord Gissin*, 739 F. Supp. 2d at 501.

10

**B.  Plaintiffs Have Failed To Allege Particularized Facts Giving Rise To A Strong Inference Of Scienter**

Plaintiffs allege that all of OSG's tax-related statements during the Class Period are false and misleading because the Individual Defendants "failed to disclose that OIN was a party to and jointly and severally liable" on certain Credit Agreements; that this "joint and several liability" constituted a guarantee of OSG's debt obligations; that by guaranteeing these obligations OIN triggered deemed distributions of OIN's earnings; and that the deemed distributions subjected OSG to millions of dollars in undisclosed federal income tax liabilities pursuant to Internal Revenue Code Section 956. *See, e.g.*, Am. Compl. ¶ 60.  Plaintiffs also allege that Arntzen and Itkin knew or were reckless in not knowing that these statements were false and misleading. *See, e.g., id.* ¶ 181. In order to survive a motion to dismiss the securities fraud claims, however, Plaintiffs must allege particularized facts giving rise to a strong inference that Arntzen and Itkin knew or were reckless in not knowing that the language in the Credit Agreements would result in tax liabilities for OSG under Section 956.  Plaintiffs did not and cannot do this.

Furthermore, as set forth below, Plaintiffs have failed to allege facts showing that Arntzen or Itkin had any concrete or personal motive to commit securities fraud.  Plaintiffs rely instead on conclusory allegations and insider stock sales that actually militate *against* a finding of scienter. Plaintiffs' attempt to allege circumstantial evidence of fraudulent intent also falls short.  OSG's announcement that its financials should not be relied upon does not give rise to an inference of scienter, and Plaintiffs do not point to any contemporaneous documents or witnesses suggesting that Arntzen or Itkin was aware of OSG's alleged undisclosed Section 956 liability.

Moreover, the Amended Complaint is replete with facts—such as OSG's disclosures and reliance on experts—suggesting that the more cogent and compelling inference is that Arntzen and Itkin did not act with fraudulent intent but rather acted at all times in reliance on OSG's

11

accountants, auditors, and counsel (or at worst acted negligently in so doing). Considering the allegations as a whole, Plaintiffs have failed to plead facts giving rise to a strong inference of scienter; thus, the Section 10(b) claims should be dismissed.

### 1. Plaintiffs Fail To Allege Particularized Facts Showing That Defendants Had A Concrete, Personal Motive To Commit Securities Fraud

To proceed under the theory that defendants had both motive and opportunity to commit the fraud, a plaintiff must allege that the defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198. Plaintiffs' allegations do not come close to meeting this standard, and in fact, cut against any such inference.

### a. Plaintiffs' Generic Motive Allegations Are Insufficient

Plaintiffs allege a laundry list of general corporate motives, none of which raises any inference of scienter. For example, Plaintiffs allege that Arntzen and Itkin committed securities fraud because they wanted OSG's securities to "trade at artificially inflated prices." Am. Compl. ¶ 189. But it is well-settled that the "desire for the corporation to appear profitable and the desire to keep stock prices high . . . do not constitute 'motive' for purposes of this inquiry." *ECA*, 553 F.3d at 198. "If scienter could be pleaded on th[e] basis [that defendants wanted to artificially inflate the company's stock price] alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). Plaintiffs further allege that Arntzen and Itkin were motivated to "maximize the amount of money raised in the Offering . . . so as to facilitate OSG's access to much needed capital." Am. Compl. ¶ 187. Courts have consistently held, however, that this generalized motive is insufficient to support an inference of scienter. *See, e.g.*, *Gissin*, 739 F. Supp. 2d at 512-13 (finding a company's desire to "complete the offering" too generalized to establish scienter). Plaintiffs' allegation that Arntzen and Itkin wanted to avoid "additional downgrades of

OSG's debt by rating agencies," Am. Compl. ¶ 188, also is insufficient.  "[T]he desire to maintain

a high credit rating for the corporation" is, like Plaintiffs' other motive allegations, a goal

"possessed by virtually all corporate insiders," and cannot give rise to an inference of scienter.  *S.*

*Cherry St.*, 573 F.3d at 109.

