**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- X

IN RE OSG SECURITIES LITIGATION

**OPINION AND ORDER**

**12 Civ. 7948 (SAS)**

-------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Lead Plaintiffs Stichting Pensioenfonds DSM Nederland ("DSM"), Indiana Treasurer of State, and Lloyd Crawford (together, "Plaintiffs"), bring this action on behalf of themselves and others similarly situated on the basis of a March 2010 Senior Notes Offering ("the Offering") by Overseas Shipholding Group, Inc. ("OSG" or "the Company").  OSG filed for bankruptcy on November 14, 2012, and is not a party to this action.[1]

---

[1]    *See* Consolidated Amended Complaint for Violations of the Federal Securities Laws ("CAC") ¶ 9.

Plaintiffs name the following parties as defendants:  Morten Arntzen[2], Myles R. Itkin[3], G. Allen Andreas III, Alan R. Batkin, Thomas B. Coleman, Charles Fribourg, Stanley Komaroff, Solomon N. Merkin, Joel I. Picket, Ariel Recanati, Oudi Recanati, Thomas F. Robards, Jean-Paul Vettier, and Michael Zimmerman[4] (collectively, the "Individual Defendants"); PricewaterhouseCoopers LLP ("PwC") and Ernst & Young ("E&Y") (collectively, the "Auditor Defendants"); and Citigroup Global Markets Inc., Deutsche Bank Securities Inc., DNB Markets, Inc. (f/k/a DnB NOR Markets, Inc.), Goldman, Sachs & Co., HSBC Securities (USA) Inc., ING Financial Markets LLC, and Morgan Stanley & Co. LLC (f/k/a Morgan Stanley & Co. Incorporated) (collectively, the "Underwriter Defendants").[5]

---

[2]     Arntzen served as OSG's President, Chief Executive Officer, and a member of the Board of Directors.  *See id.* ¶ 10(a).

[3]     Itkin served as OSG's Vice President, Chief Financial Officer, and Treasurer.  *See id.* ¶ 10(b).  Plaintiffs also allege that Itkin served on the Board of Directors, although that fact is contested. *See id.*; Reply Memorandum of Law in Support of the Individual Defendants' Motion to Dismiss the Consolidated Amended Complaint ("Indiv. Reply Mem.") at 5 n.1.

[4]     The other individual defendants served as OSG Board members during all or part of the Class Period.  *See* CAC ¶ 3.

[5]     *See id.* ¶¶ 10–13.

The Class consists of all persons and entities who purchased OSG Senior Notes pursuant to and/or traceable to the Offering, as well as purchasers of OSG securities between March 1, 2010 and October 19, 2012, inclusive (the "Class Period").[6]

Plaintiffs assert claims under the following statutes: 1) Section 11 of the Securities Act of 1933 ("Securities Act") against all Defendants,[7] 2) Section 12(a)(2) of the Securities Act against the Individual Defendants and the Underwriter Defendants,[8] 3) Section 15 of the Securities Act against the Individual Defendants,[9] 4) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 against Arntzen and Itkin,[10] and 5) Section 20(a) of the Exchange Act against Arntzen and Itkin.[11]

In April and May of 2013, four different motions to dismiss were filed pursuant to Federal Rule of Civil Procedure 12(b)(6).  Ernst & Young ("E&Y")

---

[6]     *See id.* ¶ 14.

[7]     *See id.* ¶¶ 91–103.

[8]     *See id.* ¶¶ 104–111.

[9]     *See id.* ¶¶ 112–115.

[10]    *See id.* ¶¶ 203–209.

[11]    *See id.* ¶¶ 210–212.

and PricewaterhouseCoopers LLP ("PwC"), the two Auditor Defendants, each filed a motion to dismiss, as did the Underwriter Defendants and the Individual Defendants.  For the reasons that follow, the motions by E&Y, PwC, and the Underwriter Defendants are denied in full, while the motion by the Individual Defendants is granted in part and denied in part.

## II.    BACKGROUND

### A.    OSG's Business Operations and Tax Liability

OSG is a tanker company with a fleet of over one hundred vessels operating both domestically and internationally.[12]  The international fleet, which constitutes about seventy-five percent of the Company's vessels, is owned and operated entirely by foreign subsidiaries of OSG International, Inc. ("OIN"), a wholly owned subsidiary of OSG.[13]  From 1987 to 2004, OSG was required to pay United States income taxes on the shipping income of its foreign subsidiaries, including OIN.[14]  However, after the passage of the American Jobs Creation Act of

---

[12]    *See id.* ¶¶ 21–22.

[13]    *See id.* ¶¶ 22, 25.

[14]    *See id.* ¶¶ 29, 31.

2004 (the "Jobs Act"), OSG reported that it was no longer required to pay taxes on undistributed foreign shipping income earned by its subsidiaries.[15]

Another tax provision relevant to OSG is Section 956 of Section F of the Internal Revenue Code.  Section 956 provides that, when a foreign subsidiary guarantees the loans of a United States parent company, the "accumulated 'earnings and profits' of that subsidiary are deemed to have been distributed to the U.S. parent company" and are thereby subject to United States federal income taxation.[16]  Plaintiffs allege that OSG entered into various debt arrangements for which OIN was jointly and severally liable, thereby triggering millions of dollars in income tax liability under Section 956.[17]

## B.    The Offering

On March 24, 2010, OSG conducted a public offering of three hundred million dollars of unsecured notes.[18]  In connection with the Offering, OSG filed a Shelf Registration Statement and Prospectus dated March 22, 2010 (the "Registration Statement") and a Prospectus Supplement dated March 24, 2010

---

[15]     *See id.*

[16]     *See id.* ¶ 34.

[17]     *See id.* ¶ 37.

[18]     *See id.* ¶ 49.

(the "Prospectus"), among other preliminary filings.[19]  Each of the Individual

Defendants signed the Registration Statement.[20]  None of the filings or

incorporated financial statements disclosed the alleged tax liability under Section

956.[21]

### C.    The Role of the Auditors

The Registration Statement and Prospectus incorporated the

Company's 2009 Form 10-K by reference, and thereby the Company's financial

statements from 2007, 2008, and 2009.[22]  E&Y served as OSG's independent

registered public accounting firm from 1969 through June 15, 2009, and audited

OSG's financial statements from 2005 through 2008.[23]  E&Y concluded that "the

financial statements [from 2007 and 2008] . . . present fairly, in all material

respects, the consolidated financial position of Overseas Shipholding Group, Inc.

and subsidiaries. . . ."[24]

---

[19]    *See id.* ¶ 48.

[20]    *See id.* ¶ 10(e).

[21]    *See id.* ¶¶ 60, 62, 67.

[22]    *See id.* ¶ 52.

[23]    *See id.* ¶ 12.

[24]    *Id.* ¶ 75.

PwC served as OSG's independent registered public accounting firm from June 17, 2009 to the present, and audited OSG's financial statements for 2009.[25]  PwC's audit opinion indicated that the 2009 financial statements "present fairly, in all material respects, the financial position of Overseas Shipholding Group, Inc. and its subsidiaries. . . ."[26]  PwC also concluded that "the Company maintained, in all material respects, effective internal control over financial reporting."[27]  Both firms "expressly consented to having their unqualified audit opinions for OSG's financial statements [for years 2007 through 2009] incorporated by reference into the Registration Statement."[28]

### D.    The Road to Bankruptcy

On October 3, 2012, Defendant Andreas resigned from his position on OSG's Board of Directors and Audit Committee.[29]  Andreas's resignation letter stated: "My resignation results from a disagreement with the Board as to the process the Board is taking in reviewing a tax issue. In taking this action, I urge

---

[25]    *See id.* ¶ 12.

[26]    *Id.* ¶ 75.

[27]    *Id.*

[28]    *Id.* ¶ 97.

[29]    *See id.* ¶ 40.

you to report this issue to our auditors, PricewaterhouseCoopers LLP, prior to the Company disclosing my resignation with the SEC."[30]

On October 22, 2012, OSG filed a Form 8-K with the SEC indicating that its previously issued financial statements for "at least three years ended December 31, 2011 . . . should no longer be relied upon."[31]  Later that day, S&P lowered OSG's credit rating based on the "high probability of very near-term default."[32]  On November 14, 2012, OSG filed for bankruptcy protection.[33]  In connection with that proceeding, the Internal Revenue Service filed a Proof of Claim stating that OSG owes the federal government over thirty-five million dollars in corporate income tax plus 13.7 million dollars in interest, which were accrued during 2004, 2005, 2009, 2010, and 2011.[34]

## III.   STANDARD OF REVIEW AND PLEADING STANDARD

### A.   Rule 12(b)(6) Motion to Dismiss

---

[30]    *Id.*

[31]    *Id.* ¶ 41.

