UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                                                    :
In re OSG SECURITIES LITIGATION                                     :
                                                                    :        Master File No. 12 Civ. 7948
                                                                    :
                                                                    :
                                                                    :
                                                                    :
                                                                    :
                                                                    :
                                                                    :
------------------------------------------------------------------ x

**<u>MEMORANDUM OF LAW IN SUPPORT OF
MORTEN ARNTZEN AND MYLES R. ITKIN'S MOTION
TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

**INTRODUCTION** .......................................................................................................... 1

**FACTUAL BACKGROUND** ........................................................................................ 3

    **I.**     **OSG AND THE INDIVIDUAL DEFENDANTS** ............................... 3

    **II.**    **OSG'S CREDIT AGREEMENTS** ...................................................... 4

    **III.**   **OSG'S STATEMENTS REGARDING TAXES** ............................... 5

    **IV.**   **WITHDRAWAL OF FINANCIAL STATEMENTS, ECONOMIC CHALLENGES, AND BANKRUPTCY FILING** ............................... 6

    **V.**    **ALLEGED TAX LIABILITY AND RESTATEMENT** ..................... 7

    **VI.**   **ADDITIONAL SCIENTER ALLEGATIONS** ................................. 8

**ARGUMENT** ................................................................................................................... 9

    **I.**     **PLAINTIFFS HAVE FAILED TO PLEAD SCIENTER UNDER THE HEIGHTENED PLEADING STANDARD OF THE PSLRA** ........... 9

        **A.**   **Plaintiffs Fail To Allege A Recognized Motive To Commit Fraud** .... 11

        **B.**   **Plaintiffs Fail To Allege Circumstantial Evidence Giving Rise To A Strong Inference Of Scienter** ................................................. 12

            1.   The confidential witness allegations only underscore the weakness of Plaintiffs' case ......................................... 13

            2.   OSG's restatement rebuts rather than supports an inference of scienter ........................................................ 14

            3.   Predictable responses to OSG's financial woes do not support an inference of scienter ...................................... 16

            4.   Defendants' statements about certain tax issues other than Section 956 liability do not support an inference of scienter ........ 17

        **C.**   **The Most Cogent And Compelling Inference Is That Defendants Did Not Act With Scienter** ................................................. 19

    **II.**    **PLAINTIFFS' SECTION 20(A) CLAIMS FAIL FOR LACK OF A PRIMARY VIOLATION** .................................................................. 20

**III.**     **THE EXCHANGE ACT CLAIMS SHOULD BE DISMISSED WITH PREJUDICE**.................................................................................................. **20**

**CONCLUSION** .................................................................................................................. **21**

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES:**

*ATSI Commc'ns v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)....................................................................................4, 9, 10, 20

*Bay Harbour Mgmt. LLC v. Carothers*,
    282 F. App'x 71 (2d Cir. 2008) ...........................................................................................16

*Campo v. Sears Holdings Corp.*,
    635 F. Supp. 2d 323 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010)....................13

*City of Brockton Ret. Sys. v. Shaw Grp.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008).................................................................................14

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)...................................................................................... *passim*

*Feasby v. Industri-Matematik Int'l Corp.*,
    No. 99 Civ. 8761, 2000 WL 977673 (S.D.N.Y. July 17, 2000) .............................................12

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).....................................................................13, 16, 19

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    No. 11 Civ. 3658, 2013 WL 1410147 (S.D.N.Y. Apr. 8, 2013)............................................21

*In re Manulife Fin. Corp. Secs. Litig.*,
    276 F.R.D. 87 (S.D.N.Y. 2011) ....................................................................................16, 17

*In re OSG Secs. Litig.*,
    No. 12 Civ. 7948, 2013 WL 4885890 (S.D.N.Y. Sept. 10, 2013) ................................. *passim*

*In re U.S. Aggregates, Inc. Secs. Litig.*,
    235 F. Supp. 2d 1063 (N.D. Cal. 2002) ...............................................................................17

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)........................................................................................10, 15

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) ...............16, 17

*In re PXRE Grp. Secs. Litig.*,
    600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009)..........................................................................12

*S. Cherry St., LLC v. Hennessee Grp.*,
    573 F.3d 98 (2d Cir. 2009)......................................................................................10, 12

*Tamar v. Mind C.T.I., Ltd.*,
    723 F. Supp. 2d 546 (S.D.N.Y. 2010).....................................................................20, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................................11

*Tyler v. Liz Claiborne, Inc.*,
    814 F. Supp. 2d 323 (S.D.N.Y. 2011).............................................................................11

*Union Cent. Life Ins. Co. v. Ally Financial, Inc.*,
    No. 11 Civ. 2890, 2013 WL 2154220 (S.D.N.Y. Mar. 29, 2013) ...........................16

*Woodward v. Raymond James Fin., Inc.*,
    732 F. Supp. 2d 425 (S.D.N.Y. 2010).............................................................................11

## STATUTES, RULES & OTHER AUTHORITIES:

15 U.S.C. § 78j(b) ...............................................................................................1, 9, 12, 21

15 U.S.C. § 78t(a) ..........................................................................................................1, 20

15 U.S.C. § 78u-4(b)(3)(A)..................................................................................................10

17 C.F.R. § 240.10b-5............................................................................................................1

I.R.C. § 955..................................................................................................................2, 9, 17