### b.  Plaintiffs' Insider Stock Sale Allegations Weigh *Against* A Strong Inference Of Scienter

Plaintiffs' attempt to plead motive through stock sales fares no better.  As a threshold

matter, the Amended Complaint does not allege that Arntzen or Itkin sold OSG stock during the

putative Class Period, which undermines Plaintiff's motive allegations.  *See eSpeed*, 457 F. Supp.

2d at 289-90.  Rather than sell his stock, Arntzen actually purchased more than $100,000 worth of

OSG stock during the Class Period.  This purchase, which took place well before the share price's

steep fall, further rebuts any inference of scienter.  *See Avon Pension Fund v. GlaxoSmithKline*

*PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (refusing to credit inference of scienter because

insider's acquisition of stock "signals only confidence" in the company).

Grasping at straws, Plaintiffs allege that Arntzen and Itkin committed securities fraud "in

order to allow certain Company insiders to collectively sell shares of their personally-held OSG

common stock for gross proceeds of approximately $2.7 million."  Am. Compl. ¶ 191.[7]  But

Plaintiffs fail to allege what relationship, if any, existed between these Defendants and the so-called

"insiders," or whether there was any *quid pro quo* between them.  Under Plaintiffs' theory, any sale

---

[7]    Many of Plaintiffs' so-called insider sales were not made by insiders.  As the Complaint admits, Mats Berglund, Oslo Asset Management, and Michael Recanati were not officers or directors of OSG during the Putative Class Period.  *See* Am. Compl. ¶ 191.  Moreover, Oslo Asset Management's stock sales took place several months *after* the class period.  *See id.*  The only stock sales that Michael Recanati made were to a trust owned by his mother.  *See* Form 4 (Dec. 29, 2011) (Ex. L); Form 4 (Dec. 30, 2011) (Ex. L).  Indeed, Michael Recanati's beneficial ownership of OSG stock increased during the Putative Class Period, from 3,128,817 shares in June 2010 to 3,889,907 shares in June 2012.  *See* OSG, Proxy Statement (Form DEF 14A), at 9 (Apr. 30, 2012) (Ex. L); OSG, Proxy Statement (Form DEF 14A), at 9 (Apr. 30, 2010) (Ex. L).

of stock by any person related to the Company would be a basis for finding that Arntzen and Itkin acted with scienter.  Such a general desire to permit other people to profit is not a "concrete and personal" benefit to those charged with fraud.  *ECA*, 553 F.3d at 198; *see also Russo v. Bruce*, 777 F. Supp. 2d 505, 518 (S.D.N.Y. 2011) (scienter not established where "the Complaint gives no indication as to why the Individual Defendants would have been motivated to defraud investors in order to enrich others, not themselves"); *eSpeed*, 457 F. Supp. 2d at 289-90 (scienter not established where insiders sold stock but CEO and CFO, who were "well-positioned to reap profits from insider knowledge," did not).

Even assuming *arguendo* that Plaintiffs' motive theory is plausible, the Amended Complaint omits critical information about the individuals' stock sales.  For example, the Complaint does not specify the portion of OSG stockholdings the individuals sold or whether the volume of insider sales of OSG stock increased during the Putative Class Period—factors that this Court considers relevant to determining whether the sales are sufficiently "unusual" to support an inference of scienter.  *See id.* at 457 281 n.128, 289.  The Amended Complaint also fails to mention whether any of the stock sellers made a profit, or whether the timing of the trades was suspicious. Without this information, it is impossible to draw any inferences at all about the sellers' motives, much less Arntzen or Itkin's motives.  *See id.* at 290 (allegation that two defendants "realized gross proceeds of $2.8 million" does not raise inference of scienter where "Complaint does not disclose whether either made any profit").