[32]    *Id.* ¶ 42.

[33]    *See id.* ¶ 44.

[34]    *See id.* ¶ 46.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."[35]  The court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."[36]

The court evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal.*[37]  Under the first prong, a court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."[38]  For example, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[39]  Under the second prong of *Iqbal,* "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for

---

[35]    *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)).

[36]    *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

[37]    *See* 556 U.S. 662, 678–79 (2009).

[38]    *Id.* at 679.

[39]    *Id.* at 678.

relief."[40]  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[41]  "The plausibility standard is not akin to a probability requirement" because it requires "more than a sheer possibility that a defendant has acted unlawfully."[42]

## B.      Heightened Pleading Standard under Rule 9(b) and the PSLRA

Private securities fraud claims are subject to a heightened pleading standard.  *First*, Federal Rule of Civil Procedure 9(b), which applies to allegations of fraud or mistake, requires plaintiffs to allege the circumstances constituting fraud with particularity.  However, "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[43]

*Second*, the Private Securities Litigation Reform Act ("PSLRA") provides that, in actions alleging securities fraud, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of

---

[40]     *Id.* at 679.

[41]     *Id.* at 678.

[42]     *Id.* (quotation marks omitted).

[43]     Fed. R. Civ. P. 9(b).

mind."[44]   In the Second Circuit, plaintiffs may meet the requirements of the

PSLRA by "alleging facts (1) showing that the defendants had both motive and

opportunity to commit the fraud or (2) constituting strong circumstantial evidence

of conscious misbehavior or recklessness."[45]

### C.    Leave to Amend

Whether to permit a plaintiff to amend its complaint is a matter

committed to a court's "sound discretion."[46]   Federal Rule of Civil Procedure 15(a)

provides that leave to amend a complaint "shall be freely given when justice so

requires."[47]   "When a motion to dismiss is granted, the usual practice is to grant

leave to amend the complaint."[48]   In particular, it is the usual practice to grant at

least one chance to plead fraud with greater specificity when a complaint is

---

[44]      15 U.S.C. § 74u-4(b)(2).

[45]      *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir.
2007) (citing *Ganino v. Citizens United Co.*, 228 F.3d 154, 168–69 (2d Cir. 2000)).

[46]      *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir.
2007).

[47]      Fed. R. Civ. P. 15(a).

[48]      *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).

dismissed under Rule 9(b).[49]  Leave to amend should be denied, however, where the proposed amendment would be futile.[50]

## IV.   APPLICABLE LAW

### A.   The Securities Act Claims

#### 1.   Section 11 Standard

Section 11 provides purchasers of registered securities with strict liability protection where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."[51]  To establish a prima facie claim under Section 11, "[a] plaintiff need only plead a material misstatement or omission in the registration statement."[52]  Liability is limited, however, to certain statutorily enumerated parties:

---

[49]     *See ATSI,* 493 F.3d at 108.

[50]     *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 87–88 (2d Cir. 2002).

[51]     15 U.S.C. § 77k(a) (1998).

[52]     *City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 424 (S.D.N.Y. 2011) (quoting *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006), *abrogated on other grounds,* 574 F.3d 29 (2d Cir. 2009)).

> (1) signatories of the registration statement; (2) directors or partners of the issuer at the time of filing; (3) persons consenting to be named as about to become a director or partner; (4) accountants or other experts consenting to be named as preparing or certifying part of the registration statement; and (5) underwriters of the security at issue.[53]

The statute provides an affirmative defense for experts who can prove that, after reasonable investigation, they honestly and reasonably believed that the portion of the registration statement they prepared or certified was free from material misstatements or omissions.[54] The statute provides a similar affirmative defense for non-experts, such as underwriters, who reasonably relied on the accuracy of expert reports or valuations contained in the registration statement.[55]

## 2. Section 12(a)(2) Standard

Section 12(a)(2) holds any person liable who "offers or sells a security" by means of a materially false or misleading "prospectus or oral communication."[56] The elements of a prima facie claim under Section 12(a)(2) are:

> (1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication';

---

[53]    *In re Lehman Bros. Mortg.-Backed Secs. Litig.*, 650 F.3d 167, 175 (2d Cir. 2011) (citing 15 U.S.C. § 77k(a)).

[54]    *See* 15 U.S.C. § 77k(b)(3)(B).

[55]    *See id.* § 77k(b)(3)(C).

[56]    *See id.* § 77*l*(a)(2).

13

> and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'[57]

A "statutory seller" is defined as a person who either passes title to the plaintiff for value or successfully solicits the purchase, "motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner."[58]

### 3.    Loss Causation

Sections 11 and 12 shield Defendants from liability for any portion of the Plaintiffs' damages not caused by the Defendants' misrepresentations or omissions.[59]

---

[57]    *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (quoting 15 U.S.C. §77*l* (a)(2)).

[58]    *Capri v. Murphy,* 856 F.2d 473, 478 (2d Cir. 1988) (citing *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)) (applying *Pinter* standard to 12(a)(2) claims).

[59]    *See* 15 U.S.C. § 77k(e) (providing that, "[I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement[] with respect to which his liability is asserted . . . such portion of or all such damages shall not be recoverable"); *Id.* § 77*l* (b) ("[I]f the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) of this section represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication[] with respect to which the liability of that person is asserted . . . then such portion or amount, as the case may be, shall not be recoverable.").

The burden of proving such negative causation rests on the Defendants.[60]

### 4.    When Rule 9(b) Applies to Section 11 and 12 Claims

While fraud is not an element of a claim under Section 11 or 12, the

Second Circuit has held that "the heightened pleading standard of Rule 9(b) applies

to Section 11 and Section 12(a)(2) claims "insofar as the claims are premised on

allegations of fraud," especially where "the wording and imputations of the

complaint are classically associated with fraud."[61]   Bare disclaimers are insufficient

to shield any claims that actually sound in fraud from the requirements of Rule

9(b).[62]   However, Plaintiffs may "plead Section 10(b) fraud and Section 11

negligence claims as alternatives, as long as the complaint is organized in a way

that allows the court to determine which allegations support which claim."[63]

---

[60]     *See id.* §§ 77k(e), 77*l* (b).

[61]     *Rombach v. Chang*, 355 F.3d 164, 171–72 (2d Cir. 2004).

[62]     *See In re Refco, Inc. Secs. Litig.*, 503 F. Supp. 2d 611, 633 (S.D.N.Y. 2007); *In re Axis Capital Holdings Ltd. Secs. Litig.*, 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006); *In re JP Morgan Chase Secs. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005).

[63]     *Wallace v. IntraLinks*, No. 11 Civ. 8861, 2013 WL 1907685, at *11 (S.D.N.Y. May 8, 2013) (citing *Refco*, 503 F. Supp. 2d at 632).   *Accord In re NovaGold Res. Inc. Secs. Litig.*, 629 F. Supp. 2d 272, 290 (S.D.N.Y. 2009) ("Defendants identify no controlling authority finding that Securities Act allegations, when plead entirely separately from Exchange Act allegations, and accompanied by a disclaimer explaining that they sound in negligence, in fact sound in fraud.").

"[U]nless a plaintiff specifically pleads a claim of fraud, a claim under Section 11 of the Securities Act is not subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  Rather, it is subject to the 'short and plain statement' requirements of Rule 8(a), and thus places a relatively minimal burden on a plaintiff."[64]

### B.    Section 10(b) and Rule 10b-5 of the Exchange Act

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance. . . ."[65]  Rule 10b-5, promulgated thereunder, makes it illegal to "make any untrue statement of a material fact or to omit to state a material fact . . . in connection with the purchase or sale of any security."[66]  To sustain a claim for securities fraud under Section 10(b), "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the

---

[64]    *Employees' Ret. Sys. of the Virgin Islands v. JP Morgan Chase & Co.*, 804 F. Supp. 2d 141, 151 (S.D.N.Y. 2011) (quotations and citations omitted). *Accord Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (quoting *Litwin v. Blackstone Grp. LP*, 634 F.3d 706, 716 (2d Cir. 2011)).