I.R.C. § 956 ........................................................................................................... *passim*

Defendants Morten Arntzen and Myles R. Itkin  hereby submit this joint memorandum of law in support of their motion to dismiss the claims asserted against them in the Second Consolidated Amended Complaint under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## INTRODUCTION

This Court already dismissed Plaintiffs' Exchange Act claims once and, based on the allegations in the Second Amended Complaint ("SAC"), should do so again, this time with prejudice.  Plaintiffs continue to allege the same securities fraud violation, namely that during the putative class period, Defendants Arntzen and Itkin knew that Overseas Shipholding Group ("OSG") was misapplying technical provisions of the Internal Revenue Code ("IRC") to publicly disclosed credit facilities, but failed to ensure that OSG's financials reflected this purported fact. Specifically, Plaintiffs contend that Arntzen (the CEO) and Itkin (the CFO) knew that a provision in OSG's credit agreements making OSG a "joint and several" borrower with one its foreign subsidiaries (i) constituted a "guarantee" for purposes of IRC Section 956 ("Section 956") and (ii) therefore triggered massive tax liabilities under Section 956.  Plaintiffs further insist that these Defendants appreciated the nuances of Section 956, even though the nuances were overlooked for many years by two independent professional accounting firms, as well as other company personnel.  *See In re OSG Secs. Litig.*, No. 12 Civ. 7948, 2013 WL 4885890, at *12-13 (S.D.N.Y. Sept. 10, 2013) ("Opinion").

Like the Consolidated Amended Complaint ("CAC"), the SAC fails to adequately plead scienter under the heightened pleading standard of the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b).  In the SAC, Plaintiffs rely primarily on

the same allegations that this Court has already rejected as a basis for scienter.  The handful of new allegations do not "correct the deficiencies noted in this [Court's prior] Opinion."  *Id.* at *13.

The SAC still lacks any "legally sufficient motive for Arntzen and Itkin to commit fraud."  *Id.* at *11.  Plaintiffs admit that neither Arntzen nor Itkin sold any OSG stock during the putative class period, and Arntzen's stock purchase during the putative class period actually "undercuts the inference of scienter."  *Id.* at *13.

Moreover, the SAC fails to allege "any specific documents, conversations, or exchanges suggesting that Arntzen and Itkin knew about the  Company's Section 956 liability."  *Id.*  While the SAC contains statements from a confidential witness ("CW") who left OSG in 2001 (three years before Arntzen even joined the Company), this CW merely suggests that the Defendants "probably" knew it was in OSG's "best interest" to avoid joint-and-several liability with foreign subsidiaries.  The CW does not state that either Arntzen or Itkin—or even he himself— appreciated the tax consequences of OSG's credit arrangements.  To the contrary, the CW allegations raise the more compelling inference that Section 956's intricacies eluded all of OSG's executives.

The SAC's allegations regarding post-class period events are also unavailing.  OSG's restatement of earnings for the past twelve years only buttresses this Court's prior conclusion that the duration of the alleged tax accounting errors undermines an inference of scienter.  *See Id.* at *12.  Meanwhile, the government's tagalong inquiry concerning OSG's restatement, and Arntzen and Itkin's departure from OSG as the Company works its way through bankruptcy, are insufficient to establish fraudulent intent.

2

Finally, the SAC piles on more of the same allegations that this Court has already deemed insufficient to establish scienter—*i.e.*, more allegations regarding statements Defendants made about tax provisions *other* than Section 956 and more allegations regarding Defendants' background in areas *other* than tax accounting. The most plausible inference therefore remains that Arntzen and Itkin relied on their professional advisers and did not comprehend that Section 956 was possibly being misapplied to OSG's credit agreements.

Because Plaintiffs have failed to "correct the deficiencies noted in this [Court's prior] Opinion," *id.* at *13, the SAC's Exchange Act claims should be dismissed, with prejudice.

## FACTUAL BACKGROUND

In view of the Court's prior Opinion, we will summarize only briefly the allegations of the SAC that relate to the Exchange Act claims.

## I.  OSG AND THE INDIVIDUAL DEFENDANTS

Non-party OSG owns and operates a fleet of more than 100 U.S. Flag and International Flag vessels that primarily transport crude oil and refined petroleum products worldwide. SAC ¶ 9. The Company's fleet of international vessels are all owned or operated by foreign corporations that are subsidiaries of OSG International, Inc. ("OIN"), a wholly owned subsidiary of the Company incorporated in the Marshall Islands. *Id.* ¶ 25.

Morten Arntzen was OSG's president and Chief Executive Officer, and a member of the Company's Board of Directors ("Board") from January 2004 until his resignation on February 11, 2013. *Id.* ¶ 10. Myles Itkin was OSG's Chief Financial Officer and Treasurer from June 1995 until he left the Company on April 3, 2013. According to Plaintiffs, these Defendants have "extensive financial backgrounds." *Id.* ¶ 235.

Neither Arntzen nor Itkin sold OSG stock during the putative class period. Indeed, on June 7, 2011, Arntzen *bought* 3,987 shares at $26.55 for a total of $105,854.85. *See* SAC ¶ 232;

OSG, Statements of Changes in Beneficial Ownership of Securities (Form 4) (June 8, 2011)[1]

(Ex. A to Declaration of Scott B. Schreiber dated Nov. 11, 2013 ("Schreiber Decl.")[2].  These

Defendants did not otherwise purchase OSG stock "on the open market."  SAC ¶ 232.  When

Arntzen resigned from OSG in February 2013, he forfeited his unvested shares.  His vested but

unexercised stock options terminated 30 days after his resignation.  *Id.* ¶ 211.