Conveniently, the Amended Complaint ignores that each of the Outside Director Defendants alleged to have sold stock actually *increased* his holdings of OSG common stock during the Putative Class Period.  For example, between March 16, 2010 and November 22, 2011, Zimmerman's ownership of OSG common stock increased from 5,000 to 19,000 shares; between

June 16, 2010 and October 1, 2012, Batkin's increased from 1,000 to 25,551 shares; and between

December 8, 2010 and June 29, 2012, Komaroff's increased from 924 to 16,302 shares.[8]

### 2.   Plaintiffs Fail To Allege Circumstantial Evidence Giving Rise To A Strong Inference Of Scienter

Because Plaintiffs do not allege that Arntzen or Itkin had any cognizable motive to commit

securities fraud, "the strength of the circumstantial allegations must be correspondingly greater."

*ECA*, 553 F.3d at 199.  The Amended Complaint is devoid of circumstantial facts supporting any

inference of scienter, much less the heightened standard applicable here.

### a.   OSG's Potential Restatement Does Not Give Rise To An Inference Of Scienter

As a preliminary matter, Plaintiffs cannot establish their case through the benefit of

hindsight—an announcement that OSG may have to restate certain of its financials does not

establish Arntzen or Itkin acted with scienter.[9]  "[I]t is well-settled that the mere fact of a

restatement of earnings does not support a strong, or even a weak, inference of scienter."  *City of*

*Brockton Ret. Sys. v. Shaw Grp. Inc*, 540 F. Supp. 2d 464, 472-73 (S.D.N.Y. 2008).  Likewise,

"[a]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to

state a securities fraud claim."  *ECA*, 553 F.3d at 200.  Only where such allegations are "coupled

with evidence of corresponding fraudulent intent might they be sufficient."  *Id.*; *see also Davidoff*

*v. Farina*, 04 CIV. 7617, 2005 WL 2030501, at *17 (S.D.N.Y. Aug. 22, 2005) ("[T]o the extent

plaintiffs claim that defendants had knowledge of specific facts that rendered their public

statements misleading, they must supply some factual basis for the allegation that the defendants

---

[8]   Moreover, on August 23-24, 2011 alone, Oudi Recanati purchased over 150,000 shares, while Coleman purchased 100,000 shares in a single day and Fribourg also purchased 193,000 shares in a single day.

[9]   OSG has not yet issued a restatement, though it has announced that a restatement may be necessary.  Am. Compl. ¶ 41.

[gained this knowledge] at some point during the time period alleged.").  Here, the Amended

Complaint contains no corresponding evidence—no internal documents, emails, confidential

witnesses, or anything else—directly contradicting Arntzen and Itkin's public statements or

financial reports concerning OSG's tax liability during the Putative Class Period.  "Where plaintiffs

contend defendants had access to contrary facts, they must specifically identify the reports or

statements containing this information."  *eSpeed*, 457 F. Supp. 2d at  292 n.196.  Plaintiffs' failure

to do so is fatal to their claims of scienter.

> **b.      Defendants' General Awareness Of U.S. Tax Law Does Not Give
> Rise To An Inference Of Scienter**

In the absence of any reports or statements evidencing scienter, Plaintiffs allege that

Arntzen and Itkin's awareness of "the principal U.S. tax laws applicable to the Company,"

including "the subjectivity of foreign source income to U.S. federal income taxes," gives rise to an

inference of scienter.  Am. Compl. ¶ 183.  This is wrong.  Given the complexity of the Internal

Revenue Code, these Defendants' supposed general familiarity with tax law does not give rise to an

inference that they must have known specific provisions of the tax code were being misapplied.

Although Section 956 of Subpart F provides that a controlled foreign corporation's income may

become subject to U.S. taxes if the CFC "guarantees" an obligation of the U.S. parent, Plaintiffs do

not identify any facts remotely suggesting that Arntzen or Itkin had reason to believe that the Credit

Agreements triggered Section 956 or that OSG was misapplying this provision.  Rather, as

discussed below, the most cogent and compelling inference is that Defendants—neither of whom is

alleged to be a tax expert or an accountant—relied in good faith on the advice of experts.