[65]    15 U.S.C. § 78j(b) (1934).

[66]    17 C.F.R. § 240.10b-5 (1951).

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[67]  The required level of scienter is either "intent to deceive, manipulate, or defraud"[68] or "reckless disregard for the truth."[69] Claims under Section 10(b) must meet the heightened pleading standards of both Rule 9(b) and the PSLRA.[70]

### C.    Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act creates a cause of action against "control persons" of the primary violator.[71]  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the

---

[67]    *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

[68]    *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

[69]    *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("By reckless disregard for the truth, we mean 'conscious recklessness— i.e., a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*.'" (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000))).

[70]    *See supra*, Part III.B.

[71]    *See* 15 U.S.C. § 78t(a).

controlled person's fraud."[72]  Where there is no primary violation, there can be no "control person" liability under Section 20(a).[73]

## V.    DISCUSSION

### A.    Sections 11 and 12 of the Securities Act

#### 1.    Auditor Defendants

##### a.    Liability Based on the Audit Opinions

Section 11 creates liability for experts such as accountants who certified any part of the Registration Statement containing actionably false information, or who "prepared any report or valuation used in connection with the registration statement."[74]  With respect to "matters of belief and opinion," however, Section 11 liability attaches only where the statement was "both objectively false and disbelieved by the defendant at the time it was expressed."[75]  The above

---

[72]    *ATSI*, 493 F.3d at 108.

[73]    *See id.*; *see also In re eSpeed, Inc. Secs. Litig.*, 457 F. Supp. 2d 266, 297–98 (S.D.N.Y. 2006).

[74]    15 U.S.C. 77k(a)(4) (holding liable "every accountant . . . who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement").

[75]    *Fait*, 655 F.3d at 110 (requiring subjective disbelief to find Section 11 and 12 liability for valuations of goodwill and the adequacy of loan loss reserves). *Accord Freidus v. Barclays Bank PLC*, — F. 3d —, No. 11 Civ. 2665, 2013 WL 4405291, at *6 (2d Cir. Aug. 19, 2013) (applying *Fait's* subjective disbelief

standard applies where the statements at issue are "inherently subjective" as opposed to "matters of objective fact."[76]

The Auditor Defendants contend that their Audit Opinions are statements of opinion subject to *Fait's* subjective disbelief standard.[77]  Although they concede that they consented to the inclusion of their Auditor Opinions in the Registration Statement, the Auditor Defendants claim that they did not "certify" the truth of the financial statements audited and thus cannot be held liable for the information contained therein.[78]  They move to dismiss on the grounds that

---

requirement to subjective financial valuations).

[76]     *Fait*, 655 F.3d at 110 ("[P]laintiff's allegations regarding goodwill do not involve misstatements or omissions of material fact, but rather a misstatement regarding Regions' opinion.  Estimates of goodwill depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact . . . . In other words, the statements regarding goodwill at issue here are subjective ones rather than 'objective factual matters.'"); *Id.* at 113 (applying subjective disbelief standard to statements concerning the adequacy of loan loss reserves, since "Plaintiff does not point to an objective standard for setting loan loss reserves" and "[s]uch a determination is inherently subjective, and like goodwill, estimates will vary depending on a variety of predictable and unpredictable circumstances").

[77]     *See* Memorandum of Ernst & Young LLP in Support of Its Motion to Dismiss ("E&Y Mem.") at 6; Memorandum of Law in Support of Motion to Dismiss by Defendant PricewaterhouseCoopers LLP ("PwC Mem.") at 7.

[78]     *See* Reply Memorandum of Law of Ernst & Young LLP in Support of its Motion to Dismiss ("E&Y Reply Mem.") at 7; Reply Memorandum of Law in Support of Motion to Dismiss by Defendant PricewaterhouseCoopers ("PwC Reply Mem.") at 2.

19

Plaintiffs have not alleged that the Auditor Defendants subjectively disbelieved the Audit Opinions.[79]

Plaintiffs argue that the Audit Opinions effectively certified the accuracy of OSG's financial statements and rendered the Auditors strictly liable under Section 11 for the actionably false information contained therein.[80]  Thus, Plaintiffs argue, they need not allege subjective falsity under *Fait*.[81]

In this case, the alleged misstatements and omissions contained in the Registration Statement center upon the failure to disclose OSG's significant tax liabilities under Section 956.  Although the Internal Revenue Code is complex and

---

[79]     *See, e.g.,* CAC ¶ 92 (plaintiffs "affirmatively state that they do not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent").

[80]     *See* Pl. Opp. at 30–32.

[81]     *See id.* at 31 n.14.  Plaintiffs also argue that they need not show subjective disbelief if the Auditor Defendants lacked a *reasonable* belief in the truth of their statements.  *See* Lead Plaintiff's Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Amended Complaint ("Pl. Opp.") at 32 ("Plaintiffs do not need to plead that [defendants] acted with the scienter of intent or recklessness.  Rather . . . to allege that an auditor opinion is a misrepresentation, a complaint must show that the statement in question is grounded on a specific factual premise that is false, and that the speaker did not 'genuinely or *reasonably* believe' it." (citing *In re Longtop Fin. Techs. Ltd. Secs. Litig.*, 910 F. Supp. 2d 561, 580 (S.D.N.Y. 2012))).  However, despite any dicta to the contrary, subjective disbelief is required to allege a Section 11 violation based on inherently subjective statements, not "unreasonable belief."  *See Fait,* 655 F.3d at 110.

often gives rise to debate, it cannot be said that statements of income tax liability are "subjective valuations."[82]  There is in fact an objective measure of income tax liability, as evidenced by OSG's public declaration that its financial statements should "no longer be relied upon,"[83] as well as the IRS's Proof of Claim in OSG's bankruptcy proceedings.

Defendants argue that the entire Audit Opinion is a statement of belief or opinion under *Fait* because it contains the word "opinion" in its title, and prefaces its conclusions with the phrase "in our opinion."[84]  However, it would render Section 11 meaningless to find that an accountant's liability turns on this

---

[82]     *Friedus,* 2013 WL 4405291, at *6 (applying subjective disbelief standard to "financial valuation models which are inherently subjective," including writedowns of mortgage-related assets).  Even prior to *Fait*, courts in this district have required allegations of disbelief where the statements involved inherently subjective matters – such as real estate appraisals, securities ratings, and valuations of complex securitized holdings.  *Lighthouse Fin. Grp. v. The Royal Bank of Scotland Grp.*, PLC, No. 11 Civ. 398, 2012 WL 4616958, at *11 (S.D.N.Y. Sept. 28, 2012) (valuations of complex securitized holdings); *Tsereteli v. Residential Asset Securitization*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010) (securities ratings by rating agencies); *In re IndyMac Mortg.-Backed Secs. Litig.*, 718 F. Supp. 2d 495 (S.D.N.Y. 2010) (real estate appraisals); *In re Global Crossing, Ltd. Secs. Litig.*, 313 F. Supp. 2d 189 (S.D.N.Y. 2003) (individual's personal opinion that a transaction is "fair").  The applicability of a tax provision, however, does not fall into the same "inherently subjective" category.

[83]     CAC ¶ 41.

[84]     *See* E&Y Reply Mem. at 7; PwC Reply Mem. at 6.

semantic choice.[85]  Auditors may not shield themselves from liability under Section 11 merely by using the word "opinion" as a disclaimer.  Plaintiffs are only required to allege subjective disbelief where the statements concern "inherently subjective" matters rather than "matters of objective fact."[86]

> The Auditor Defendants' broad reading of *Fait* would undercut the statutory language establishing strict liability for accountants based on the materials they have certified.  It is difficult to imagine what Congress might have meant by an accountant's certification if not an audit affirming the accuracy of the documents in question.[87]  Here, the Audit Opinions allegedly endorsed the accuracy of the tax

---

[85]    PwC argues that when Section 11 was enacted, the common practice of auditors was to "certify" financial statements, whereas the modern practice is to merely issue "opinions" on the accuracy of those financial statements.  PwC Reply Mem. at 7 n.3.

[86]    *Fait*, 655 F.3d at 110, 113.