## II.   OSG'S CREDIT AGREEMENTS

Prior to and during the putative class period of October 29, 2007 to October 19, 2012,

OSG entered into various credit facilities with third parties.  *Id.* ¶ 37.  Some of these agreements

provided that OIN—the Company's wholly-owned international subsidiary—was a joint-and-

several party.  *Id.* ¶ 38.  For example, a $240 million credit agreement that OSG, OIN, and

another OSG subsidiary entered into in 2001 stated that the three entities were "joint and several

Borrowers."  *Id.*  OSG disclosed the full text of this agreement in the Company's annual report

for 2001.  *See* OSG, Annual Report (Form 10-K), Ex. 4(d)) (Mar. 26, 2002) (Ex. B).  In 2005,

OSG filed a Current Report with the SEC disclosing, in the very first sentence, that the Company

had entered into a credit facility with two of its subsidiaries as "joint and several borrowers."

OSG, Current Report (Form 8-K) (Jan. 21, 2005) (Ex. C).  Moreover, OSG's Annual Report for

2005 made several references to this $500 million credit agreement as a "joint and several"

---

[1] On a motion to dismiss, the Court is not limited to the face of the complaint, but "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[2] All exhibits are to the Schreiber Decl. unless otherwise noted.

obligation.  *See* OSG, Annual Report (Form 10-K) (Mar. 1, 2006), at 112, 119, Schedule III to

Ex. 4(e)(6) (Ex. D).[3]

### III.    OSG'S STATEMENTS REGARDING TAXES

OSG's public disclosures during the putative class period contained statements about the

Company's "credit for federal income taxes, its then current and deferred income tax asset and

liability amounts and its related income tax disclosures."  *Id.* ¶ 52.  The Company's 2009 Form

10-K, for example, stated that "[a]s a result of changes made by the American Jobs Creation Act

of 2004 . . . the Company is no longer required to report taxable income on a current basis the

undistributed foreign shipping income earned by OIN under the 'Subpart F' provisions of the

[Internal  Revenue] Code."  *Id.* ¶ 61.  Furthermore, the 2009 10-K explained that:

> Effective January 1, 2005, the earnings from shipping operations
> of the Company's foreign subsidiaries are not subject to U.S.
> income taxation as long as such earnings are not repatriated to the
> U.S.  The Company intends to permanently reinvest these earnings,
> as well as the undistributed income of its foreign companies
> accumulated through December 31, 1986, in foreign operations.

*Id.* ¶ 59.  Nonetheless, the 2009 10-K explicitly warned that "[t]he Company's views should not

be considered official, and no assurance can be given that the conclusions discussed below

would be sustained if challenged by taxing authorities."  *Id.* ¶ 61.

Defendant Ernst & Young ("E&Y") served as OSG's independent registered public

accounting firm from 1969 until June 15, 2009.  *Id.* ¶ 12.  Since June 17, 2009,

PricewaterhouseCoopers LLP ("PwC") has served as OSG's independent registered public

accounting firm.  *Id.* ¶ 13.  E&Y and PwC gave unqualified audit opinions for OSG's financial

---

[3] OSG also appended the full text of a $1.5 billion credit agreement as an exhibit to the
Company's 2005 Form 10-K.  *See*, Ex. 4(e)(6) to OSG, Annual Report (Form 10-K) (Mar. 1,
2006) (Ex. D).  The very first recital in that agreement states that the lenders are making credit
available to OSG, OIN, and another subsidiary "on a joint and several basis."  *See Id.* at 1-2.

statements, expressly consented to have their opinions incorporated by reference into a

registration statement for an OSG notes offering in 2010, and expressly consented to serve as

accounting experts with respect to that notes offering. *Id.* ¶ 99.[4]

## IV.   WITHDRAWAL OF FINANCIAL STATEMENTS, ECONOMIC CHALLENGES, AND BANKRUPTCY FILING

On October 3, 2012, OSG announced in a Form 8-K filed with the SEC that Board

member Allen Andreas was resigning because of his disagreement with the Board over the

process that the Board was taking in reviewing a "tax issue." *Id.* ¶ 41.  OSG explained that the

tax issue referred to by Andreas arose "from the fact that the Company is domiciled in the United

States and has substantial international operations," and related "to the interpretation of certain

provisions contained in the Company's loan agreements."  OSG, Current Report (Form 8-K)

(Oct. 3, 2012) (Ex. E).  The Company stated that it was continuing to review the tax issue. *Id.*

*See also* SAC ¶ 41.