In a similar vein, Plaintiffs suggest that Arntzen and Itkin should have known about OSG's

alleged section 956 liability because OSG's tax accounting policy was a "critical" one.  *Id.*  This

16

too is wrong.  Plaintiffs do not allege that taxes are the "core operation" of OSG.  Nor can they:

OSG is a shipping company.  *In re JP Morgan Chase Securities Litigation*, 363 F. Supp. 2d 595

(S.D.N.Y. 2005), is instructive.  The plaintiffs there alleged that the defendant, an investment bank,

mischaracterized certain transactions as trades when the transactions should have been recorded as

loans.  *Id.* at 627-28.  The court rejected the plaintiffs' theory of scienter against the CEO, finding

that the "plaintiffs allege no facts suggesting that the accounting treatment of the [ ] transactions as

trades rather than as loans was at the core of [the company's] business."  *Id.* at 628.  Thus, the

mischaracterization of the "transactions as trades cannot properly be attributed to [the CEO]."  *Id.*[10]

Plaintiffs also claim that Arntzen and Iktin were "completely knowledgeable about . . .

Section 956" by virtue of OSG's lobbying activities, and so must have known about OSG's Section

956 liability.  Am. Compl. ¶ 185.  That OSG's Head of Government Affairs once referenced

Subpart F in a statement submitted to Congress for a hearing on tax reform does not establish that

Arntzen and Itkin knew the intricacies of Subpart F, let alone Section 956.  Moreover, the subject of

this statement to Congress was not Section 956, but rather Section 955, which prevents U.S.

companies from repatriating investments made in CFCs prior to 1987.  *See* Statement for the

Record of Eric F. Smith, V.P. & Head of Gov't Affairs, OSG, June 23, 2011 (Ex. M).  Similarly

irrelevant are Arntzen's acknowledgement that OSG lobbied Congress to change the tax laws

regarding the deferral of foreign shipping income and the repatriation of cash, and Arntzen and

Itkin's statements about a tax refund from the Workers, Homeowners, and Business Assistance Act

of 2009.  None of these statements mentions Section 956 or Subpart F, let alone whether Section

---

[10]   In any case, this Court has expressed skepticism that the "'core operations' method of pleading conscious misbehavior or recklessness is viable after the PSLRA."  *eSpeed*, 457 F. Supp. 2d at 294 n.210 (citing cases).

956 is triggered by the inclusion of "joint and several" language in Credit Agreements.

Accordingly, these statements do not give rise to an inference of scienter.

### c.   Defendants' SOX Certifications Do Not Give Rise To An Inference Of Scienter

In a single throwaway line, Plaintiffs allege that Defendants must have had scienter because they signed OSG's SOX certifications.  Am. Compl. ¶ 190.  As the Ninth Circuit has held, "[b]oilerplate language in a corporation's . . . required certifications under Sarbanes-Oxley section 302(a) . . . add[s] nothing substantial to the scienter calculus."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1003-04 (9th Cir. 2009) (noting unanimous agreement among sister circuits that have considered the effect of a SOX certification on scienter allegations).  Thus, without corresponding facts suggesting Defendants acted with fraudulent intent, Plaintiffs' reference to SOX certifications is meaningless.  *See City of Brockton Ret. Sys.*, 540 F. Supp. 2d at 474.

### 3.   The Most Cogent And Compelling Inference Is That Defendants Did Not Act With Scienter

Not only have Plaintiffs failed to plead facts giving rise to an inference of scienter, many of the facts they plead actually undermine any such inference.  As a result, the most cogent and compelling inference that emerges from the Amended Complaint is that Arntzen and Itkin did not act with scienter—they publicly disclosed the relevant Credit Agreements and tax laws, and relied in good faith on experts and other professionals.