[87]    Courts in this district have consistently found that accountants bear Section 11 liability for the portions of a Registration Statement that they audited. *See In re Wachovia Equity Secs. Litig.*, 753 F. Supp. 2d 326, 378–79 (S.D.N.Y. 2011) (finding possible Section 11 liability against auditors based on financial statements they audited as well as statements in their audit reports); *Amorosa v. Ernst & Young LLP*, 672 F. Supp. 2d 493, 513 (S.D.N.Y. 2009), *aff'd*, 409 Fed. Appx. 412 (2d Cir. 2011) (auditors subject to Section 11 liability for any actionable misstatements in financial statements they audited); *In re WorldCom, Inc. Secs. Litig.,* 352 F. Supp. 2d 472, 492 (S.D.N.Y. 2005) (auditor's opinion that company's "financial statements present fairly, in all material respects, the financial position of the company" constituted certification of "each material statement within the financial statements and to the financial statements taken as a whole," and thus subjected auditor to strict liability under Section 11); *In re Global*

liabilities disclosed in OSG's financial statements.  Because those statements of tax liability are not "inherently subjective"[88] valuations, Plaintiffs have adequately stated a claim against the Auditor Defendants under Section 11 without alleging subjective disbelief.

The Auditor Defendants will have the opportunity to establish a "due diligence" defense by showing that their interpretation of Section 956 was reasonable and that they conducted a reasonably diligent audit.[89]  At this stage, however, the Auditor Defendants' motions to dismiss are denied.

### b.    Lack of Material Misstatement Against E&Y

Defendant E&Y separately moves to dismiss the Section 11 claims because Plaintiffs do not allege any misstatement in OSG's tax liability from 2007 or 2008, the only two years during the Class Period for which E&Y performed an

---

*Crossing, Ltd. Secs. Litig.,* 322 F. Supp. 2d 319, 348–49 (S.D.N.Y. 2004) (upholding Section 11 claims against outside auditor for having audited allegedly false and misleading financial statements); *Escott v. BarChris Constr. Corp.,* 283 F. Supp. 643, 683–84 (S.D.N.Y. 1968) (finding accountants subject to Section 11 liability for balance sheets and earnings statements that they audited and approved in their auditors' report). Although these cases were decided prior to *Fait,* their interpretation of what constitutes "certification" under Section 11 is instructive.

[88]    *Fait*, 655 F.3d at 110.

[89]    *See* 15 U.S.C. 77k(b)(3)(B).

audit.[90]  Plaintiffs admit that the IRS does not seek back taxes from those years.[91]

Thus, E&Y asserts, Plaintiffs have not alleged a material misstatement or omission

against E&Y based on its Audit Opinion or the 2007–2008 financial statements.

Plaintiffs respond that OSG's financial statements from 2007 and 2008

"were required to include all liabilities as of those dates," including the significant

tax liabilities that had accrued in 2004 and 2005.[92]  Assuming Plaintiffs' allegations

are correct that the financial statements in question were required to disclose past

income tax liability and did so inaccurately or incompletely, then the 2007 and 2008

financial statements may in fact contain material misstatements or omissions giving

rise to Section 11 liability.  Thus, Plaintiffs have adequately stated a claim for relief

on the basis of E&Y's audits despite the fact that no new income tax liability

accrued during fiscal years 2007 or 2008.

### 2.    Underwriter Defendants

### a.    Reliance Defense

---

[90]     *See* E&Y Mem. at 4–6.

[91]     *See* CAC ¶¶ 46–47.

[92]     Pl. Opp. at 34.

24

Section 11 provides an affirmative defense for underwriters who "shall sustain the burden of proof"[93] that, with respect to any expert report incorporated into the registration statement, the underwriter "had no reasonable ground to believe and did not believe" that the report contained misstatements or omissions of material fact.[94]  In rare cases it may be appropriate for courts to dismiss a claim on the basis of an affirmative defense, but only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief"[95] and "the complaint itself establishes the facts necessary to sustain defendant's . . . defense."[96]

The Underwriter Defendants assert that their reliance on the audited financial statements was per se reasonable, given that Plaintiffs have not alleged

---

[93]     15 U.S.C. § 77k(b).

[94]     *Id.* § 77k(b)(3)(C).  *See also id.* § 77*l* (a)(2) (providing affirmative defense where defendant "did not know, and in the exercise of reasonable care could not have known, of such untruth or omission" contained in the prospectus or oral communication).

[95]     *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (citing *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992)).

[96]     *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998).

any "red flags" that might have put the Underwriter Defendants on notice.[97]

Because this defense appears on the face of the Complaint, they argue, the claims

must be dismissed.[98]

  Despite the Underwriter Defendants' contention that reliance is per se

reasonable in the absence of red flags, no such rule of law exists.  Most of the

Underwriter Defendants' cases address the reliance defense in the context of a

motion for summary judgment, not a motion to dismiss.[99]  One case even

acknowledges that the reasonableness of reliance is "generally a fact issue, rarely

suitable for summary judgment, let alone a motion to dismiss."[100]  Plaintiffs have

adequately alleged that Defendants served as underwriters in a securities offering

that employed a materially false or misleading registration statement.  Plaintiffs are

not required to additionally plead red flags or facts negating the Underwriters'

---

[97] *See* The Underwriter Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Complaint ("Underwriter Mem.") at 8–11.

[98] *See id.*

[99] *See In re Software Toolworks, Inc. Secs. Litig.* 50 F.3d 615, 623 (9th Cir. 1994)*; In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1421 (9th Cir. 1994); *Phillips v. Kidder*, 933 F. Supp. 303, 323–24 (S.D.N.Y. 1996).

[100] *In re Countrywide Fin. Corp. Secs. Litig.*, 588 F. Supp. 2d 1132, 1175 (C.D. Cal. 2008).

defense.  Thus, the Underwriter Defendants' motion to dismiss on this ground is denied.

### b.    Loss Causation

The Underwriter Defendants further allege that they are entitled to dismissal because they cannot have caused the Plaintiffs' losses.  The Underwriter Defendants assert that their loss causation defense is "apparent on the face of the complaint" because the magnitude of tax liability asserted to have arisen during the Offering Period is "de minimis" in relation to OSG's overall liability prior to filing for bankruptcy.[101]  Specifically, the Underwriter Defendants contend that only two percent of OSG's total tax liability arose during the Offering Period, and such a small amount cannot have caused the drop in value of the notes and OSG's subsequent bankruptcy as a matter of law.[102]

The Underwriter Defendants misconstrue the loss causation defense in several ways.  *First,* the defense is proportional, and only applies to that portion of the damages for which the defendant establishes negative causation.[103]  Because the

----

[101]    The Underwriter Defendants' Reply Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Complaint ("Underwriter Reply Mem.") at 12–13.

[102]    *See id.* at 13.

[103]    *See* 15 U.S.C. § 77k(e) ("[I]f the defendant proves that *any portion or all of such damages* represents other than the depreciation in value of such security

Underwriter Defendants cannot allege that *none* of Plaintiffs' damages are causally connected to the tax liability from the Offering Period, Plaintiffs' claims cannot be dismissed at this stage.

*Second,* "it is the defendant who bears the burden of demonstrating that something other than the misstatement at issue caused plaintiff's loss."[104]  Plaintiffs dispute Defendants' characterization of the tax liability attributable to the Offering Period,[105] and plausibly allege that such undisclosed tax liability was at least a partial cause of the drop in the value of OSG securities.  Because it is not clear whether and to what extent the loss causation defense applies at this stage, the Underwriter Defendants' motion to dismiss is denied.

### 3.    Individual Defendants

---

resulting from such part of the registration statement[] with respect to which his liability is asserted . . . *such portion of or all such damages* shall not be recoverable.") (emphasis added); *Id.* § 77*l*(b) ("[I]f the person who offered or sold such security proves that *any portion or all* of the amount recoverable under subsection (a)(2) of this section represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication[] with respect to which the liability of that person is asserted . . . then *such portion or amount, as the case may be*, shall not be recoverable.") (emphasis added).

[104]    *Flag Telecom*, 574 F.3d at 36.  *See also* 15 U.S.C. § 77k(e) ("if the defendant proves. . ."); *id.* § 77*l* (b) ("if the person who offered or sold such security proves. . .").

[105]       *See* Pl. Opp. at 29.

28

The Individual Defendants argue that the Section 12 claims against them must be dismissed because Plaintiffs have not established that the Individual Defendants are "statutory sellers."[106]  Given that Plaintiffs do not allege a direct sale of securities by the Individual Defendants, they must show that the Individual Defendants "successfully solicit[ed]" the purchase of securities, and were "motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner."[107]  The Individual Defendants contend that merely signing a registration statement does not constitute "solicitation," and that the Company's proceeds from the Offering do not constitute the Individual Defendants' "own financial interests."[108]  Thus, the Individual Defendants argue, they cannot be held liable under Section 12.