A few weeks later, on October 22, 2012, OSG filed another Form 8-K with the SEC

announcing that as a result of its continuing review of the tax issue, "the Company's previously

issued financial statements for at least the three years ended December 31, 2011 and associated

interim period, and for the fiscal quarters ended March 31 and June 30, 2012, should no longer

be relied upon." *Id.* ¶ 42.  OSG further disclosed that it was determining whether a restatement

may be required. *Id.*  In addition, the October 22, 2012 8-K mentioned other difficulties the

Company was facing, including negotiations with its bank creditors.  *See* OSG, Current Report

(Form 8-K) (Oct. 22, 2012) (Ex. F).  As discussed in OSG's prior disclosures, the highly cyclical

---

[4] Plaintiffs have asserted claims against E&Y and PwC for violations of Section 11 of the
Securities Act.  Plaintiffs have also asserted claims under Section 11 and Section 12(a)(2) against
Citigroup Global Markets Inc., Deutsche Bank Securities Inc., DnB NOR Markets, Inc.,
Goldman, Sachs & Co., HSBC Securities (USA) Inc., ING Financial Markets LLC, and
MorganStanley & Co. Inc. for their role as underwriters.

shipping industry had experienced a severe downswing in recent years and the Company's cash flow had been under intense pressure.  *See*, *e.g.*, OSG, Current Report (Form 8-K) (Aug. 2, 2012) (Ex. G); Annual Report (Form 10-K) at 35, 37-39, 61-64 (Feb. 29, 2012) (Ex. H) (discussing market conditions, OSG finances, and OSG stock decline).

In connection with these various challenges, OSG announced that it was evaluating strategic options, including voluntary bankruptcy.  SAC ¶ 43.  Following the Company's October 22 announcement, the price of OSG's common stock dropped from $3.50 to $1.40 per share, and OSG's notes declined from $50 to $33.50 per note.  *Id.* ¶ 206.  On November 14, 2012, OSG filed for protection under Chapter 11 of the United States Bankruptcy Code.  *Id.* ¶ 9.

## V.    ALLEGED TAX LIABILITY AND RESTATEMENT

The SAC alleges that a U.S. borrower's act of causing a controlled foreign corporation ("CFC") "to *guarantee* the U.S. parent company's debt obligation, *may* cause the U.S. parent company to incur income tax liability under Section 956 [within Subpart F of the Internal Revenue Code]."  *Id.* ¶ 36 (emphasis added).  According to Plaintiffs, OIN—by agreeing to be "jointly and severally liable" on OSG's debt arrangements—in effect guaranteed OSG's debt obligations.  *See, e.g.*, *id.* ¶ 62  In Plaintiffs' view, these "guarantees" resulted in "a deemed distribution of OIN's then current and accumulated earnings and profits to OSG," and "subjected OSG to tens of millions of dollars in undisclosed federal income taxes" under Section 956.  *See, e.g.*, *Id.*  The SAC alleges that as a result of OSG's disclosures, the Internal Revenue Service ("IRS") claimed on February 8, 2013, that the Company owes more than $435 million in corporate income tax for the years 2004 through 2011, a portion of which is attributable to Section 956.  *Id.* ¶¶ 47-48.

According to Plaintiffs, on November 13, 2012 OSG received a request from the Securities and Exchange Commission ("SEC") for documents related to the Company's

accounting for income taxes.  *Id.* ¶ 226.  The SEC issued a formal order of investigation of OSG on January 29, 2013 and a subpoena on August 1, 2013.  *Id.* ¶¶ 210, 213.

On August 25, 2013, OSG announced that, upon completion of its inquiry, the Company "determined that there were errors in the Company's previously issued financial statements" for the past twelve years and that "such financial statements should be restated."  *Id.* ¶ 215.  The previously issued financial statements were inaccurate "due to insufficient processes to identify and evaluate adequately the income tax accounting impact of Section 956."  *Id.* ¶ 217.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

The SAC includes allegations, not present in the CAC, that "Plaintiffs interviewed a former treasurer at OSG, who served in that capacity until December 2001."  *Id.* ¶ 119.  This CW claims that "he knew (and that anyone in a finance position would probably know too), that it was in OSG's best interests to avoid having foreign subsidiaries jointly and severally liable with domestic entities on credit agreements and that OSG tried to avoid having foreign companies guarantee the debt of domestic companies."  *Id.* ¶ 120.  Although the CW allegedly told Plaintiffs' counsel that there can be "a deemed tax event if the foreign companies were guaranteeing the obligations of the domestic companies," *id.* ¶ 121, he does not claim that he ever discussed this particular issue with anyone at OSG, or even that he himself appreciated that the "joint and several" language in the 2001 credit facility he negotiated for OSG constituted a guarantee that triggered such a "deemed tax event."

As further purported evidence that Arnzten and Itkin "were aware of the U.S. income tax rules and regulations associated with foreign source income and their significance to OSG's operations," *id.* ¶ 124, the SAC points out OSG's efforts to obtain favorable changes in the tax law unrelated to Section 956.  For example, Arntzen acknowledged that OSG helped convince Congress to pass legislation in 2004 that allowed OSG to defer foreign-source shipping income

and thereby reduce its tax liability. *Id.* ¶¶ 127, 162. Plaintiffs also claim that in 2008 Arntzen was aware of pending legislation that would encourage OSG to repatriate cash held overseas, *id.* ¶ 136, and that in 2012 Arntzen testified before the U.S. House of Representatives Ways and Means Committee in support of legislation that would repeal the rules in Section 955 of the tax code preventing the repatriation of foreign earnings, *id.* ¶¶ 125-26, 193, 238.