OSG's disclosures weigh heavily against an inference of scienter.  For example, the Company expressly disclosed in the first sentence of a Form 8-K that OSG and its two subsidiaries had entered into the $500 Million Credit Agreement "as joint and several borrowers."  OSG repeatedly mentioned this "joint and several" obligation in its Annual Report for 2005.  Moreover, OSG warned shareholders time and time again that it was subject to Subpart F (the part of the tax

code that includes Section 956), and that "no assurance can be given" that the Company's interpretation of the tax laws "would be sustained if challenged by taxing authorities."  Plaintiffs cannot establish a strong inference of scienter where the facts that form the basis of the alleged fraud—OIN's joint and several liability, Subpart F of the Internal Revenue Code—"were actually disclosed in published documents or otherwise relayed to investors."  *Gissin*, 739 F. Supp. 2d at 510.  In *In re GeoPharma, Inc. Securities Litigation*, the plaintiff alleged that the company made false and misleading statements regarding the status of FDA approval of a new product, but the court refused to infer scienter because the "FDA approval of [the product] was public information." 399 F. Supp. 2d 432, 450 (S.D.N.Y. 2005).  The Court explained that "[c]ases in this Circuit assume that the contradictory information in question must be non-public."  *Id.* at 452.  Given that investors and analysts pore over the public disclosures of a company like OSG, it would be self-defeating for Arntzen and Itkin to disclose the supposedly critical fact of joint and several liability if they had an intent to deceive or defraud about its tax consequences.

Defendants' non-fraudulent intent is further reinforced by Arntzen and Itkin's reliance on experts to identify and address pertinent tax issues.  As the Complaint reveals, the tax issue at the heart of this case is highly technical and concerns specific provisions of Section 956 of Subpart F of the Internal Revenue Code regarding a CFC's guarantee of a parent company's debt.  Plaintiffs do not allege that either Arntzen or Itkin was a tax lawyer or tax accountant.  Nor do Plaintiffs allege that either of these Defendants was ever personally involved in OSG's tax calculation.  The most natural inference, therefore, is that Arntzen and Itkin relied in good faith on the expertise of their accounting and legal professionals, as corporate directors and officers regularly do.  Indeed, Plaintiffs allege that every year during the Putative Class Period, OSG's auditors issued an unqualified opinion certifying OSG's year-end financial statements.  *See Kushner v. Beverly*

19

*Enters., Inc*., 317 F.3d 820, 829 (8th Cir. 2003) (refusing to find an inference of scienter because it was "telling" that the company's "outside auditors did not question its accounting practices") (citing Second Circuit cases). In addition to their accountants, OSG was also represented by counsel, including tax counsel, in the negotiation and drafting of the Credit Agreements. *See, e.g.*, $500 Million Credit Agreement (listing counsel). The involvement of such experts strongly militates against an inference of scienter.

Taking Plaintiffs' factual allegations as a whole, the Complaint raises a plausible, competing inference that Arntzen and Itkin did not have fraudulent intent, but rather relied in good faith on the expertise of accounting and legal professionals, and took responsible steps to address any potential problems in the Company's financial statements. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("Later disclosures that timely raised questions about the reliability of financial information . . . lend weight to an inference that contemporaneous financial statements were made in good faith."). Alternatively, even assuming the facts in the Amended Complaint may give rise to an inference that Defendants were negligent in failing to make an accurate assessment of OSG's tax liability during the Putative Class Period, that still does not support an actionable claim for recklessness or fraud. A reasonable person, therefore, would deem the inference of scienter to be weaker than competing inferences.

## II. PLAINTIFFS' SECTION 20(A) CLAIMS FAIL FOR LACK OF A PRIMARY VIOLATION

Section 20(a) of the Exchange Act creates a cause of action against defendants alleged to have been "control persons" of the primary violators. *See* 15 U.S.C. § 78t(a). However, where a plaintiff fails to allege a primary violation of the Exchange Act, the plaintiff cannot establish control person liability. *See ATSI*, 493 F.3d at 108; *eSpeed*, 457 F. Supp. 2d at 297-98. Because the

Complaint has not alleged a primary violation of Section 10(b) and Rule 10b-5 by Arntzen and

Itkin, Plaintiffs have not established control person liability pursuant to Section 20(a).