Plaintiffs cite various cases for the proposition that signing a registration statement or prospectus constitutes solicitation.[109]  However, more

---

[106]   *See Morgan Stanley*, 592 F.3d at 359 (only "statutory sellers" are subject to liability under Section 12).

[107]   *Capri,* 856 F.2d at 478 (citing *Pinter,* 486 U.S. at 647) (applying *Pinter* standard to Section 12(a)(2) claims).

[108]   *See* Memorandum of Law in Support of the Individual Defendants' Motion to Dismiss the Consolidated Amended Complaint ("Indiv. Mem.") at 24–25.

[109]   *See Briarwood Inv. Inc. v. Care Inv. Trust Inc.*, No. 07 Civ. 8159, 2009 WL 536517, at *4 (S.D.N.Y. Mar. 4, 2009); *Flag Telecom,* 352 F. Supp. 2d

recent cases from this district have come to the opposite conclusion.[110]   Although the Second Circuit has not directly addressed the issue, several Courts of Appeals have held that merely signing the registration statement or prospectus does not constitute solicitation.[111]   This reasoning is consistent with the Supreme Court's

<hr/>

at 454; *Steed Fin. LDC v. Nomura Secs. Int'l, Inc.*, No. 00 Civ. 5058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001); *In re APAC Teleservices, Inc. Secs. Litig.*, No. 97 Civ. 9145, 1999 WL 1052004, at *11 (S.D.N.Y. Nov. 19, 1999).

[110]     *See City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12 Civ. 0256, 2013 WL 775434, at *9 (S.D.N.Y. Feb. 28, 2013) (dismissing Section 12 claim where plaintiffs claimed "solicitation by the director defendants based on the fact that they signed the registration statements"); *McKenna*, 2012 WL 1131935, at *18 (same); *Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010) ("While Section 11 expressly imposes liability upon every signer of the registration statement, Section 12 does not do so. Plaintiffs' position would render this distinction a nullity and is, in any event, inconsistent with *Pinter's* statement that Congress did not intend to impose liability under Section 12 'for mere participation in unlawful sales transactions.'" (citing *Pinter*, 486 U.S. at 650)).   *Compare In re Vivendi Universal, S.A. Secs. Litig.*, 381 F. Supp. 2d 158, 187 (S.D.N.Y. 2003) (complaint adequately alleged that corporate CEO was statutory seller where he "actively participated in the preparation of the allegedly misleading or false registration statement" and "regularly appeared before investors and financial news agencies to tout the financial vitality of Vivendi and thereby encourage investors to purchase Vivendi's securities").

[111]     *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) ("the seller must, at a minimum, directly communicate with the buyer"); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996), *superceded by statute on other grounds,* 15 U.S.C. § 78u–4(b)(1)–(2) ("[N]either involvement in preparation of a registration statement or prospectus nor participation in 'activities' relating to the sale of securities, standing alone, demonstrates the kind of *relationship between defendant and plaintiff* that could establish statutory seller status."); *Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989) (requiring "direct and active participation in the solicitation of the immediate sale to hold the issuer

conclusion in *Pinter* that Congress did not intend to impose Section 12 liability on "participants collateral to the offer or sale," or those whose conduct constituted merely "substantial participation" in the sale.[112]

In this case, however, Plaintiffs allege that the Individual Defendants did more than sign the Registration Statement.  The Complaint states that the Individual Defendants "prepar[ed] the defective and inaccurate Prospectus and participat[ed] in efforts to market the Offering to investors."[113]  These allegations go beyond the bare assertion that the Individual Defendants signed the Registration Statement, and suggest the plausible inference that the Individual Defendants played an active role in marketing the securities to Plaintiffs.[114]

In addition to pleading active solicitation, Plaintiffs must further plead that the Individual Defendants were motivated "at least in part by a desire to serve [their] own financial interests or those of the securities owner."[115]  According to the

---

liable" under 12(a)(2)).

[112]    *Pinter*, 486 U.S. at 650.

[113]    CAC ¶ 108.

[114]    *See In re IndyMac Mortg.-Backed Secs. Litig.*, 718 F. Supp. 2d 495, 502 (S.D.N.Y. 2010) (pleadings sufficient where plaintiffs alleged that defendants "solicited, sold and distributed" the securities, and also "promoted and sold" the securities for personal gain).

[115]    *Pinter*, 486 U.S. at 647.

Complaint, "Defendants solicited such purchases for their personal financial gain, as OSG received over $289 million in proceeds."[116]   Defendants argue that the Company's financial gain does not necessarily constitute personal gain for its officers and directors.[117]   Indeed, personal financial gain is clearest in cases where the defendant receives a commission or other direct remuneration from the sale.[118] That said, many courts have taken a more expansive view of financial gain that includes increased compensation tied to share price or company performance.[119]   In

---

[116]     Pl. Opp. at 22 (citing CAC ¶¶ 42, 104).

[117]     *See In re Scottish Re Grp. Secs. Litig.*, 524 F. Supp. 2d 370, 400 (S.D.N.Y. 2007) (proceeds from sale of securities constituted financial gain to the *issuer* rendering *issuer* a statutory seller).

[118]     *See, e.g., Independent Energy Holdings PLC Secs. Litig.*, 154 F. Supp. 2d 741, 751, 760–61 (S.D.N.Y. 2001), *abrogated on other grounds by In re Initial Pub. Offering Secs. Litig.*, 544 F. Supp. 2d 277 (S.D.N.Y. 2008) ("The allegation of financial gain in the SAC — that these Individual Defendants stood to gain more than $30 million in capital from the Secondary Offering — is sufficient to meet the second prong.").

[119]     *See Meadows v. SEC*, 119 F.3d 1219, 1226 (5th Cir. 1997) (finding financial gain where, although receiving no salary or commission from the sale, defendant was shareholder of issuing companies and "thereby stood to benefit personally from the additional investments he solicited"); *Capri*, 856 F.2d at 478 (finding defendants to be statutory sellers of the company's securities based on their stake in the company as general partners); *Vivendi,* 381 F. Supp. 2d at 187 (finding CEO to be statutory seller where salary and bonuses were tied to Company's revenues); *In re Keegan Mgmt. Co. Secs. Litig.*, No. 91–20084, 1991 WL 253003, at *8 (N.D. Cal. Sept. 10, 1991) (finding that officers benefitted financially from securities sales by protecting their positions and compensation, as well as enhancing the value of their own holdings in company's securities, and

fact, although the defendant in *Pinter* received no commission, the Supreme Court remanded for the district court to determine whether he nonetheless had a financial interest in the sale.[120]  Here, Plaintiffs allege that the Individual Defendants stood to gain personally from the Offering by virtue of their continued positions and salaries, since the survival of the Company was at stake.[121]  Such benefits are sufficient to constitute the Individual Defendants' "own financial interests" under *Pinter*.

Moreover, a defendant need not act out of personal financial motivation if he acts to serve the interests of the securities owner.[122]  Given their

---

noting that plaintiffs need only allege "that the stock sales improved defendants' financial position," rather than alleging "that the sale translated into an immediate increase in defendants' wealth"); *Flournoy v. Peyson*, 701 F. Supp. 1370, 1379 n.12 (N.D. Ill. 1988) (noting that defendant need not receive proceeds from the sales, given that "the sales promoted the viability of [the Company], in which [defendant] had a direct stake").

[120]    *See Pinter,* 486 U.S. at 655.

[121]    *See* Pl. Opp. at 42 ("the very existence of the Company was at stake, and by extension Arntzen and Itkin's lucrative positions with the company"). Although the above allegation was made in the context of Plaintiffs' Section 10(b) claims against Arntzen and Itkin, it equally supports the inference that all the Individual Defendants stood to lose their positions and/or salaries with the Company if the Offering failed.

[122]    *See Pinter*, 486 U.S. at 655 ("[A] person who solicits the buyer's purchase in order to serve the financial interests of the owner may properly be liable under Section 12(1) without showing that he expects to participate in the benefits the owner enjoys."); *SEC v. Tuchinsky*, No. 89–6488–CIV, 1992 WL

positions as officers and directors of the Company, the Individual Defendants likely participated in the Offering in order to benefit OSG — if not themselves. Therefore, Plaintiffs have adequately alleged that the Individual Defendants were motivated by either their own financial interests or those of the securities owner.