In addition, the SAC alleges that on certain quarterly earnings calls, Arntzen and Itkin made statements demonstrating knowledge of OSG's tax liability. Specifically, these Defendants answered questions about the tax consequences of repatriating foreign source income, *id.* ¶ 132; discussed the size of the Company's tax benefit for 2008, *id.* ¶ 139; and mentioned a $42 million tax recovery resulting from the Workers, Homeowners, and Business Assistance Act of 2009. *Id.* ¶¶ 148, 173. The SAC does not allege that either Defendant made any statements regarding Section 956 or the tax consequences of OSG's credit agreements.[5]

## ARGUMENT

### I.   PLAINTIFFS HAVE FAILED TO PLEAD SCIENTER UNDER THE HEIGHTENED PLEADING STANDARD OF THE PSLRA

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, the "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI*, 493 F.3d at 105.[6] "Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *Id.* at 99. "[A]

---

[5] Plaintiffs also suggest that OSG's restatement, an SEC investigation, and Defendants' departures from the Company—all of which occurred post-class period—support an inference of scienter. *See* SAC. ¶¶ 39-40, 57, 210-13, 215, 217, 226, 288.

[6] Internal quotations omitted except where otherwise noted.

complaint alleging securities fraud must satisfy Rule 9(b), which requires that 'the circumstances constituting fraud . . . shall be stated with particularity, [and] must also meet the PSLRA's pleading requirements or face dismissal." *Id.* (citing 15 U.S.C. § 78u-4(b)(3)(A)).

A plaintiff can plead scienter under the PSLRA by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* To proceed under the first theory, a plaintiff must allege that defendants "benefitted in some concrete and personal way from the purported fraud." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co*., 553 F.3d 187, 198 (2d Cir. 2009). "This requirement [is] generally met when corporate insiders [are] alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." *S. Cherry St., LLC v. Hennessee Grp*., 573 F.3d 98, 108 (2d Cir. 2009). By contrast, motives possessed by virtually all corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, are not a sufficient basis for scienter. *Id.* at 109.

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). Under this alternative theory of scienter, a plaintiff must show that the defendant's conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.*

To determine whether plaintiffs have alleged a strong inference of scienter, the Supreme Court has held that courts must look at the complaint as a whole and "must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). It is not sufficient to "allege[] facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." *Id.* at 324. Rather, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

### A. Plaintiffs Fail To Allege A Recognized Motive To Commit Fraud

To proceed under the theory that defendants had both motive and opportunity to commit the fraud, a plaintiff must allege that the defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198. As with the CAC, *see* Opinion, at *11, Plaintiffs' allegations in the SAC do not come close to meeting this standard.

The fact remains that neither Arntzen nor Itkin sold any OSG stock during the putative class period. Both Defendants' OSG stock holdings increased during the putative class period.[7] Indeed, "that Arntzen actually bought shares of OSG stock during the Class Period . . . undermines the likelihood that he knew about the company's undisclosed tax liability." *Id.*, at *11. To the extent Plaintiffs suggest that Defendants' failure to buy *more* stock "on the open market" supports an inference of scienter, courts in this district have held otherwise. *See Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 337-38 (S.D.N.Y. 2011) (holding that a lack of stock purchases during the class period cannot support an inference of scienter); *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 437 (S.D.N.Y. 2010) (same). Meanwhile, the

---

[7] *Compare* Morten Arntzen Form 4 (Feb. 20, 2007) (holding 116,103 shares), *with* Morten Arntzen Form 4 (Dec.. 19, 2012) (holding 166,500 shares); *compare* Myles Itkin Form 4A (Jan. 12, 2007) (holding 16,714 shares), *with* Myles Itkin Form 4A (Feb. 27, 2012) (holding 46,887 shares). *See* Ex. I to Schreiber Decl.

SAC's passing references to Arntzen's loss of his unvested shares and his unexercised options after resigning from OSG (months after the putative class period) are wholly irrelevant. *Cf. Feasby v. Industri-Matematik Int'l Corp.*, No. 99 Civ. 8761, 2000 WL 977673, at *4 n.5 (S.D.N.Y. July 17, 2000) (holding that a defendant's stock sales did not satisfy the scienter requirement when the defendant "sold his shares at the time he resigned from [the company], a frequent occurrence when a former executive no longer has a say in the management of the company").

Without any allegations of insider trading, Plaintiffs fall back on the worn-out contention that Arntzen and Itkin committed fraud to raise much-need capital for OSG. It is well-established that "goals possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability . . . are not sufficient to allege a personal motive under Section 10(b)." Opinion, at *11 (citing *Cherry St.*, 573 F.3d at 109)). As this Court explained, "even the desire to maintain a high credit rating to raise money that is desperately needed or necessary to protect the very survival of a company is too generalized a motive plead securities fraud." *Id.* (citing *In re PXRE Grp. Secs. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009)).

The SAC offers no new allegations to alter the Court's conclusion that Plaintiffs have failed to show that either Arntzen or Itkin possessed a motive to commit securities fraud.

### B.    Plaintiffs Fail To Allege Circumstantial Evidence Giving Rise To A Strong Inference Of Scienter

Because Plaintiffs do not allege that Arntzen or Itkin had any cognizable motive to commit securities fraud, "the strength of the circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 199. This Court concluded that the allegations in the CAC, taken both individually and collectively, failed to meet the heightened pleading standard applicable

here.  Opinion, at *11.  The SAC fares no better.  The SAC is still devoid of a single document

or communication suggesting that Arntzen or Itkin knew that OSG's tax accounting was

erroneous.