## III.      PLAINTIFFS' SECTION 11 AND 12(A)(2) CLAIMS FAIL UNDER RULE 9(B)

### A.      Plaintiffs' Securities Act Claims Against Arntzen And Itkin Are Subject To Rule 9(b)

Plaintiffs' Section 11 and 12(a)(2) claims against Defendants Arntzen and Itkin fail for the

same reason their Section 10(b) claim fails—Plaintiffs' inability to allege fraudulent intent under

Rule 9(b).  In *Rombach v. Chang*, the Second Circuit held that "the heightened pleading standard of

Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on

allegations of fraud."  355 F.3d 164, 171 (2d Cir. 2004).  Rule 9(b)'s purpose is to "provide a

defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from

improvident charges of wrongdoing, and to protect a defendant against the institution of a strike

suit."  *Id*.  Importantly, "[t]hese considerations apply with equal force to . . . Section 11 and Section

12(a)(2) claims that are grounded in fraud."  *Id.*

Plaintiffs' allegations are of the type that are "classically associated with fraud" and thus

implicate the heightened pleading standards of Rule 9(b).  *See id.* at 172.  As a preliminary matter,

Plaintiffs base their Securities Act claims against Arntzen and Itkin on the same factual allegations

as their securities fraud claims under Section 10(b), which require allegations of fraudulent intent.

*Compare* Am. Compl. ¶¶ 20-70, *with* ¶¶ 116-79.  As in *Caiafa v. Sea Containers Ltd.*, Plaintiffs'

Securities Act claims are subject to Rule 9(b) because they "rel[y] on the same factual allegations

that served as a basis for their Section 10(b) claim."  331 F. App'x 14, 16 (2d Cir. 2009).

Plaintiffs' fraud allegations are not limited to the Section 10(b) claim; they permeate other

parts of the Amended Complaint as well.  For example, Plaintiffs' class certification allegations

assert that "Lead Plaintiffs' and all the Class members' damages arise from . . . the same *false and*

*misleading representations* and omissions made by . . . Defendants."  Am. Compl. ¶ 17 (emphasis added); *see also id.* ¶ 19(c) (common issue is "whether Defendants' statements issued during the Class Period were *materially false and misleading*" (emphasis added)).  Similarly, in their factual allegations relating to the Securities Act claims, Plaintiffs allege that the Registration and Prospectus contained "materially false and misleading statements," *id.* ¶¶ 57, 59, 61, and that "the Individual Defendants knew or should have known of the material misstatements or omissions contained in the Registration and Prospectus," *id.* ¶ 95; *see also id.* ¶¶ 56, 93, 108.  This Court, like the *Rombach* court, should take these allegations for what they are—allegations of fraud.  *See* 355 F.3d at 172 (applying Rule 9(b) where plaintiffs alleged that registration statement was "inaccurate *and* misleading"; that it contained "*untrue* statements of material facts"; and that "materially *false* and *misleading* written statements" were issued (emphases in original)).

Plaintiffs' attempt to disclaim any reliance on fraud is unavailing.  Plaintiffs "cannot escape [Rule 9(b)] by disclaiming any reliance on fraud while simultaneously alleging fraud to support their allegations."  *Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405, 2009 WL 174656, at *15 (S.D.N.Y. Jan. 26, 2009) (citing *Rombach*, 355 F.3d at 172).  Accordingly, Rule 9(b) must apply to Plaintiffs' Securities Act claims.

**B.     Plaintiffs' Securities Act Claims Fail To Allege Fraudulent Intent**

Because Plaintiffs' Section 11 and 12(a)(2) claims against Arntzen and Itkin sound in fraud, Plaintiffs "must state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), including facts that give rise to a strong inference of fraudulent intent.  *Tellabs*, 551 U.S. at 324.[11]  As set forth above, Plaintiffs have not alleged facts giving rise to a strong inference

---

[11]     *See also Zirkin v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 851, 2009 WL 185940, at *12 (S.D.N.Y. Jan. 23, 2009) (Securities Act claims subject to Rule 9(b) must "convey by factual allegations that the defendants made materially false statements, and that they did so with