### 4.    Arntzen and Itkin

Defendants Arntzen and Itkin claim that Plaintiffs' Section 11 and 12 claims against them are subject to the heightened pleading standard of Rule 9(b) because the claims "sound in fraud."[123]   Specifically, Plaintiffs accuse the Individual Defendants of "false and misleading representations and omissions,"[124] and repeatedly state that they "knew or should have known of the material misstatements or omissions."[125]   According to Defendants, such language is "not limited to the Section 10(b) claim; [it] permeate[s] other parts of the Amended Complaint as well."[126]

---

226302, at *4 (S.D. Fl. June 29, 1992) ("Cannon admits that he acted on behalf of SW Computer in his capacity as president . . . . It is therefore unnecessary to show that he also had his own financial interests at heart in orchestrating the sale of ICOM stock.").

[123]    Indiv. Mem. at 22.

[124]    *Id.* at 21–22 (citing CAC at ¶¶ 17, 19(c), 57, 59, 61).

[125]    *Id.* at 22 (citing CAC at ¶¶ 95, 56, 93, 108).

[126]    *Id.* at 21.

Defendants point to *Rombach v. Chang,* in which the Second Circuit held that phrases like "inaccurate and misleading," "untrue statements of material facts" and "materially false and misleading written statements" were allegations of fraud subject to Rule 9(b).[127]  However, the above passage "presents something of a conundrum"[128] for lower courts, because the language cited in *Rombach* tracks verbatim the elements of a Section 11 claim as set out in the statute.[129]  Applied literally, the passage "would seem to require applying a 9(b) standard to all claims under § 11."[130]  However, "[i]t is clear that the Second Circuit did not intend *Rombach* as an instruction that all § 11 pleadings should be subjected to the Rule 9(b) standard."[131]  To the contrary, *Rombach* provides that Rule 9(b) only applies to Section 11 claims on a case-by-case basis where they are "premised on allegations

---

[127]    *Rombach,* 355 F.3d at 171.

[128]    *Refco,* 503 F. Supp. 2d at 631.

[129]    *See* 15 U.S.C. § 77k(a) (providing liability where "any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading"); *Wallace,* 2013 WL 1907685, at *11 ("allegations that statements were 'materially false or misleading' and contained 'untrue statements of material fact' do not necessarily sound in fraud because such allegations simply track the language of Section 11 and 12(a)(2)"); *Wachovia,* 753 F. Supp. 2d at 375 (same).

[130]    *Refco,* 503 F. Supp. 2d at 631.

[131]    *Id.* at 632.

of fraud," and "the wording and imputations of the complaint are classically associated with fraud."[132]

In this case, the Section 11 claims are not in fact "premised on allegations of fraud."[133]  As discussed above, phrases like "materially false and misleading" simply track the language of the statute and do not necessarily sound in fraud.[134]  Similarly, Plaintiffs' assertion that, "in the exercise of reasonable care, the Individual Defendants knew or should have known"[135] of the misstatements or omissions does not constitute an allegation of fraud, but rather of negligence.  In fact, Plaintiffs repeatedly disclaim any allegation of "scienter or fraudulent intent" in connection with their Securities Act claims.[136]  Finally, the Complaint addresses

---

[132]   *Rombach*, 355 F.3d at 171–72.  *Accord Refco,* 503 F. Supp. 2d at 632 (Rule 9(b) applies where the "gravamen of the complaint is plainly fraud"); *Expedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 269 (S.D.N.Y. 2004) ("[A] claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim.").

[133]   *Rombach*, 355 F.3d at 171–72.

[134]   *See* Pl. Opp. at 19; *Wallace,* 2013 WL 1907685, at *11; *Wachovia,* 753 F. Supp. 2d at 375 (same).

[135]   Indiv. Mem. at 22 (citing CAC ¶ 95).

[136]   CAC ¶¶ 92, 105, 113.  Note that bare disclaimers alone are insufficient to shield claims that otherwise sound in fraud.  *See Refco,* 503 F. Supp. 2d at 633; *Axis Capital Holdings*, 456 F. Supp. 2d at 598; *JP Morgan*, 363 F. Supp. 2d at 635.

the Securities Act claims and the Exchange Act claims in completely different sections.  Plaintiffs may "plead Section 10(b) fraud and Section 11 negligence claims as alternatives, as long as the complaint is organized in a way that allows the court to determine which allegations support which claim."[137]

Defendants further argue that Plaintiffs' Securities Act claims are subject to Rule 9(b) because they are based on the same facts as the Section 10(b) claims.[138]  However, "the fact that the alleged misstatements supporting the Section 11 and 12(a)(2) claims are the same as those in the Section 10(b) claims is not dispositive."[139]

---

[137]    *Wallace*, 2013 WL 1907685, at \*11 (citing *Refco,* 503 F. Supp. 2d at 632).  *Accord City of Roseville*, 814 F. Supp. 2d at 424 n.12 ("[c]omplete isolation of Securities Act claims is not necessary" as long as the complaint's structure generally separates the allegations of fraud from the Section 11 and 12 claims); *NovaGold*, 629 F. Supp. 2d at 290 ("Defendants identify no controlling authority finding that Securities Act allegations, when plead entirely separately from Exchange Act allegations, and accompanied by a disclaimer explaining that they sound in negligence, in fact sound in fraud.").

[138]    *See* Indiv. Mem. at 21 (citing *Caiafa v. Sea Containers Ltd.*, 331 Fed. App'x 14, 16 (2d Cir. 2009) (applying Rule 9(b) because "plaintiffs' Section 11 claim relies on the same factual allegations that served as a basis for their Section 10(b) claim")). However, *Caiafa* is an unpublished summary order and includes only one sentence of analysis on the topic.

[139]    *Wallace,* 2013 WL 1907685, at \*11 (citing *In re IAC/InterActiveCorp. Secs. Litig.,* 695 F. Supp. 2d 109 (S.D.N.Y. 2010)).

Ultimately, "unless a plaintiff specifically pleads a claim of fraud,"[140] Section 11 claims "need not satisfy the heightened particularity requirements of Rule 9(b)"[141] and impose only "'a relatively minimal burden on a plaintiff.'"[142]  The mere act of pleading violations of Sections 10(b), 11, and 12 in the same complaint does not automatically subject the Section 11 and 12 claims to a higher pleading standard.[143]  For the foregoing reasons, the Individual Defendants' motion to dismiss the Section 11 and 12 claims against Arntzen and Itkin is denied.

**B.    Section 10(b) and Rule 10b-5 of the Exchange Act**

**1.    Motive and Opportunity**

To demonstrate motive under the first prong, Plaintiffs must show that defendants "benefitted in some concrete and personal way from the purported

---

[140]    *Employees Ret. Sys.,* 804 F. Supp. 2d at 152.

[141]    *Panther Partners,* 681 F.3d at 120.

[142]    *Id.* (quoting *Litwin*, 634 F.3d at 716).

[143]    To hold otherwise would discourage plaintiffs from bringing Section 10(b) and Section 11 claims in the same lawsuit, which would result in the potential inefficiency of multiple lawsuits.

fraud,"[144] such as the opportunity to sell their own shares at artificially inflated

prices[145] or other "concrete benefits."[146]

   The Complaint alleges that Arnzen and Itkin perpetrated the fraud in

order to "allow certain Company insiders to collectively sell shares of their

personally-held OSG common stock for gross proceeds of approximately $2.7

million during the Class Period."[147]   Plaintiffs seem to abandon this claim

completely in their Opposition brief.  Even if the argument is not deemed waived,

however, it is unconvincing.  The Complaint did not allege that Arntzen or Itkin

personally traded in OSG securities during the Class Period, or that they benefitted

in any way from the sales of other "insiders."[148]   In fact, there is evidence that

---

[144]   *ECA and Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citing *Novak*, 216 F.3d at 307–08).

[145]   *See Cherry St.,* 573 F.3d at 108–09 (test generally met "'when corporate insiders [are] alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit'") (quoting *Novak*, 216 F.3d at 308).

[146]   *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

[147]   CAC ¶ 191.