> 1.    *The confidential witness allegations only underscore the weakness of
> Plaintiffs' case*

Plaintiffs' new allegations from an interview with a former OSG treasurer do not fortify

their Exchange Act claims in any way.  This CW left OSG in 2001,[8] and there are no allegations

that he ever interacted with Arntzen, who joined the Company three years later, in 2004.  Even

though the CW overlapped with Itkin at OSG, he does not allege that Itkin understood the tax

consequences of the joint-and-several language in OSG's credit agreements or that anyone ever

presented Itkin with information related to those consequences.  The CW merely asserts that

"anyone in a finance position would *probably* know . . . that it was in OSG's best interests to

avoid having foreign subsidiaries jointly and severally liable with domestic entities on credit

agreements and that OSG tried to avoid having foreign companies guarantee the debt of domestic

companies," and that Itkin received copies of the credit agreements and participated in some

negotiations.[9]  SAC ¶ 120 (emphasis added); *see also Id.* ¶¶ 122-23.  These allegations are

insufficient to raise a strong inference of scienter.  *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573,

591 (S.D.N.Y. 2011) ("[M]ere allegations [from a CW] that defendants 'would have' or 'should

have' had such knowledge is insufficient."); *see also* Opinion, at *13 (dismissing Exchange Act

---

[8] It strains credulity to believe that the CW remembers anything about a single phrase in a credit agreement that he negotiated almost twelve years ago.  *See Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009) (discounting allegations where CWs "left the company before the class period"), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).

[9] Notably, the CW does not and cannot allege that Itkin participated in any negotiations related to the "joint and several" language or was aware of any adverse tax implications allegedly triggered by language in the credit agreements.

claims because "Plaintiffs have not pointed to any specific documents, conversations, or exchanges suggesting that Arntzen and Itkin knew about the Company's Section 956 liability").

To the extent the CW statements are relevant at all, they actually weaken an inference of scienter.  The CW allegedly recognizes that there can be "a deemed tax event if the foreign companies were guaranteeing the obligations of the domestic companies," SAC ¶ 121; however, he does not say that he understands now, or understood at the time, that the "joint and several" language in the credit facility he negotiated for OSG in 2001 constituted a guarantee that triggered such a "deemed tax event."  Indeed, the CW reportedly told Plaintiffs that "if something was going the wrong way, [he] would certainly point [it] out to seniors of the company."  SAC ¶ 265.  But the SAC does not allege that he ever did so.[10]  Accordingly, the most natural inference is that the CW—like Arntzen, Itkin, and two major independent accounting firms—did not appreciate that OSG's credit agreements triggered a significant tax liability under Section 956.

### 2.    *OSG's restatement rebuts rather than supports an inference of scienter*

Months after Arntzen and Itkin left OSG, the Company announced a restatement of earnings in its 2012 Form 10-K.  The announcement of a restatement—just like the prior announcement of a potential restatement, which Plaintiffs alleged in the CAC—does not establish that Arntzen or Itkin acted with scienter.  "[I]t is well-settled that the mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter." *City of Brockton Ret. Sys. v. Shaw Grp.*, 540 F. Supp. 2d 464, 472-73 (S.D.N.Y. 2008).  Likewise,

---

[10] While the CW allegedly (i) was "given a lot of latitude to negotiate" OSG's credit agreements (SAC ¶ 265), and (ii) knew it was in OSG's "best interest" to avoid joint-and-several liability with a foreign subsidiary, he nevertheless allowed OSG to enter credit agreements with OIN as a joint-and-several borrower and, apparently, did not propose any alternative borrowing arrangements.

14

"[a]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *ECA*, 553 F.3d at 200. Only where such allegations are "coupled with evidence of corresponding fraudulent intent might they be sufficient." *Id.*

That OSG's restatement reaches back twelve years does not help establish scienter. To the contrary, the duration shows that OSG's misstatements began years before Arntzen joined the Company. Even more so than in the CAC, "the length of time before the error was discovered actually lends support to the theory that Section 956's applicability was unclear, rather than the theory that Arntzen and Itkin concealed an obvious or known tax liability." Opinion, at *12. The public disclosures regarding OSG's restatement, moreover, underscore the highly technical nature of Section 956. *See* OSG, Annual Report (Form 10-K), at 3-4 (Aug. 26, 2013) (Ex. J). They support the Court's observations that Section 956's applicability was not "so obvious that an executive's ignorance of the position would be difficult to believe, or else highly irresponsible." Opinion, at *12. In addition, the SAC does not suggest why Arntzen and Itkin would knowingly incur a tax liability under Section 956 through "joint and several" language in OSG's credit agreements, instead of using alternative language that did not carry such adverse consequences. *See Kalnit*, 264 F. 3d at 140-41 (no scienter where allegations are "nonsensical" or "defy economic reason").

Plaintiffs' other allegations based on the restatement are also unavailing. As this Court has noted, the magnitude of OSG's tax liability lacks persuasive value without more concrete evidence of knowledge or recklessness. Opinion at *12. Such evidence cannot come, however, from OSG's disclosure that previously issued financial statements were inaccurate "due to insufficient processes to identify and evaluate adequately the income tax accounting impact of Section 956." As an initial matter, this disclosure is not an admission by Arntzen or Itkin. Both

of these Defendants had left OSG months before the Company made the disclosure in August 2013. And in any event, a determination in August 2013 that OSG had insufficient processes to appreciate the nuances of Section 956 does not shed any light on what Defendants knew during the putative class period. Plaintiffs' theory of "fraud by hindsight" must fail. *See Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71, 75 (2d Cir. 2008) (holding that a "fraud by hindsight" theory "is not actionable in this Circuit").