Footnote continued on next page

of fraudulent intent with respect to Arntzen and Itkin.  Plaintiffs therefore have failed to meet the requirements of Rule 9(b) with respect to their Section 11 and 12(a)(2) claims.  Accordingly, Arntzen and Itkin's motion to dismiss the Section 11 and 12(a)(2) claims should be granted.  *See Caiafa*, 331 F. App'x at 16 (affirming dismissal of Securities Act claim that "relies on the same factual allegations that served as a basis for their Section 10(b) claim . . . [b]ecause those allegations do not state with sufficient particularity the fraud alleged").[12]

## IV.   PLAINTIFFS' SECTION 12(A)(2) CLAIM FAILS AGAINST ALL THE INDIVIDUAL DEFENDANTS BECAUSE THE INDIVIDUAL DEFENDANTS ARE NOT STATUTORY SELLERS

Plaintiffs' Section 12(a)(2) claim fails because the Individual Defendants do not qualify as "statutory sellers" for the purposes of Section 12(a)(2).  In *Pinter v. Dahl*, 486 U.S. 622 (1988), the Supreme Court defined "seller" for the purposes of Section 12(a)(1) to be a person who (1) passes title to the plaintiff, or (2) "successfully solicits the purchase [of securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  *Id.* at 642, 647.  The Second Circuit has applied *Pinter*'s definition of "seller" to claims arising under Section 12(a)(2).  *See Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988).

Plaintiffs make boilerplate assertions that the Individual Defendants were "sellers and offerors *and/or solicitors* of purchasers of securities," that they "issued, caused to be issued, and/or signed the Registration Statement" and that their "solicitation activities" included "preparing the defective and inaccurate Prospectus," and "participating in efforts to market the Offering to

---

Footnote continued from previous page

*scienter*."); *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208, 2006 WL 1008138, at *6 n.12 (S.D.N.Y. Apr. 18, 2006) ("When Section 11 and 12(a)(2) claims sound in fraud . . . the scienter requirements of Rule 9(b) . . . apply").

[12]   Because the Complaint fails to state a claim against Arntzen or Itkin under Section 11 and the Company is not named as a defendant, the Section 15 claim against Arntzen and Itkin should be dismissed as well.  *See ECA*, 553 F.3d at 207.

investors."  Am. Compl. ¶¶ 106, 108 (emphasis added).  With respect to the first prong of *Pinter*,

Section 12(a)(2) "imposes liability on only the buyer's immediate seller; remote purchasers are

precluded from bringing actions against remote sellers."  *Pinter*, 486 U.S. at 644 n.21.  Here, the

Amended Complaint does not allege that the Individual Defendants sold any securities directly to

the plaintiff class.  Therefore, Plaintiffs' allegations do not satisfy the first prong of *Pinter*.

   With respect to the second prong of *Pinter*, Plaintiffs have not adequately alleged that the

Individual Defendants solicited the purchase of the Notes or that they were motivated by any

personal financial interest.  Although courts are divided within this District on the question of

whether the mere signing of a registration statement constitutes solicitation for the purposes of

Section 12(a)(2), the more recent and better reasoned cases hold that such a rule would erase the

distinction between Sections 11 and 12(a)(2).  *See, e.g.*, *Citiline Holdings*, *Inc. v. iStar Fin., Inc.*,

701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010) ("While Section 11 expressly imposes liability upon

every signer of the registration statement, Section 12 does not do so.  Plaintiffs' position would

render this distinction a nullity and is, in any event, inconsistent with *Pinter*'s statement that

Congress did not intend to impose liability under Section 12 for mere participation in unlawful

sales transactions."); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12 Civ. 0256,

2013 WL 775434, at *9 (S.D.N.Y. Feb. 28, 2013) (citing *Citiline* and holding a complaint "largely

silent as to the role played by the Individual and Director defendants" fails to show defendants were

solicitors); *McKenna v. Smart Techs. Inc.*, No. 11 Civ. 7673, 2012 WL 1131935, at *18 (S.D.N.Y.