[148]   *See Russo v. Bruce*, 777 F. Supp. 2d 505, 518 (S.D.N.Y. 2011) (scienter not established where "the Complaint gives no indication as to why the Individual Defendants would have been motivated to defraud investors in order to enrich others, not themselves"); *eSpeed,* 457 F. Supp. 2d at 289–90 (scienter not established against corporate officer defendants where other insiders sold stock,

Arntzen actually bought shares of OSG stock during the Class Period, which undermines the likelihood that he knew about the company's undisclosed tax liability.[149]

Plaintiffs also allege that Arntzen and Itkin were motivated by a desire to "facilitate OSG's access to much needed capital at a time when the Company was recording hundreds of millions of dollars in annual losses."[150]  However, the Second Circuit has indicated that goals "'possessed by virtually all corporate insiders,' such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation,"[151] are not sufficient to allege a personal motive under Section 10(b).

---

but they — despite being "well-positioned to reap profits from insider knowledge" — did not).  *Cf. ECA*, 553 F.3d at 198 (motive generally established "when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit").

[149]    *See* Indiv. Reply Mem. at 2.  Because this information is publicly available on Arntzen's Form 4, it is properly considered on a motion to dismiss. *ATSI*, 493 F.3d at 98 (courts may consider "public disclosure document[] filed with the SEC").

[150]    CAC ¶ 187.

[151]    *Cherry St.*, 573 F.3d at 109.  *Accord ECA*, 553 F.3d at 198; *Kalnit*, 264 F.3d at 139; *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (if the desire to inflate stock price were sufficient to constitute scienter, "virtually every company in the United States that experiences a downturn in stock price could be

Plaintiffs concede that "the need to raise capital does not ordinarily constitute an adequate motive under the motive and opportunity prong of the scienter test," but argue that in this case the Offering was "critical to OSG's very survival, as well as to the survival of Arntzen's and Itkin's jobs."[152]  In such circumstances, Plaintiffs allege, "the need for capital satisfies the motive requirement."[153]  However, the cases cited by Plaintiffs do not establish any exception to the general law in this Circuit.[154]  Furthermore, "[t]o allege a motive . . . a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold."[155]  Indeed, even "the desire to maintain a high credit rating to raise money that is 'desperately needed' or necessary 'to protect the

---

forced to defend securities fraud actions"); *Gissin v. Endres,* 739 F. Supp. 2d 488, 512 (S.D.N.Y. 2010) (finding company's desire to "complete the offering" too generalized to establish scienter).

[152]   Pl. Opp. at 40–41.

[153]   *Id.* at 42.

[154]   *See In re Cabletron Sys. Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) (finding that allegations of insider trading and fraudulent warehousing activities, along with company's dire need for capital, stated a claim for relief); *In re Initial Pub. Offering Secs. Litig.*, 544 F. Supp. 2d 277, 294 (S.D.N.Y. 2008) (finding that various allegations, including motive to raise capital, supported inference of scienter against *issuer* Defendants).  Note that neither complaint was sustained solely or even primarily based on the desire to raise capital, and *IPO* concerned an issuer defendant instead of officer/director defendants.

[155]   *Kalnit,* 264 F.3d at 139.

very survival' of a company" is "too generalized a motive plead securities fraud."[156]
For the above reasons, Plaintiffs have not alleged a legally sufficient motive for
Arntzen and Ikin to commit securities fraud.

### 2. Strong Circumstantial Evidence

Plaintiffs point to various facts supporting the theory that Arnken and
Itkin might have known or recklessly disregarded the Company's tax liabilities
under Section 956.  Specifically, they contend that Arnzen and Itkin understood
other related tax provisions applicable to the Company[157] and appreciated the
importance of tax policy to OSG's bottom line.[158]  Plaintiffs further argue that the
sheer size of the tax liability, the length of time that it went undisclosed, the

---

[156]   *In re PXRE Grp., Ltd., Secs. Litig.,* 600 F. Supp. 2d 510, 532
(S.D.N.Y. 2009).  *Accord Gissin*, 739 F. Supp. 2d at 499, 512–13 (despite
company's "crippling liquidity problem," desire to complete an offering did not
support inference of scienter); *In re Elan Corp. Secs. Litig.,* 543 F. Supp. 2d 187,
216 (S.D.N.Y. 2008) ("Any corporation would be motivated to make a profit, to
avoid bankruptcy, or to finance the successful launch of a promising product.
Similarly, corporate executives are generally motivated to maximize bonus
compensation. These allegations do not support an inference of scienter.").

[157]   *See* CAC ¶ 183 (Defendants were "aware of the principal U.S. tax
laws applicable to the Company, the subjectivity of foreign source income to U.S.
federal income taxes and the 'critical' nature of OSG's policy of accounting for
income taxes.").  *See also id.* ¶ 184 (senior OSG officials "spent significant
resources trying to persuade federal officials to enact changes in the tax law that
were favorable to the Company").

[158]   *See* Pl. Opp. at 40.

presence of GAAP violations, and Defendant Andreas' resignation from the Board collectively constitute strong circumstantial evidence of scienter.[159]  Even taken collectively, however, the above arguments do not establish "strong circumstantial evidence" of scienter.

The allegations that Arnzen and Itkin must have known about OSG's Section 956 liability because they were well-informed about other tax provisions affecting the Company is unpersuasive.  The tax provisions that Arntzen and Itkin allegedly discussed in detail at various meetings and conference calls are largely unrelated to Section 956.[160]  It is certainly plausible that Arntzen and Itken might have understood certain tax provisions affecting the Company — especially high-profile changes in the law that yielded large tax breaks for OSG — without appreciating the intricacies of Section 956.  Similarly, the allegation that defendants understood the importance of tax policy in general does not suggest that they understood the content of each section of the tax code applicable to the Company.  Plaintiffs do not allege that Section 956's applicability was so obvious that an

---

[159]     *See id.*

[160]     *See id.* (Arntzen "discussed how new tax laws would allow OSG to carry back 2009 tax losses" on a conference call in 2009, while Itkin "told analysts that the Company recognized a tax benefit for $30.5 million during that quarter. . . and described how the Worker, Homeownership, and Business Assistance Act of 2009 ("WHBA Act") was significant to the Company.").

executive's ignorance of the provision would be difficult to believe, or else highly irresponsible.  To the contrary, the nuances of Section 956 seem to have eluded multiple independent auditors in addition to Arntzen and Itkin.  Even if Arntzen and Itkin understood that Section 956 triggers income tax liability when a foreign subsidiary guarantees the debt of a parent company, they would also have had to understand that OIN's "joint and several" liability for OSG's debt constituted a "guarantee."  Thus, Arntzen and Itkin's familiarity with certain other tax provisions relevant to OSG does little to establish circumstantial evidence of scienter.

Plaintiffs also attempt to impute knowledge of Section 956 to Arntzen and Itkin under the "core operations doctrine."[161]  However, even if the validity of the doctrine were undisputed,[162] it would not apply here.  The Company's core

---

[161]     *Id.* at 44 ("Given the centrality of its foreign operations to the health of its business, and the importance of U.S. tax policy to those foreign operations, it is entirely fair to impute knowledge of the fraud to Arntzen . . . and Itken.").

[162]     *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 596 (S.D.N.Y. 2011) (questioning whether the "core operations" doctrine "remains good law" after the PSLRA)*; eSpeed,* 457 F. Supp. 2d at 294 n.209, 210 (citing cases that have rejected the "core operations" doctrine since the enactment of the PSLRA).

operation is shipping, not tax policy.[163]  Thus, knowledge of OSG's tax liabilities

under Section 956 may not properly be imputed to Arntzen and Itkin.[164]

Plaintiffs further argue that Defendant Andreas's resignation from the

Board of Directors provides evidence of Arntzen and Itkin's scienter.  However,

Andreas resigned from the Board on October 3, 2012, only a month before the

Company filed for bankruptcy.[165]  Thus, although Andreas's resignation suggests

that Artnzen and Itkin knew about the tax issue in October of 2012, it does nothing

to indicate knowledge during the March 2010 Offering or any portion of the Class

Period prior to that time.  In fact, the most likely inference is that members of the

Board first became aware of the "tax issue" shortly before Andreas resigned over it.

---

[163]   *See JP Morgan*, 363 F. Supp. 2d at 628 ("[P]laintiffs allege no facts suggesting that the accounting treatment of the Mahonia transactions as trades rather than as loans was at the core of JPM Chase's business.").

[164]   *See Board of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011) (courts in this district "have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight") (quoting *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce,* 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010)).

[165]   *See* CAC ¶ 40.