       3.    *Predictable responses to OSG's financial woes do not support an inference of scienter*

       The fact of an SEC investigation into OSG's restatement is not evidence that Arntzen or Itkin acted with fraudulent intent. Having begun *after* the putative class period, the investigation could not possibly have put Defendants on notice of the Section 956 issue. Moreover, "[s]ecurities regulators are obligated to examine the behavior of public corporations, and the fact that a regulator is fulfilling this role cannot be sufficient to allege scienter." *In re Manulife Fin. Corp. Secs. Litig.*, 276 F.R.D. 87, 102 (S.D.N.Y. 2011). The SAC contains no allegations that the investigation involves any allegation, much less finding, of fraudulent conduct. There are also no allegations that either Arntzen or Itkin has concealed information from investigators or obstructed the investigation in any way. Thus, the SEC's post-hoc investigation of OSG is not probative of anything. *See Union Cent. Life Ins. Co. v. Ally Financial, Inc.*, No. 11 Civ. 2890, 2013 WL 2154220, at *2 (S.D.N.Y. Mar. 29, 2013) ("Plaintiffs' citation to . . . government investigations involving the . . . Defendants . . . provides no evidence of scienter.").

       Similarly, the departures of Arntzen and Itkin from OSG cannot contribute to an inference of scienter. A resignation supports an inference of scienter only where it is "highly unusual and suspicious." *Glaser*, 772 F. Supp. 2d at 598. The same is true of terminations. *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 161-62 (D. Conn. 2007), *aff'd*, 312 F. App'x 400

(2d Cir. 2009).

A company's change in senior management during the bankruptcy process is not unusual or suspicious. Nor is a change in senior management as a result of the need to restate earnings. *See In re U.S. Aggregates, Inc. Secs. Litig.,* 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) (noting that after an earnings restatement and loan default "it is unremarkable that the Company would seek to change its management team"). That OSG announced Arntzen's resignation on or around the same date that the IRS amended a claim it had already filed in the bankruptcy court— and several months *after* OSG had announced a potential restatement—is irrelevant to whether he acted with fraudulent intent. With respect to Itkin, Plaintiffs simply allege that he was terminated as a result of a reduction in force in April 2013, almost six months after the potential restatement was announced. SAC ¶¶ 10(b), 212. These allegations militate against a finding of wrongdoing. Therefore, "in the absence of a specific allegation that the resignation resulted from [either executive's] wrongdoing, the Court cannot say that the resignation raises any inference of scienter." *In re Manulife*, 276 F.R.D. at 102.

> ### 4. Defendants' statements about certain tax issues other than Section 956 liability do not support an inference of scienter

As this Court has recognized, "neither defendant is a tax expert." Opinion, at *13. The SAC's recitation of Arntzen and Itkin's resumes, *see* SAC ¶ 10, confirms this fact. Left grasping at straws, Plaintiffs simply offer more examples of Defendants' statements regarding certain tax issues *unrelated* to Section 956, the relevant tax provision in this case.

The SAC places great emphasis on OSG's efforts to lobby for favorable changes to the Internal Revenue Code. In the CAC Plaintiffs cited to certain irrelevant statements that OSG's Head of Government Affairs provided Congress, and now in the SAC they also cite to testimony that Arntzen gave the House Ways and Means Committee on the very same subject—that is, the

rules in Section 955 of the tax code that prevent the repatriation of investments in foreign shipping assets made prior to the year 1987.  Neither individual mentioned Section 956 or the rules regarding tax liability for joint-and-several borrowing arrangements or for guarantees. Contrary to the  SAC's assertion, *see id.* ¶ 128, their statements on a very specific issue pending before Congress did not require a complete understanding of the more than a dozen different technical provisions of Subpart F of the Internal Revenue Code.

Among the new allegations in the SAC are other statements by Defendants that are both irrelevant and repetitive.  For instance, the SAC quotes an article purporting to show Arntzen's awareness of legislation passed in 2004 that allowed OSG to defer foreign-source shipping income and thereby reduce its taxes.  *Id.* ¶ 127.  The SAC also includes further allegations demonstrating that Arntzen and Itkin had knowledge of certain tax benefits OSG received.  *Id.* ¶ 139.  Finally, Plaintiffs point to quarterly earnings calls on which the Defendants mentioned certain "tax ramifications associated with the repatriation of foreign source income."  *Id.* ¶¶ 132, 134, 136.  None of these statements refer to Section 956 or the tax consequences of OSG's credit agreements.