Apr. 3, 2012).[13]  Significantly, although the Second Circuit has not yet addressed the issue, every

---

[13] *But see Briarwood Invs. Inc. v. Care Inv. Trust Inc.*, No. 07 Civ 8159, 2009 WL 536517
(S.D.N.Y. Mar. 4, 2009); *Steed Fin. v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL
1111508, at *7 (S.D.N.Y. Sept. 20, 2001).

Court of Appeals to have done so has held that the mere signing of a registration statement is not sufficient to constitute solicitation for the purposes of 12(a)(2).[14]

Here, the Amended Complaint does not allege specific solicitation activities in which Individual Defendants engaged.  Courts have routinely found that such a "conclusory allegation that defendants solicited" a purchase, standing alone, is insufficient to meet Plaintiffs' pleading burden.  *See, e.g.*, *Credit Suisse First Bos. Corp. v. ARM Fin. Grp.*, No. 99 Civ. 12046, 2001 WL 300733, at *10 (S.D.N.Y. Mar. 28, 2001).  Moreover, Plaintiffs do not plead that they purchased securities as a direct result of any solicitation by the Individual Defendants.  *See Steed Fin.*, 2001 WL 1111508, at *7 (dismissing Section 12 claim where the complaint failed to allege that "plaintiff purchased the securities as a result of [defendant's] solicitation").

Even if Plaintiffs could establish that Individual Defendants were solicitors, that would not be enough to satisfy the second prong of *Pinter* because Plaintiffs do not, and cannot, allege that Individual Defendants had any financial interest in the Offering or were motivated by any desire for personal financial gain.  *See Emps' Ret. Sys. of the Gov. of the V.I. v. J.P. Morgan Chase*, 804 F. Supp. 2d 141, 151 (S.D.N.Y. 2011) (dismissing a solicitation claim under Section 12(a)(2) for failure to plead a specific financial interest in the transaction).  Plaintiffs therefore have failed to plead that the Individual Defendants were statutory sellers under the second prong of *Pinter*.

## CONCLUSION

For the foregoing reasons, the Individual Defendants respectfully request that their motion to dismiss the Amended Complaint be granted with prejudice.

---

[14]   *See Rosenzweig* v. *Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717 n.19 (3d Cir. 1996); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989).

Dated:    April 19, 2013
          New York, NY

**DECHERT LLP**

/s/ David H. Kistenbroker
David H. Kistenbroker
Joni S. Jacobsen
77 W. Wacker Dr., Suite 3200
Chicago, IL 60601
Tel.:  (312) 646-5800
Fax:  (312) 646-5858
david.kistenbroker@dechert.com
joni.jacobsen@dechert.com

*Attorneys for Defendant Myles R. Itkin*

**ARNOLD & PORTER LLP**

/s/ Scott B. Schreiber
Scott B. Schreiber
Craig A. Stewart
399 Park Avenue
New York, NY 10022-4690
Tel.: (212) 715-1142
Fax: (212) 715-1399
scott.schreiber@aporter.com
craig.stewart@aporter.com

*Attorneys for Defendant Morten Arntzen*

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

/s/ Richard A. Rosen
Richard A. Rosen
1285 Avenue of the Americas
New York, NY  10019-6064
Tel.: (212) 373-3000
Fax: (212) 757-3990
rrosen@paulweiss.com

*Attorneys for Defendants G. Allen Andreas III, Alan R. Batkin, Thomas B. Coleman, Charles A. Fribourg, Stanley Komaroff, Solomon N. Merkin, Joel I. Picket, Ariel Recanati, Oudi Recanati, Thomas F. Robards, Jean-Paul Vettier, and Michael J. Zimmerman*

**CERTIFICATE OF SERVICE**

I hereby certify that the above document was filed through the ECF system for electronic service to the registered participants, and paper copies will be sent to those indicated as non-registered participants (if any) on April 19, 2013.

/s/  Scott B. Schreiber