Finally, Plaintiffs contend that the sheer size of the tax liability, and the length of time that it went undisclosed, support an inference of scienter.[166] Although both factors are properly considered, they are generally not persuasive absent more concrete evidence of knowledge or recklessness.[167]   Additionally, the duration of a misstatement or omission could actually undercut the inference of scienter in certain circumstances.   Plaintiffs do not allege that Artnzen and Itkin concealed the facts underlying OSG's tax liability — namely the existence of the loan agreements involving OIN or the "joint and several" language.[168]   Given that this information was available to the public as well as OSG's two auditors, the

---

[166]   *See, e.g., In re Scholastic Corp. Secs. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) (holding that $13 million pre-tax special charge "lends yet more support to the notion that defendants had knowledge"); *Rothman v. Gregor,* 220 F.3d 81, 92 (2d Cir. 2000) (the magnitude of a $73.8 million write-off supported inference of scienter); *In re Alstom SA Secs. Litig.,* 406 F. Supp. 2d 433, 460 (S.D.N.Y. 2005) ("significant length of time (several years) during which the arrangements were not disclosed" supported strong inference of scienter); *In re Am. Bank Note Holographics, Inc. Secs. Litig.,* 93 F. Supp. 2d 424, 446–47 (S.D.N.Y. 2000) (noting "the admitted falsity of the statements, the extraordinary degree to which they were false, the length of time (covering several years) that the statements were false").

[167]   *See Glaser*, 772 F. Supp. 2d at 596–97 ("[A]bsent facts indicating that defendants knew of the falsity of their statements, that an eventual write-off was large does not support the required strong inference of misbehavior."); *PXRE Grp.,* 600 F. Supp. 2d at 545 ("[I]t is well established that the size of the fraud alone does not create an inference of scienter.").

[168]   *See* Indiv. Mem. at 19.

46

length of time before the error was discovered actually lends support to the theory that Section 956's applicability was unclear, rather than the theory that Arntzen and Itkin concealed an obvious or known tax liability.  In the absence of other persuasive circumstantial evidence of scienter, the size and duration of the tax error are insufficient to state a claim under Section 10(b).

Plaintiffs also argue that the existence of GAAP violations is indicative of scienter.[169]  However, most courts have found GAAP violations to be insufficient to state a claim.[170]  Furthermore, the sole basis for alleging GAAP violations here is the magnitude of the tax error, which is duplicative and adds little to the scienter analysis.[171]

Overall, Plaintiffs cannot demonstrate that the inference of scienter in this case is "at least as compelling as any opposing inference of nonfraudulent

---

[169]    *See Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) (GAAP violations contribute to inference of scienter).

[170]    *See ECA*, 553 F.3d at 200 ("Allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."); *Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) ("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."); *Worlds of Wonder,* 35 F.3d at 1426 (holding that the "failure to follow GAAP, without more, does not establish scienter") (citations omitted).

[171]    *See, e.g.,* CAC at ¶ 53.

intent."[172]  Significantly, Plaintiffs have not pointed to any specific documents,

conversations, or exchanges suggesting that Arntzen and Itkin knew about the

Company's Section 956 liability, or even any sources from which they might have

learned about it.[173]  Moreover, given that two professional accounting firms

overlooked OSG's tax liabilities under Section 956, it cannot be inferred that the

applicability of Section 956 was "so obvious that the defendant[s] must have been

aware of it,"[174] especially given that neither defendant is a tax expert.[175]  At best, the

Complaint alleges that the defendants were negligent in failing to identify and

disclose the tax liability sooner.  Finally, Arntzen actually *bought* OSG securities

---

[172]     *Tellabs,* 551 U.S. at 324.

[173]     *See Davidoff v. Farina*, No. 04 Civ. 7617, 2005 WL 2030501, at *17 (S.D.N.Y. Aug. 22, 2005) ("[T]o the extent plaintiffs claim that defendants had knowledge of specific facts that rendered their public statements misleading, they must supply some factual basis for the allegation that the defendants [gained this knowledge] at some point during the time period alleged."); *eSpeed,* 457 F. Supp. 2d at 292 n.196 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

[174]     *Cherry St.,* 573 F.3d at 109 (quotation marks and emphasis omitted). *Accord Kalnit*, 264 F.3d at 142.

[175]     *See Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 829 (8th Cir. 2003) (declining to find an inference of scienter because it was "telling" that the company's "outside auditors did not question its accounting practices").

during the Class Period, which undercuts the inference of scienter.[176]  The more compelling inference based on these facts is that Arntzen and Itkin learned of the Company's liability under Section 956 shortly before Andreas's resignation in October 2012.  Thus, Plaintiffs have failed to adequately allege scienter under the PSLRA, and the claims against Arntzen and Itkin under Section 10(b) and Rule 10b-5 are dismissed.

### C.    Section 20(a) of the SEA

"Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law."[177]  Because Plaintiffs have failed to alleged a primary violation under Section 10(b), their claim under Section 20(a) must also be dismissed.

### D.    Leave to Amend

For the foregoing reasons, Plaintiffs' Exchange Act claims against Arntzen and Itkin are dismissed for failing to adequately allege scienter under the PSLRA.  Because leave to amend should be freely given "when justice so requires,"[178]  I grant Plaintiffs leave to amend to correct the deficiencies noted in

---

[176]    *See* Indiv. Reply Mem. at 2.

[177]    *Pacific Inv. Mgmt Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010).

[178]    Fed. R. Civ. P. 15(a)(2).

this Opinion if they can do so in compliance with their obligations under Rule 11. Any repleading must be made within thirty days of the date of this Order.

## V.    CONCLUSION

For the foregoing reasons, the motions to dismiss by E&Y, PwC, and the Underwriter Defendants are denied in full.  The Individual Defendants' motion to dismiss is granted with respect to the Exchange Act claims and denied with respect to the Securities Act Claims.  It is further Ordered that Plaintiffs are granted leave to replead within thirty days of the date of this Order.  The Clerk of Court is directed to close these motions (Docket Nos. 85, 86, 95, 102).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            September  10 , 2013

50

**-Appearances-**

**For Lead Plaintiffs:**

Samuel H. Rudman, Esq.
David A. Rosenfeld, Esq.
Mark T. Millkey, Esq.
Christopher M. Barrett, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

**For Defendant Overseas Shipholding Group, Inc.:**

Lewis J. Liman, Esq.
Elizabeth Vicens, Esq.
Cleary Gottlieb Steen & Hamilton, LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000

**For Defendant Morten Arntzen:**

Scott B. Schreiber, Esq.
Craig A. Stewart, Esq.
Arnold & Porter
Thurman Arnold Building
555 Twelfth Street, N.W.
Washington, DC 20004-1206
(202) 942-5000

**For Defendant Myles R. Itkin:**

David H. Kistenbroker, Esq.
Joni S. Jacobsen, Esq.
Ashley J. Burden, Esq.
Neil A. Steiner, Esq.

Dechert LLP
115 S.Lasalle Street
Chicago, IL 60661
(312) 646-5800

**For Consolidated Defendants G. Allen Andreas, III, Alan R. Batkin, Thomas P. Coleman, Charles A. Fribourg, Stanley Komaroff, Solomon N. Merkin, Joel I. Picket, Ariel Recanati, Oudi Recanati, Thomas F. Robards, Jean-Paul Vettier, Michael J. Zimmerman:**

Richard A. Rosen, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3305
Fax: (212) 373-2359

**For Consolidated Defendants Citigroup Global Markets Inc, Deutsche Bank Securities Inc., Goldman, Sachs & Co., HSBC Securities (USA) Inc., ING Financial Markets, LLC, Morgan Stanley & Co. LLC (f/k/a Morgan Stanley & Co. Incorporated), DNB Markets, Inc. (f/k/a DnB NOR Markets, Inc.):**

Adam Selim Hakki, Esq.
Daniel Hector Rees Laguardia, Esq.
Stuart Jay Baskin, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-4924
Fax: (646) 848-4924

**For Consolidated Defendant PriceWaterhouseCoopers LLP:**

Jamie Lynne Wine, Esq.
Miles Norman Ruthberg, Esq.
Kevin Michael McDonough, Esq.
Latham & Watkins, LLP
885 Third Avenue, Suite 1000

New York, NY 10022
(212) 906-2904
Fax: (212) 751-4864

**For Consolidated Defendant Ernst & Young:**

Stanley J. Parzen, Esq.
Mayer Brown LLP (Chicago)
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
Fax: (312) 706-8668