Although the catalog of statements Arntzen and Itkin allegedly made about taxes may add pages to the pleadings, the statements do not add anything to an inference of scienter.  As this Court has already made clear, Defendants "might have understood certain tax provisions affecting the Company—especially high-profile changes in the law that yielded large tax breaks for OSG—without appreciating the intricacies of Section 956."  Opinion, at *12.  Moreover, "[e]ven if Arntzen and Itkin understood that Section 956 triggers income tax liability when a foreign subsidiary guarantees the debt of a parent company, they would also have had to

understand that OIN's 'joint and several' liability for OSG's debt constituted a 'guarantee.'" *Id.* The legal analysis in the Court's prior decision therefore still applies.[11]

*   *   *

Even when Plaintiffs' factual allegations are viewed as a whole, they still fail to meet the heightened pleading standard for scienter. *Glaser v. The9* is again instructive. The *Glaser* plaintiffs argued, like Plaintiffs' here, that their complaint supported an inference of scienter drawn from circumstantial evidence. *See* 772 F. Supp. 2d, at 594. The *Glaser* plaintiffs likewise alleged that the company eventually wrote down a substantial amount of net income; that the fraud concerned a critical area of the defendants' business; that the company experienced resignations potentially related to inadequate financial reporting during the class period; and that confidential witness statements suggested the defendants knew the falsity of their statements. *Id.* Nevertheless, the court found those allegations insufficient to support a strong inference of scienter, even when considered collectively with an allegation that the individual defendants had made inconsistent statements—an additional scienter allegation not present here. *Id.*

### C.   The Most Cogent And Compelling Inference Is That Defendants Did Not Act With Scienter

Taking Plaintiffs' factual allegations as a whole, the SAC raises plausible, competing inferences that Arntzen and Itkin did not have fraudulent intent. In particular, the following facts support opposing inferences: (1) the Defendants increased their OSG stock holdings during the putative class period; (2) OSG publicly disclosed the relevant credit agreements in their entirety; (3) OSG warned that the Company's conclusions about tax liability for foreign shipping income

---

[11] As this Court has already determined, Plaintiffs cannot impute knowledge of Section 956 to Arntzen and Itkin under the "core operations doctrine" by alleging that tax accounting was "critical" to the Company. OSG's core operation is shipping, not tax policy. Furthermore, the validity of this doctrine is disputed. Opinion, at *12.

19

might not be sustained if challenged by taxing authorities; (4) neither Arntzen nor Itkin is a tax expert; and (5) the nuances of Section 956 eluded multiple independent auditors who certified OSG's financial statement over the last 12 years, as well as OSG's inside counsel, controllers, treasurers, and other staff.  Indeed, as a matter of law and common sense, Defendants would not have disclosed the relevant facts giving rise to OSG's tax liability if Defendants were truly trying to conceal that liability.  The most compelling inference remains that Arntzen and Itkin relied in good faith on the expertise of accounting and legal professionals.

Alternatively, even assuming the facts in the SAC may give rise to an inference that Defendants were negligent in failing to make an accurate assessment of OSG's tax liability during the putative class period, that still does not support an actionable claim for recklessness or fraud.  A reasonable person would deem the inference of scienter to be weaker than competing inferences.  Thus, because Plaintiffs have not met the heightened pleading standard required by the PSLRA and Rule 9(b), their Exchange Act claims must be dismissed.

## II.     PLAINTIFFS' SECTION 20(A) CLAIMS FAIL FOR LACK OF A PRIMARY VIOLATION

Section 20(a) of the Exchange Act creates a cause of action against defendants alleged to have been "control persons" of the primary violators.  *See* 15 U.S.C. § 78t(a).  However, where a plaintiff fails to allege a primary violation of the Exchange Act, the plaintiff cannot establish control person liability.  *See ATSI*, 493 F.3d at 108.  Because the SAC does not allege a primary violation of Section 10(b) and Rule 10b-5 by Arntzen and Itkin, Plaintiffs have not established control person liability pursuant to Section 20(a).

## III.    THE EXCHANGE ACT CLAIMS SHOULD BE DISMISSED WITH PREJUDICE

Plaintiffs have already had "an opportunity to replead after specific warnings as to [their] complaint's deficiencies."  *Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 559 (S.D.N.Y.

2010).  Indeed, Plaintiffs have already had "more than two bites at an apple they have not been able to get their teeth into."  *Id.* at 560 (internal citation omitted).  Furthermore, "[b]ecause the PSLRA increases the probability that a proposed amendment will be futile, . . . amendment should be granted less freely when a complaint subject to the PSLRA is dismissed."  *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, No. 11 Civ. 3658, 2013 WL 1410147, at *22 (S.D.N.Y. Apr. 8, 2013).   The Exchange Acts claims therefore should be dismissed with prejudice this time.

## CONCLUSION

For the foregoing reasons, the Defendants Arntzen and Itkin respectfully request that their motion to dismiss the Exchange Act claims in the Second Consolidated Amended Complaint be granted with prejudice.

Dated:  November 12, 2013
        New York, NY

**DECHERT LLP**

/s/ David H. Kistenbroker
David H. Kistenbroker
Joni S. Jacobsen
77 W. Wacker Dr., Suite 3200
Chicago, IL 60601
Tel.  (312) 646-5800
Fax  (312) 646-5858
david.kistenbroker@dechert.com
joni.jacobsen@dechert.com

*Attorneys for Defendant Myles R. Itkin*

**ARNOLD & PORTER LLP**

/s/ Scott B. Schreiber
Scott B. Schreiber
Craig A. Stewart
Daniel R. Bernstein
399 Park Avenue
New York, NY 10022
Tel. (212) 715-1142
Fax (212) 715-1399
scott.schreiber@aporter.com
craig.stewart@aporter.com

*Attorneys for Defendant Morten Arntzen*