UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————— x

In re OSG SECURITIES LITIGATION

———————————————

This Document Relates To:

    ALL ACTIONS.

——————————————— x

: Civil Action No. 1:12-cv-07948-SAS
:
:
: CLASS ACTION
:
: THIRD CONSOLIDATED AMENDED
: COMPLAINT FOR VIOLATIONS OF THE
: FEDERAL SECURITIES LAWS

RECEIVED

2014 FEB 18 P 9 19

U S DISTRICT COURT SDNY

Lead Plaintiffs Stichting Pensioenfonds DSM Nederland ("DSM"), Indiana Treasurer of State ("Indiana Treasurer") and Lloyd Crawford (collectively "Lead Plaintiffs" or "Plaintiffs"), by their undersigned attorneys, make the allegations set forth herein based upon knowledge as to their own acts and upon the investigation conducted by Lead Plaintiffs' counsel. The investigation included, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings by Overseas Shipholding Group Inc. ("OSG" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by the Company, interviews with former OSG employees and public filings in OSG's Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of: (i) OSG 8.125% Senior Notes Due 2018 (the "Notes") issued pursuant and/or traceable to the Company's $300 million public offering conducted on or about March 24, 2010 (the "Offering") seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"); and (ii) OSG securities between October 29, 2007 and October 19, 2012, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o], Sections 10(b) and 20(a) of the

Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17C.F.R. §240.10b-5].

3.	This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v], Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §1331.

4.	Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District, and the Offering was marketed in this District.

5.	In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange ("NYSE").

## PARTIES

6.	Plaintiff DSM, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased Notes in and traceable to the Offering, and on the open market, and was damaged thereby.

7.	Plaintiff Indiana Treasurer, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased Notes in and traceable to the Offering, and on the open market, and was damaged thereby.

8.	Plaintiff Lloyd Crawford, as set forth in his certification previously filed with the Court and incorporated herein by reference, purchased the common stock of OSG during the Class Period, and was damaged thereby.

9. Non-Party OSG, through its subsidiaries, owns and operates a fleet of more than 100 U.S. Flag and International Flag vessels that primarily transport crude oil and refined petroleum products worldwide. The Company maintains its corporate headquarters at 666 Third Avenue, New York 10017. On November 14, 2012, OSG filed for protection under Chapter 11 of the United States Bankruptcy Code and, for that reason, is not named as a defendant in this action.

10. (a) Defendant Morten Arntzen ("Arntzen") served as OSG's President, Chief Executive Office ("CEO") and as a member of the Company's Board of Directors beginning in January 2004. Defendant Arntzen holds a bachelor's degree from Ohio Wesleyan University and a Masters of International Affairs, with a specialization in International Business and International Economics, from Columbia University School of International Affairs. OSG announced that Defendant Arntzen "resigned" as CEO of OSG on February 11, 2013.

(b) Defendant Myles R. Itkin ("Itkin") served as OSG's Executive Vice President beginning in June 2006, and as Chief Financial Officer ("CFO") and Treasurer beginning in June 1995. Defendant Itkin served as OSG's Principal Accounting Officer since at least 2000. Defendant Itkin holds a bachelor's degree from Cornell University and an MBA degree from New York University. On June 15, 2012, OSG agreed, subject to certain conditions, to pay Defendant Itkin a $1.5 million retention bonus. On April 3, 2013, after serving as CFO for 18 years, Defendant Itkin left the Company.

(c) Defendants Alan R. Batkin ("Batkin"), Thomas P. Coleman ("Coleman"), Charles A. Fribourg ("Fribourg"), Stanley Komaroff ("Komaroff"), Solomon N. Merkin ("Merkin"), Joel I. Picket ("Picket"), Ariel Recanati ("A. Recanati"), Ouidi Recanati ("O. Recanati"), Thomas F. Robards ("Robards"), Jean-Paul Vettier ("Vettier") and Michael J.

Zimmerman ("Zimmerman") served as members of OSG's Board of Directors. Defendant Robards also served as Audit Committee Chairman and Audit Committee financial expert (as defined by the rules of the SEC) and Defendant Zimmerman served as Chairman of the Board of Directors.

(d) The defendants listed above at ¶10(a)-(c) are collectively referred to herein as the "Individual Defendants." Each of the Individual Defendants signed the Registration Statement (defined below) issued in connection with the Offering.

11. Defendants Citigroup Global Markets Inc. ("Citigroup"), Deutsche Bank Securities Inc. ("Deutsche Bank"), DnB NOR Markets, Inc. ("DnB"), Goldman, Sachs & Co. ("Goldman Sachs"), HSBC Securities (USA) Inc. ("HSBC"), ING Financial Markets LLC ("ING"), and Morgan Stanley & Co. Incorporated ("Morgan Stanley") are providers of investment banking services, served as underwriters for the Offering and, as such, were responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Registration Statement. Citigroup, Deutsche Bank, DnB, Goldman Sachs, HSBC, ING and Morgan Stanley are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants received $5.25 million in underwriting discounts and commissions in connection with the Offering.

12. Defendant Ernst & Young ("E&Y") served as OSG's independent registered public accounting firm from 1969 until E&Y was "dismissed" by OSG's Audit Committee on June 15, 2009. E&Y audited OSG's financial statements and its system of internal controls over financial reporting for the years ended December 31, 2008, 2007, 2006 and 2005. E&Y's unqualified audit opinion on the Company's financial statements for the years ended December 31, 2008 and 2007 (the "2008 and 2007 financial statements") were incorporated by reference

into the Registration Statement. On March 22, 2010, OSG filed E&Y's consent to include in the Registration Statement E&Y's February 26, 2009 unqualified audit report on the 2008 and 2007 financial statements and OSG's reference to E&Y as an "Expert" in the Registration Statement.

13.    Defendant PricewaterhouseCoopers LLP ("PwC") has served as OSG's independent registered public accounting firm since June 17, 2009. PwC audited OSG's financial statements and its system of internal controls over financial reporting for the years ended December 31, 2011, 2010 and 2009. PwC's unqualified audit opinion on the Company's financial statements for the year ended December 31, 2009 (the "2009 financial statements") and its 2009 system of internal controls over financial reporting was incorporated by reference into the Registration Statement. On March 22, 2010, OSG filed PwC's consent to include in the Registration Statement PwC's March 1, 2010 unqualified audit report on the Company's 2009 financial statements and its 2009 system of internal controls over financial reporting and OSG's reference to PwC as an "Expert" in the Registration Statement.

## CLASS ACTION ALLEGATIONS

14.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons who purchased Notes pursuant and/or traceable to the Offering or OSG securities between October 29, 2007 and October 19, 2012, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

15.     The members of the Class are so numerous that joinder of all members is impracticable. OSG sold $300 million of Notes in the Offering, which were then traded in the open market. During the Class Period, OSG also had more than 30 million common shares issued and outstanding, which actively traded over the NYSE. The precise number of Class members is unknown to Lead Plaintiffs at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of OSG or its transfer agent. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

16.     Lead Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Lead Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

17.     Lead Plaintiffs' claims are typical of the claims of the other members of the Class because Lead Plaintiffs' and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Lead Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

18.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Lead Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether the Registration Statement issued by Defendants to the investing public in connection with the Offering negligently omitted and/or misrepresented material facts about OSG and its business;

(c)     whether Defendants' statements issued during the Class Period were materially false and misleading; and

(d)     the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

20.     OSG is engaged primarily in the ocean transportation of crude oil and petroleum products through the ownership and operation of a diversified fleet of vessels in both the international market and the U.S. Flag trades.  The Company charters its vessels for specific voyages at spot rates or for specific periods of time at fixed daily amounts.  OSG's customers include major independent and state-owned oil companies, oil traders, and U.S. and international government entities.

21.     At December 31, 2009, the Company owned or operated a fleet of 106 vessels (aggregating 10.9 million deadweight tons and 864,800 cubic meters), of which 84 vessels operated in the international market and 22 operated in the U.S. Flag market.  By December 2011, the Company owned or operated fleet of double-hulled vessels totaled 111, with 89 and 22

vessels, respectively operating the international and U.S. Flag markets. During the Class Period, OSG employed approximately 3,600 people, approximately 88% of whom were seagoing personnel and 12% of which were shore-side staff.

22. The Company's international operations, which utilize approximately 75% of the vessels that OSG operates, is comprised of fleets of crude oil tankers and product carriers. The Company's fleet of crude oil tankers operate primarily in the U.S. Gulf of Mexico, transporting crude oil to oil refiners. OSG has integrated a number of its crude oil tankers into a commercial pool transportation system with other ship owners so that it can achieve higher vessel utilization rates, scheduling efficiencies and revenues.

23. OSG's fleet of product carriers primarily transport refined petroleum products worldwide. In contrast to the crude oil tanker market, the refined petroleum trades are more complex due to the diverse nature of product cargoes, which include gasoline, diesel, jet fuel, home heating oil, vegetable oils and organic chemicals (*e.g.,* methanol and ethylene glycols).

24. The Company's U.S. Flag operations, which utilize approximately 25% of the vessels OSG operates, manage a fleet of vessels that execute medium to long-term charters for relatively small or niche trades, including the transportation of crude oil, products, dry bulk, container and RoRo/Car Carriers. Much of the Company's U.S. Flag business is subject to various legislation and regulation, including: (a) the Merchant Marine Act of 1920, more commonly referred to as the Jones Act, which, among other things, provides that shipping between U.S. ports be reserved for U.S. Flag vessels that are built in the U.S. and owned by U.S. companies that are more than 75% owned and controlled by U.S. citizens; (b) the Cargo Preference Act of 1954, which among other things, requires that preference be given to U.S. Flag vessels engaged in certain cargo trade if such trade is available at fair and reasonable rates; and

(c) the Cargo Preference Act of 1904, which, among other things, requires that cargoes for the U.S. military be carried exclusively on U.S. Flag vessels.

**OSG International and Subpart F of the Internal Revenue Code**

25.     According to OSG's Form 10-K for 2009 filed with the SEC on March 1, 2010 (the "2009 10-K"), the Company's fleet of international vessels are all owned or operated by foreign corporations that are subsidiaries of OSG International, Inc. ("OIN"), a wholly owned subsidiary of the Company incorporated in the Marshall Islands that functions as a holding company for the foreign entities that own or operate OSG's international vessels.

26.     OIN derives substantially all of its gross income from the use and operation of vessels in international commerce.  This income principally consists of hire from time and voyage charters for the transportation of cargoes and the performance of services directly related thereto, which OSG refers to as "shipping income."

27.     The 2009 10-K represents that OSG considers shipping income that is attributable to transportation that begins or ends, but that does not both begin and end, in the U.S. to be 50% derived from sources within the U.S.  In addition, OSG considers shipping income attributable to transportation that both begins and ends in the U.S. to be 100% derived from sources within the U.S.  OIN does not engage in transportation that gives rise to 100% U.S. source income.

28.     The 2009 10-K represents that shipping income attributable to transportation exclusively between non-U.S. ports will be considered to be 100% derived from sources outside the U.S. and to not be subject to any U.S. federal income tax.

29.     In addition, the 2009 10-K states that for taxable years beginning on or after January 1, 1987 and ending on or before December 31, 2004, the Company, as a 10% or more shareholder of controlled foreign corporations, was subject to current taxation on the shipping income of its foreign subsidiaries.  The 2009 10-K further represents that, as a result of changes

made by the American Jobs Creation Act of 2004 ("Jobs Act"), for taxable years beginning after December 31, 2004, OSG is no longer required to report the undistributed foreign shipping income earned by OIN under the "Subpart F" provisions of the U.S. Internal Revenue Code of 1986 as taxable income on a current basis.

30.     Subpart F of the Internal Revenue Code ("Subpart F"), encompassing Internal Revenue Code §§951-964, generally provides that one form of income of a controlled foreign corporation ("CFC") that is taxable to U.S. Shareholders is Foreign Base Company Shipping Income.  Foreign Base Company Shipping Income generally includes income derived from the use of an aircraft or vessel in foreign commerce, the performance of services directly related to the use of any such aircraft or vessel, the sale or other disposition of any such aircraft or vessel, and certain space or ocean activities.

31.     The 2009 10-K states that, in an attempt to make U.S.-controlled shipping companies competitive with foreign-controlled shipping companies, Congress passed the Jobs Act, which repealed Subpart F's rules relating to Foreign Base Company Shipping Income. Accordingly, the 2009 10-K represents that "for years beginning on or after January 1, 2005, the Company is not required to include in income OIN's undistributed shipping income."

32.     While the Jobs Act repealed Subpart F's rules relating to Foreign Base Company Shipping Income, OSG remained subject to Section 956 of the Internal Revenue Code ("Section 956") included within Subpart F.  Section 956 is a well-studied and longstanding provision of Subpart F that deals with a U.S. entity's recognition of a CFC's income.  Prior to 1962, income from foreign subsidiaries was only subject to U.S. tax at the time it was repatriated via a dividend.  Recognizing that U.S. corporations were obtaining the economic benefit of foreign

subsidiaries' earnings via investments, loans or guarantees provided by foreign subsidiaries, Congress, in 1962, enacted Section 956.

33.     Generally, Section 956 is an anti-avoidance rule that treats certain transactions by a CFC as being effective repatriations of the CFC's earnings to its U.S. parent company when such transactions are, in substance, tantamount to the U.S. parent company receiving a dividend from the CFC.

34.     Under Section 956, when a CFC subsidiary provides certain support for the borrowings of its U.S. parent company, the accumulated "earnings and profits" of that subsidiary are deemed to have been distributed to the U.S. parent company and, accordingly, are subject to the U.S. parent company's federal income tax liability.  In this context, the general rationale of Section 956 is if a corporate U.S. borrower obtains credit support from its CFC subsidiaries, it has essentially obtained the benefit of the past and future earnings of such subsidiaries, and as long as that credit support remains in place, future earnings and profits of such subsidiary will, on a periodic basis, be deemed to have been distributed to the U.S. parent company.

35.     Accordingly, pursuant to Section 956, the U.S. parent company's obligation to a third-party lender is deemed a distribution of the current and accumulated earnings and profits of a CFC subsidiary to the U.S. parent company up to the amount of the obligation, when, among other events, the subsidiary guarantees payment of loans made to the U.S. parent company or the subsidiary grants a security interest to the lender in its assets to secure loans by the U.S. parent company.

36.     Therefore, the U.S. borrower's simple act of causing its CFC subsidiary to guarantee the U.S. parent company's debt obligation, may cause the U.S. parent company to incur income tax liability under Section 956.  With respect to the securing of debt by a U.S.

parent company via a loan guarantee by a CFC, the amount subject to tax pursuant to Section 956 is the unpaid principal balance of the U.S. parent company's loan. *See* Treas. Reg. §1.956-1(e)(2).

## OSG Triggers U.S. Income Tax Liability
## Because OIN Is Jointly and Severally Liable on Borrowings

37.    Prior to and during the Class Period, OSG entered into various debt arrangements with third parties, including with affiliates of certain of the Underwriter Defendants, that triggered tens of millions of dollars in U.S. income tax liability under Section 956 because OIN was jointly and severally liable on those borrowings.

38.    For example, in 2001, OSG, OIN and OSG Bulk Ships, Inc. ("OBS"), an OSG subsidiary, entered into a long-term credit facility with certain third party lenders to borrow up to $240 million (the "$240 million facility").  OIN was jointly and severally liable for the $240 million facility, which facility was increased in amount to $350 million in 2002.  Similarly, in 2005, OSG, OIN and OBS entered into a long-term credit facility with certain third party lenders to borrow up to $500 million (the "$500 million facility").  OIN was jointly and severally liable for the $500 million facility.

## OSG Admits Its Financial Statements
## Should No Longer Be Relied Upon and Files for Bankruptcy Protection

39.    On August 26, 2013, OSG filed with the SEC its Form 10-K for the year ended December 31, 2012 (the "2012 Form 10-K").   The 2012 Form 10-K reported that, upon completion of an inquiry by OSG's Audit Committee in June 2013, the Company determined that there were material misstatements in its previously issued financial statements for ***each of the twelve calendar years in the twelve year period ended December 31, 2011*** (including the interim periods within those years), and for each of the calendar quarters ended March 31, 2012 and June 30, 2012, and such financial statements should be restated.

40.	OSG also disclosed in August 2013 that the SEC is investigating the potential tax consequences pursuant to Section 956 of the Internal Revenue Code arising out of credit agreements to which OSG, OBS and OIN were parties and pursuant to which OSG or OBS borrowed funds.  The credit agreements cover a twelve-year period.

41.	OSG's tax problems first came to light in October 2012.  On October 3, 2012, OSG filed a Form 8-K with the SEC representing that G. Allen Andreas III ("Andreas"), a member of its Board of Directors, had resigned, effective September 27, 2012, from his positions on OSG's Board of Directors and its Audit Committee.  The Form 8-K attached Andreas's resignation letter wherein Andreas cited a disagreement with OSG's Board of Directors' process in reviewing an unidentified "tax issue," and that Andreas "had hoped in prior discussions to convince the Board and Audit Committee to follow a different direction," but that he "was unsuccessful in those efforts" and "[a]s a result, [Mr. Andreas had] decided to tender [his] resignation."  The Form 8-K also noted that the tax issue referenced in Mr. Andreas's resignation letter relates to the interpretation of certain of the Company's loan agreement provisions, as well as the fact that the Company is domiciled in the U.S. and has substantial international operations. The letter stated, in pertinent part, as follows:[1]

> Mr. Michael J. Zimmerman
> Chairman of the Board
> Overseas Shipholding Group, Inc.
> 666 Third Avenue
> New York, New York  10017
>
> Dear Michael:
>
> This letter will serve as my resignation from the Board of Directors of Overseas Shipholding Group, Inc. (the "Company") and any of its committees, including the Audit Committee.  My resignation is effective immediately.

---

[1]	All emphasis herein is added, unless otherwise noted.

**My resignation results from a disagreement with the Board as to the process the Board is taking in reviewing a tax issue**.

In taking this action, I urge you to report this issue to our auditors, PricewaterhouseCoopers LLP, prior to the Company disclosing my resignation with the SEC. I understand that the Company must file a Form 8-K with the SEC when a director resigns in this context.

I very much regret having to take this action. **I had hoped in prior discussions to convince the Board and Audit Committee to follow a different direction**. I was unsuccessful in those efforts. As a result, I have decided to tender my resignation.

42. On October 22, 2012, OSG filed a Form 8-K (the "October 22nd 8-K") with the SEC representing that in furtherance of the investigation into the tax issues raised in connection with Andreas's resignation, the Board's Audit Committee, "on the recommendation of management," had, on October 19, 2012, "concluded that the Company's previously issued financial statements **for at least the three years ended December 31, 2011** and associated interim periods, and for the fiscal quarters ended March 31 and June 30, 2012, **should no longer be relied upon**." According to the October 22nd 8-K, the "Audit Committee and authorized officers ha[d] informed the Company's independent registered public accountants of this conclusion" and the "Company [was] continuing its review processes, including determining whether a restatement of those financial statements may be required, and the nature and amount of any potential restatement."

43. The October 22nd 8-K also stated that "the Company [was] evaluating its strategic options, including the potential voluntary filing of a petition for relief to reorganize under Chapter 11 of the Bankruptcy Code." Later in the day on October 22, 2012, S&P lowered its credit rating on OSG to CCC, nine steps into junk territory, because of the "high probability of very near-term default," and S&P's belief that the Company is in a liquidity crisis and the likelihood that OSG's covenants would be breached unless the Company developed a "credible

plan" to avert the breach or its lenders provided a covenant waiver. Moody's also downgraded OSG to Caa1 because of the looming bankruptcy filing.

44.     Thereafter, on November 13, 2012, OSG filed a notice with the SEC confirming that the Company still could not bring its financial statements current. The filing stated, in pertinent part, as follows:

> As previously disclosed in a Form 8-K filed with the Securities and Exchange Commission on October 22, 2012, the Audit Committee of the Board of Directors of Overseas Shipholding Group, Inc. (the Company), on the recommendation of management, has concluded that the Company's previously issued financial statements for at least the three years ended December 31, 2011 and associated interim periods, and for the fiscal quarters ended March 31 and June 30, 2012, should no longer be relied upon. The Company is continuing its review processes, including determining whether a restatement of those financial statements may be required, and the nature and amount of any potential restatement. The time frame for completing this review is not currently known. However, it is anticipated to be beyond the November 14, 2012 permitted extension of the prescribed due date for the Form 10-Q.

45.     Then, on November 14, 2012, OSG filed for bankruptcy protection. In its filing with the SEC disclosing the bankruptcy filing, OSG also stated that "[o]n November 14, 2012, NYSE Regulation, Inc. ("NYSE Regulation") announced the immediate suspension of trading on the New York Stock Exchange of the common stock of OSG,"; that "NYSE Regulation determined that OSG is no longer suitable for listing in light of the filing of the Voluntary Petitions, which is sufficient grounds for the commencement of delisting procedures according to Section 802.01D of the NYSE's Listed Company Manual" and that "[a]t this time OSG does not intend to take any action to appeal the NYSE's decision and therefore, it is expected that OSG's common stock will be delisted after completion by the NYSE of application to the Securities and Exchange Commission."

46.     On February 14, 2013, OSG's debtors (the "Debtors") made an application with the Bankruptcy Court seeking the entry of an order (the "Proposed Order") authorizing the

retention of Deloitte Tax LLP ("Deloitte Tax") as the Debtors' tax advisors. The Proposed Order provides, among other things, that Deloitte Tax provide the following services to the Debtors:

- **understand current Internal Revenue Code ("IRC") section 956 position**, including facts and technical tax analysis, and work done to date by other advisors (*i.e.,* discuss with legal counsel, read memos/opinions, review Client's workpapers, etc.);

- **analyze potential resolutions of the IRC section 956 issue**;

- help manage the IRS audit process through coordination of oral and written responses;

- prepare Client for and attend meetings with the IRS;

- **assist Client and other advisors in conferring with the IRS to address the IRC section 956 issue**;

- **calculate IRS penalties and interest associated with any <u>IRS adjustment to Client's prior federal income tax as a result of the IRC section 956 issue</u>; and**

- **advise Client on responding to tax notices and audits from various taxing authorities, in addition to the IRC section 956 issue**.

Accordingly, the Proposed Order indicates that the "tax issue" cited in Andreas's letter and the October 22nd 8-K relates to the "IRS adjustment to [OSG's] prior federal income tax as a result of the IRC section 956 issue."

47.     Indeed, the IRS has now taken steps to collect back taxes owed by OSG. On December 17, 2012, the IRS filed a Proof of Claim (the "POC") with the Bankruptcy Court claiming that OSG owed the U.S Government more than $35 million in corporate income tax, and $13.7 million in interest thereon, as follows:

| Tax Period | Corporate Income Taxes Due (000s) | Interest To Petition Date |
|---|---|---|
| December 31, 2004 | $25,692 | $12,785 |
| December 31, 2005 | 172 | 69 |
| December 31, 2009 | 9,209 | 864 |
| December 31, 2010 | 10 | 0 |

| | | |
|---|---|---|
| December 31, 2011 | _10_ | _0_ |
| Totals | $35,093 | $13,718 |

48.     Then, on February 8, 2013, the IRS filed an amendment to the POC with the Bankruptcy Court claiming that OSG owed the U.S Government more than $435 million in corporate income tax, and $27.9 million in interest thereon, as follows:

| _Tax Period_ | _Corporate Income Taxes Due (000s)_ | _Interest To Petition Date_ |
|---|---|---|
| December 31, 2004 | $25,692 | $12,785 |
| December 31, 2005 | 172 | 69 |
| December 31, 2009 | 9,209 | 864 |
| December 31, 2010 | 200,000 | 10,700 |
| December 31, 2011 | _200,000_ | _3,522_ |
| Totals | $435,073 | $27,940 |

49.     As reported in OSG's December 19, 2013 Current Report on Form 8-K (as filed with the SEC), after extensive discussions between OSG and the IRS concerning the calculation of OSG's tax liability, OSG agreed with the IRS that OSG would pay approximately $264 million in taxes and interest relating to "additional taxable income under Section 956 of the Internal Revenue Code in respect of 2010 and 2011." However, OSG's settlement with the IRS does not cover OSG's 2012 and 2013 tax years. For those years, OSG anticipates reporting "substantial" amounts of Section 956 taxable income as a result of drawdowns on the 2006 credit agreement in 2012.

**The Offering**

50.     On March 4, 2010, OSG filed a registration statement with the SEC on Form S-3 to register the sale of an "indeterminate number of shares of common stock and debt securities of the registrant as may from time to time be issued at indeterminate prices" in the future. On March 22, 2010, OSG filed a Shelf Registration Statement and Prospectus (the "Registration Statement") with the SEC. The Registration Statement was supplemented via a March 22, 2010

Preliminary Prospectus Supplement and a March 24, 2010 Prospectus Supplement (the "Prospectus"). The Prospectus, which forms part of the Registration Statement, and the Registration Statement each expressly incorporated by reference many of the Company's public filings made with the SEC, including OSG's 2009 10-K.

51. The sale of $300 million of the redeemable, unsecured Notes offered by the Registration Statement and Prospectus was completed on March 29, 2010, yielding the Company net Offering proceeds of approximately $289.8 million. The Prospectus represented that OSG intended to use the net Offering proceeds to repay debt under its unsecured revolving credit facility. The Prospectus further represented that OSG intended to use at least 5% of the Offering proceeds to repay certain affiliates of each of Defendants Citigroup, HSBC, Deutsche Bank, DnB, and ING, who were lenders under the credit facility.

**The Registration Statement and Prospectus Contained
Inaccurate Statements of Material Fact and Omitted
Material Information Required to Be Disclosed Therein**

52. The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

53. As detailed further below, the Registration Statement and Prospectus, which incorporated the 2009 Form 10-K by reference, materially misstated OSG's credit for federal income taxes, its then current and deferred income tax asset and liability amounts and its related income tax disclosures.

54. **Financial Statements**: The 2009 10-K, which was incorporated by reference in the Registration Statement and the Prospectus, also included OSG's audited financial statements for the years ended December 31, 2009, 2008 and 2007 (collectively referred to herein as the

"Financial Statements"). OSG's 2009 financial statements were audited by Defendant PwC, and its 2008 and 2007 financial statements were audited by Defendant E&Y.

55. The Financial Statements included in the Registration Statement and the Prospectus were presented in violation of Generally Accepted Accounting Principles ("GAAP") in that they reported materially inaccurate information about OSG's 2009 credit for federal income taxes and its income tax assets and liabilities during each of the years represented by the Financial Statements.

56. Regulation S-X [17 C.F.R. §210.4-01.(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Generally Accepted Auditing Standard ("GAAS") AU §411.02.

57. OSG has now admitted that its previously issued financial statements for **at least** each of the calendar years in the three year period ended December 31, 2011, which included OSG's financial statements for the year ended December 31, 2009, incorporated by reference in the Registration Statement and the Prospectus, "**should no longer be relied upon.**"

58. On August 26, 2013, the Company disclosed in its Form 10-K that it had determined that there were material misstatements in the Company's previously issued financial statements for each of the twelve calendar years in the twelve year period ended December 31, 2011 (including the interim periods within those years), and for each of the calendar quarters ended March 31, 2012 and June 30, 2012, and such financial statements should be restated. Accordingly, the Company has restated its previously issued financial statements for the two calendar years ended December 31, 2011 and 2010 and for each of the calendar quarters ended

March 31, 2012 and June 30, 2012.  The Company has not amended its previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for the periods affected by this restatement.

59.     In addition, the Financial Statements falsely represented that they had been prepared in conformity with GAAP, when, in violation of GAAP's Accounting Standards Codification ("ASC") Section 740, they incorrectly accounted for and materially misstated OSG's income taxes.  ASC Section 740 provides, among other things, that financial statements reflect the tax effect of all transactions that have been reported in such statements, including the tax effects that are taxable or deductible in the current reporting period, as well as tax effects that will lead to taxable income or tax deductions in future periods.  The Financial Statements violated ASC Section 740 by failing to report, at each balance-sheet date, OSG's true current and deferred tax assets or liabilities (representing income taxes refundable or payables) and the 2009 Financial Statements violated ASC Section 740 by failing to report OSG's true 2009 credit for income taxes.

60.     Further, the Financial Statements incorporated by reference in the Registration Statement and the Prospectus contained the following materially false and misleading statements about OSG's credit for federal income taxes and tax assets and liabilities:

NOTE L—TAXES:

From January 1, 1987 through December 31, 2004, earnings of the foreign shipping companies (exclusive of foreign joint ventures in which the Company has a less than 50% interest) have been subject to U.S. income taxation in the year earned and may therefore be distributed to the U.S. parent without further tax. Income of foreign shipping companies earned from January 1, 1976 through December 31, 1986 ("Deferred Income") was excluded from U.S. income taxation to the extent that such income was reinvested in foreign shipping operations.  Foreign shipping income earned before 1976 is not subject to tax unless distributed to the U.S. parent.  A determination of the amount of qualified investments in foreign shipping operations,  as defined, is made at the end of each year and such amount is compared with the corresponding amount at December

31, 1986. If, during any determination period, there is a reduction of qualified investments in foreign shipping operations, Deferred Income, limited to the amount of such reduction, would become subject to tax.

On October 22, 2004, the President of the U.S. signed into law the American Jobs Creation Act of 2004. The Jobs Creation Act reinstated tax deferral for OSG's foreign shipping income for years beginning after December 31, 2004. **Effective January 1, 2005, the earnings from shipping operations of the Company's foreign subsidiaries are not subject to U.S. income taxation as long as such earnings are not repatriated to the U.S. The Company intends to permanently reinvest these earnings, as well as the undistributed income of its foreign companies accumulated through December 31, 1986, in foreign operations.**

Accordingly, no provision for U.S. income taxes on the shipping income of its foreign subsidiaries was required in the three years ended December 31, 2009 and no provision for U.S. income taxes on the undistributed income of the foreign shipping companies accumulated through December 31, 1986 was required at December 31, 2009. Further, no provision for U.S. income taxes on the Company's share of the undistributed earnings of the less than 50%-owned foreign shipping joint ventures was required as of December 31, 2009, because the Company intends to indefinitely reinvest such earnings ($85,000,000 at December 31, 2009). The unrecognized deferred U.S. income taxes attributable thereto approximated $30,000,000.

As of December 31, 2009, undistributed earnings on which U.S. income taxes have not been provided aggregated approximately $2,400,000,000, including $119,000,000 earned prior to 1976; **the unrecognized deferred U.S. income tax attributable to such undistributed earnings approximated $840,000,000**.

As discussed above, earnings of OSG's foreign shipping subsidiaries from January 1, 1987 through December 31, 2004, were subject to U.S. income taxes and, therefore, may be distributed to the U.S. parent without further tax. In 2008, the Company repatriated approximately $545,000,000 of such previously taxed earnings, representing the full balance of its undistributed previously taxed earnings.

\*       \*       \*

The significant components of the Company's deferred tax liabilities and assets follow:

| In thousands at December 31, | 2009 | 2008 |
|---|---|---|
| Deferred tax liabilities: | | |
| Excess of book over tax basis of depreciable or amortizable assets—net | $ 193,632 | $ 181,055 |
| Tax benefits related to the Capital Construction Fund | 14,244 | 17,038 |
| Costs capitalized and amortized for book, expensed for tax | 9,020 | 9,367 |
| Other—net | 5,456 | 9,272 |
| Total deferred tax liabilities | 222,352 | 216,732 |
| Deferred tax assets: | | |
| Vessel impairment charges | 642 | 20,289 |
| Net operating loss carryforward | 27,742 | 27,742 |
| Employee Compensation and Benefit Plans | 14,898 | 8,785 |
| Other comprehensive income | 6,598 | 11,132 |
| Total deferred tax assets | 49,880 | 67,948 |
| Valuation allowance | 32,823 | 48,031 |
| Net deferred tax assets | 17,057 | 19,917 |
| Net deferred tax liabilities | 205,295 | 196,815 |
| Current portion of net deferred tax liabilities | — | — |
| Long-term portion of net deferred tax liabilities | $ 205,295 | $ 196,815 |

\* \* \*

The components of income before federal income taxes, adjusted for noncontrolling interest, follow:

| In thousands for the year ended December 31, | 2009 | 2008 | 2007 |
|---|---|---|---|
| Foreign | $ 170,207 | $ 593,025 | $ 296,807 |
| Domestic | (135,757) | (309,364) | (80,670) |
| | $ 34,450 | $ 283,661 | $ 216,137 |

Substantially all of the above foreign income resulted from the operations of companies that were not subject to income taxes in their countries of incorporation.

The adjustments for noncontrolling interest relate only to domestic income.

The components of the (provision)/credits for federal income taxes follow:

| In thousands for the year ended December 31, | 2009 | 2008 | 2007 |
|---|---|---|---|
| Current | $ 40,395 | $ 7,868 | $ (5,908) |
| Deferred | (3,698) | 26,136 | 1,081 |
| | $ 36,697 | $ 34,004 | $ (4,827) |

Reconciliations of the actual federal income tax rate attributable to pretax income and the U.S. statutory income tax rate follow:

| For the year ended December 31, | 2009 | 2008 | 2007 |
|---|---|---|---|
| Actual federal income tax provision/(credit) rate | (106.5)% | (12.3)% | 2.1% |
| Adjustments due to: | | | |
| Goodwill impairment charge | — | (6.0)% | — |
| Income not subject to U.S. income taxes | 97.3% | 68.0% | 32.9% |
| Basis adjustment recognized on liquidation of OSG America L.P. | (13.6)% | — | — |
| Other | 13.6% | 2.2% | — |
| Valuation allowance | 44.2% | (16.9)% | — |
| U.S. statutory income tax provision rate | 35.0% | 35.0% | 35.0% |

The following is a roll-forward of the Company's unrecognized tax benefits for 2009 and 2008:

| In thousands | | 2009 | | 2008 |
|---|---|---|---|---|
| Balance of unrecognized tax benefits as of January 1, | $ | 7,546 | $ | 5,424 |
| Increases for positions taken in prior years | | 226 | | 2,775 |
| Increases for positions related to the current year | | 1,234 | | — |
| Amounts of decreases related to settlements | | (2,094) | | — |
| Reductions due to lapse of statutes of limitations | | (1,620) | | (653) |
| Balance of unrecognized tax benefits as of December 31, | $ | 5,292 | $ | 7,546 |

The Company does not presently anticipate such uncertain tax positions will significantly increase or decrease in the next 12 months; however actual developments could differ from those currently expected. The Company is generally no longer subject to federal, state and local income tax examinations by tax authorities for years prior to 2005.

OSG records interest on unrecognized tax benefits in its provision for income taxes. The interest and penalties on unrecognized tax benefits are included in the roll-forward schedule above and were approximately $1,303,000 in 2009 and $1,811,000 in 2008.

61. The statements referenced above in ¶60 were each inaccurate statements of material fact when made because the Financial Statements, which the Company has advised should no longer be relied upon, violated GAAP, specially ASC Section 740, thereby causing OSG's reported credit for federal income taxes for the year end December 31, 2009 and its deferred tax assets and liabilities at December 31, 2009, 2008 and 2007, to be materially misstated.

62. **Income Tax Statements**: The Registration Statement and the Prospectus incorporated by reference OSG's 2009 10-K, which, in pertinent part, included materially inaccurate statements about the taxation of OSG's operations. The 2009 10-K provided materially false and misleading statements about the taxability of OIN income, stating, in pertinent part, as follows:

Taxation of the Company

The following summary of the principal United States tax laws applicable to the Company, as well as the conclusions regarding certain issues of tax law, are based

on the provisions of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), existing and proposed U.S. Treasury Department regulations, administrative rulings, pronouncements and judicial decisions, all as of the date of this Annual Report. No assurance can be given that changes in or interpretation of existing laws will not occur or will not be retroactive or that anticipated future circumstances will in fact occur. The Company's views should not be considered official, and no assurance can be given that the conclusions discussed below would be sustained if challenged by taxing authorities.

All of the Company's International Flag vessels are owned or operated by foreign corporations that are subsidiaries of OSG International, Inc., a wholly owned subsidiary of the Company incorporated in the Marshall Islands ("OIN"). These corporations have made special U.S. tax elections under which they are treated as "branches" of OIN rather than separate corporations for U.S. federal income tax purposes.

As a result of changes made by the American Jobs Creation Act of 2004 ("2004 Act"), as discussed below, for taxable years beginning after December 31, 2004, the Company is no longer required to report taxable income on a current basis the undistributed foreign shipping income earned by OIN under the "Subpart F" provisions of the Code.

\* \* \*

Taxation to OIN of its Shipping Income: In General

OIN derives substantially all of its gross income from the use and operation of vessels in international commerce. This income principally consists of hire from time and voyage charters for the transportation of cargoes and the performance of services directly related thereto, which is referred to herein as "shipping income."

Shipping income that is attributable to transportation that begins or ends, but that does not both begin and end, in the U.S. will be considered to be 50% derived from sources within the United States. Shipping income attributable to transportation that both begins and ends in the United States will be considered to be 100% derived from sources within the United States. OIN does not engage in transportation that gives rise to 100% U.S. source income. Shipping income attributable to transportation exclusively between non-U.S. ports will be considered to be 100% derived from sources outside the United States. Shipping income derived from sources outside the U.S. will not be subject to any U.S. federal income tax. OIN's vessels will operate in various parts of the world, including to or from U.S. ports. Unless exempt from U.S. taxation under Section 883 of the Code, OIN will be subject to U.S. federal income taxation of 4% of its U.S. source shipping income on a gross basis without the benefit of deductions.

Application of Code Section 883

Under Section 883 of the Code and temporary Treasury regulations, OIN will be exempt from the foregoing U.S. taxation of its U.S source shipping income if, for more than half of the days in its taxable year, it is a "controlled foreign corporation" within the meaning of Section 957 of the Code and more than 50 percent of the total value of its stock is owned by certain U.S. persons including a domestic corporation. These requirements should be met and therefore OIN should continue to benefit from the application of Section 883 of the Code. To the extent OIN is unable to qualify for exemption from tax under Section 883, OIN's U.S. source shipping income will become subject to the 4% gross basis tax regime described above.

Taxation to OSG of OIN's Shipping Income

For taxable years beginning on or after January 1, 1987 and ending on or before December 31, 2004, the Company, as a 10% shareholder or more of controlled foreign corporations, was subject to current taxation on the shipping income of its foreign subsidiaries. To make U.S.-controlled shipping companies competitive with foreign-controlled shipping companies, through the passage of the 2004 Act, Congress repealed the current income inclusion by 10% shareholders of the shipping income of controlled foreign corporations. Accordingly, for years beginning on or after January 1, 2005, the Company is not required to include in income OIN's undistributed shipping income.

For taxable years beginning on or after January 1, 1976 and ending on or before December 31, 1986, the Company was not required to include in income the undistributed shipping income of its foreign subsidiaries that was reinvested in qualified shipping assets. For taxable years beginning on or after January 1, 1987, the Company is required to include in income the deferred shipping income from this period to the extent that at the end of any year the investment in qualified shipping assets is less than the corresponding amount at December 31, 1986. By virtue of the nature of OIN's business, the Company anticipates that the recognition of this deferred income will be postponed indefinitely. This is discussed in more detail in the notes to the Company's consolidated financial statements set forth in Item 8.

63.     The statements referenced above in ¶62 were each inaccurate statements of material fact when made because they failed to disclose the following facts which existed at the time of the Offering:

(a)     that OIN was party to and jointly and severally liable for OSG's debt obligations to third party lenders, thereby guaranteeing such obligations;

(b)  that pursuant to Section 956, OIN's guarantees of various OSG debt obligations, resulting from its being a party to and jointly and severally liable on such obligations, triggered a deemed distribution of OIN's then current and accumulated earnings and profits to OSG; and

(c)  that OIN's guarantees of OSG's debt obligations then subjected OSG to tens of millions of dollars in undisclosed federal income taxes.

64.  The Registration Statement and Prospectus included the following materially false and misleading statement about OSG's critical accounting policies, its deferred tax assets and its provision/(credit) for income taxes:

PROVISION/(CREDIT) FOR FEDERAL INCOME TAXES

The income tax provision for 2007 and the credits for 2009 and 2008 are based on the pre-tax results of the Company's U.S. subsidiaries, adjusted to include non shipping income of the Company's foreign subsidiaries. The tax credit for 2009 reflects the carryback of approximately $42,200,000 of 2009 tax losses against earnings generated in 2004. On November 6, 2009, the President of the U.S. signed the Worker, Homeownership, and Business Assistance Act of 2009. This law included a provision allowing taxpayers to elect an increased carryback for net operating losses incurred in either 2008 or 2009. In addition, OSG also recognized a charge of approximately $3,700,000 attributable to the net increase in deferred tax liabilities in 2009. This increase was net of a benefit aggregating approximately $4,700,000 attributable to a reduction in deferred tax liabilities recognized upon dissolution for tax purposes of the partnership, OSG America L.P., in 2009. The tax credit for 2008 reflects the carryback of approximately $4,000,000 of 2008 tax losses against the non shipping income of the Company's foreign subsidiaries generated in 2007. In addition, the vessel write-downs recorded in 2008 gave rise to the reversal of previously established deferred tax liabilities aggregating approximately $26,300,000.

On October 22, 2004, the President of the U.S. signed into law the American Jobs Creation Act of 2004. The Jobs Creation Act reinstated tax deferral for OSG's foreign shipping income for years beginning after December 31, 2004. Effective January 1, 2005, the earnings from shipping operations of the Company's foreign subsidiaries are not subject to U.S. income taxation as long as such earnings are not repatriated to the U.S. Because the Company intends to permanently reinvest these earnings in foreign operations, no provision for U.S. income taxes on such earnings of its foreign shipping subsidiaries is required after December 31, 2004.

In September 2006, the Company made an election under the Jobs Creation Act, effective for years commencing with 2005, to have qualifying U.S. Flag operations taxed under a new tonnage tax regime rather than under the usual U.S. corporate income tax regime. As a result of that election, OSG's taxable income for U.S. income tax purposes with respect to the eligible U.S. Flag vessels will not include income from qualifying shipping activities in U.S. foreign trade (*i.e.,* transportation between the U.S. and foreign ports or between foreign ports).

65. The statements referenced above in ¶64 were each inaccurate statements of material fact when made because they failed to disclose the following facts which existed at the time of the Offering:

(a) that the financial statements were presented in violation of GAAP;

(b) that OSG's deferred tax assets and liabilities and its provision/(credit) for income taxes were materially misstated;

(c) that pursuant to Section 956, the obligation of a U.S. parent company to a third-party lender triggers a deemed distribution of the current and accumulated earnings and profits of a CFC subsidiary to the U.S. parent company up to the amount of the obligation, when, among other events, the subsidiary guarantees the loans made to the U.S. parent company or the subsidiary grants a security interest to the lender in its assets to secure a loan issued to a U.S. parent company;

(d) that OIN was party to and jointly and severally liable on certain of OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations; and

(e) that OIN's guarantees of OSG's debt obligations to third party lenders subjected OSG to tens of millions of dollars in undisclosed federal income tax liabilities and expense.

66. **Selected Financial Data**: The 2009 10-K also included inaccurate selected financial data required by Item 301 of Regulation S-K [17 C.F.R. §229.301] for the five years ended December 31, 2009. These disclosures, which were derived from financial statements for

the year ended December 31, 2009 (which were audited by Defendant PwC) and from the financial statements for the years ended December 31, 2008, 2007, 2006 and 2005 (which were audited by Defendant E&Y), stated, in pertinent part:

| In thousands | 2009 | 2008 | 2007 | 2006 | 2005 |
|---|---|---|---|---|---|
| Net income attributable to Overseas Shipholding Group, Inc. | $ 70,170 | $ 317,665 | $ 211,310 | $ 392,660 | $ 464,829 |
| Provision/(credit) for income taxes | (36,697) | (34,004) | 4,827 | (8,187) | (1,110) |
| Interest expense | 45,125 | 57,449 | 74,696 | 68,652 | 89,489 |
| Depreciation and amortization | 172,404 | 189,163 | 185,499 | 141,940 | 152,311 |
| EBITDA | $ 251,002 | $ 530,273 | $ 476,332 | $ 595,065 | $ 705,519 |

67.     The statements referenced above in ¶66 were each inaccurate statements of material fact when made because OSG's 2009 provision/credit income taxes was materially misstated.

68.     **Items 303(a) and 503(c) Disclosure**: Pursuant to Item 12(a)(1) of Form S-3, registrants are required to provide in a registration statement the information required by Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, including any known trends, events or uncertainties that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. At the time of the Offering, OSG was improperly accounting for its income tax liabilities, as detailed herein. The uncertainties associated with OSG's improper income tax accounting were reasonably likely to have a material impact on OSG's continuing operations and, therefore, were required to be disclosed in the Registration Statement, but were not.

69.     The 2009 10-K, which was incorporated by reference in the Registration Statement, also included inaccurate information required by Item 503(c) of Regulation S-K [17 C.F.R. §229.503(c)] that made the Offering speculative or risky. The Registration Statement and Prospectus contained the following statement concerning the risks associated with the taxation of OIN's income:

OSG's financial condition would be materially adversely affected if the shipping income of OSG's foreign subsidiaries becomes subject to current taxation in the U.S.

As a result of changes made by the 2004 Act, the Company does not report in taxable income on a current basis the undistributed shipping income earned by its international flag vessels, which in recent years represented substantially all of the Company's pre-tax income. These changes in the 2004 Act were made to make U.S. controlled shipping companies competitive with foreign-controlled shipping companies, which are generally incorporated in jurisdictions in which they either do not pay income taxes or pay minimal income taxes.

In his State of the Union address on January 27, 2010, President Obama stated that "it's time to finally slash the tax breaks for companies that ship our jobs overseas and give those tax breaks for companies that create jobs in the United States of America". An increasing number of Congressmen and Senators have announced support for ending such tax breaks. While the Company believes that the changes made in the 2004 Act with respect to foreign shipping income do not "ship jobs overseas," and, in fact, have enabled the Company to expand its U.S. Flag fleet and create jobs in the U.S., Congress may decide to repeal the changes made in the 2004 Act with respect to taxation of foreign shipping income. Such repeal, either directly or indirectly by limiting or reducing benefits received under the 2004 Act, would have a materially adverse affect on the Company's business and financial results.

70.     The statements referenced above in ¶69 were each inaccurate statements of material fact when made because they failed to disclose the following facts which existed at the time of the Offering:

(a)     that OIN was party to and jointly and severally liable on OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations;

(b)     that pursuant to Section 956, OIN's guarantees of various OSG debt obligations, resulting from its being a party to and jointly and severally liable on such obligations, triggered a deemed distribution of OIN's then current and accumulated earnings and profits to OSG; and

(c)     that OIN's guarantees of OSG's debt obligations subjected OSG to tens of millions of dollars in undisclosed federal income taxes.

71.    **Internal Control Statements**:    The 2009 10-K also included inaccurate information required by Items 307 and 308 of Regulation S-K [17 C.F.R. §229.307 and §229.308] about OSG's disclosure controls and procedures and its internal control over financial reporting.

72.    The Registration Statement and Prospectus included, in pertinent part, the following inaccurate disclosure required by Items 307 and 308 of Regulation S-K about OSG's disclosure controls and procedures and its internal control over financial reporting:

(a)    Evaluation of disclose control and procedures.

As of the end of the period covered by this Annual Report on Form 10-K, an evaluation was performed under the supervision and with the participation of the Company's management, including the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act"). Based on that evaluation, the Company's management, including the CEO and CFO, concluded that the Company's current disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports the Company files or submits under the Exchange Act is (i) recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms and (ii) accumulated and communicated to the Company's management, including the CEO and CFO, as appropriate to allow timely decisions regarding required disclosure. There have been no changes in the Company's internal controls over financial reporting during the quarter ended December 31, 2009 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting

(b)    Management's report on internal controls over financial reporting.

Management's report on internal controls over financial reporting, which appears elsewhere in this Annual Report, is incorporated herein by reference.

*        *        *

MANAGEMENT'S REPORT ON INTERNAL CONTROLS
OVER FINANCIAL REPORTING

To the Stockholders

Overseas Shipholding Group, Inc.

In accordance with Rule 13a-15(f) of the Securities Exchange Act of 1934, the management of Overseas Shipholding Group, Inc. and its subsidiaries (the "Company") is responsible for the establishment and maintenance of adequate internal controls over financial reporting for the Company. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's system of internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements. Management has performed an assessment of the effectiveness of the Company's internal controls over financial reporting as of December 31, 2009 based on the provisions of Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on our assessment, management determined that the Company's internal controls over financial reporting was effective as of December 31, 2009 based on the criteria in Internal Control—Integrated Framework issued by COSO.

PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, who audited the 2009 financial statements included in the Annual Report, has audited and reported on the effectiveness of the Company's internal controls over financial reporting as of December 31, 2009 as stated in their report which appears elsewhere in this Annual Report.

February 26, 2010

OVERSEAS SHIPHOLDING GROUP, INC.
By: /s/ MORTEN ARNTZEN
Morten Arntzen
President,
Chief Executive Officer

By: /s/ MYLES R. ITKIN
Myles R. Itkin
Executive Vice President,
Chief Financial Officer and Treasurer

73.     The statements referenced above in ¶72 were each inaccurate statements of material fact when made because OSG negligently failed to disclose the material weaknesses in its system of internal controls over its income taxes.  Specifically, the Company did not possess the resources to accurately identify, evaluate and report, in a timely manner, the true amounts of OSG's income tax expense and related tax assets and liabilities.  In addition, the design and operation of the Company's system of internal controls over the accounting for income taxes failed to prevent or detect a material misstatement in OSG's Financial Statements.  Indeed, such weaknesses have caused the Company to now disclose to investors that the Financial Statements "should no longer be relied upon."

74.     **Audit Opinions**: As noted above, the Registration Statement and Prospectus included OSG's inaccurate 2009 financial statements audited by PwC and OSG's inaccurate 2008 and 2007 financial statements audited by E&Y.  In addition, the Registration Statement and Prospectus included inaccurate selected financial data derived from OSG's annual Financial Statements for the years 2005 through 2008 audited by E&Y and its 2009 financial statements audited by PwC.

75.     E&Y is a firm of certified public accountants that was engaged by OSG to provide independent auditing and accounting services from the time the Company was organized in 1969 through its "dismissal" in 2009.  E&Y's website describes its tax practice as being "one of the world's most globally-coordinated tax practices, with a network of 28,000 professionals in more than 120 countries" who "offer leadership in all tax disciplines, including business tax, indirect tax, international tax, transactional tax, and tax-related issues associated with human capital . . . dedicated to setting the standard for exceptional client service."

76.    As a result of E&Y's long history with OSG and the far-reaching scope of tax and audit-related services provided to the Company, E&Y personnel were intimately familiar with OSG's business, including OSG's tax matters and its accounting for income taxes.    The extensive services that E&Y provided to OSG are demonstrated by the fees that the Company paid E&Y.    From 2000 through 2009, OSG paid E&Y more than $13.1 million in fees for various services, including $1.9 million in fees associated with tax related services.

77.    PwC is also a firm of certified public accountants that was engaged on June 17, 2009 by OSG to provide it with accounting and independent auditing services.    GAAS provides that PwC should have requested to review E&Y's workpapers involving matters of significant accounting and auditing significance, including its accounting for income taxes, which OSG described as a "critical accounting policy."    PwC fully understood the significance of the Company's accounting for income taxes and was paid $792,500 for rendering tax related services to OSG in 2009, an amount that exceeded what OSG paid E&Y for such services from 2003 through 2008.

78.    E&Y's inaccurate unqualified audit opinion on the 2008 and 2007 financial statements, dated February 26, 2009, and PwC's inaccurate unqualified audit opinion on the 2009 financial statements and OSG's system of internal controls over financial reporting were included in the Registration Statement and Prospectus:

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders

Overseas Shipholding Group, Inc.

We have audited the accompanying consolidated balance sheet of Overseas Shipholding Group, Inc. and subsidiaries as of December 31, 2008, and the related consolidated statements of operations, cash flows, and changes in equity for each of the two years in the period ended December 31, 2008. These financial statements are the responsibility of the Company's management.    Our

responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Overseas Shipholding Group, Inc. and subsidiaries at December 31, 2008, and the consolidated results of their operations and their cash flows for each of the two years in the period ended December 31, 2008, in conformity with U.S. generally accepted accounting principles.

/s/ Ernst & Young
New York, New York
February 26, 2009

\* \* \*

Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders of Overseas Shipholding Group, Inc.:

In our opinion, the accompanying consolidated balance sheet and the related consolidated statements of operations, cash flows, and changes in equity present fairly, in all material respects, the financial position of Overseas Shipholding Group, Inc. and its subsidiaries at December 31, 2009, and the results of their operations and their cash flows for the period ended December 31, 2009 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audit. We conducted our audit in accordance with the standards

of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audit of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provide a reasonable basis for our opinions.

We also have audited the adjustments to the 2008 and 2007 financial statements to retrospectively apply change in accounting for the presentation of noncontrolling interest, as described in Note A - Summary of Significant Accounting Policies. In our opinion, such adjustments are appropriate and have been properly applied. We are not engaged to audit, or apply any procedures to the 2008 or 2007 financial statements of the Company other than with respect to the adjustments and, accordingly, we do not express an opinion or any other form of assurance on the 2008 or 2007 financial statements taken as a whole.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

New York, New York
March 1, 2010

79. The statements referenced above in ¶78 were each inaccurate statements of material fact when made because they failed to disclose the following facts which existed at the time of the Offering:

(a) that, as detailed above, OSG's Financial Statements were presented in violation of GAAP; and

(b) that, as detailed below, E&Y's audit of the 2008 and 2007 financial statements and PwC's audit of 2009 financial statements were not conducted in accordance with GAAS.

80. GAAS has been established to ensure that external auditors fulfill their obligations when auditing and reviewing financial statements and other information contained in SEC filings. It consists of authoritative standards, originally established by the American Institute of Certified Public Accountants ("AICPA"), which, as a result of the Sarbanes-Oxley Act of 2002, have now been adopted, amended and expanded upon by the Public Company Accounting Oversight Board ("PCAOB").

81. GAAS, includes, *inter alia*, ten basic standards establishing the objectives of a financial statement audit and providing guidance for the quality of audit procedures to be performed; interpretations of these standards in Statements on Auditing Standards issued by the AICPA, (codified and referred to as "AU §__") and additional auditing standards (referred to herein as "AS __") promulgated by the PCAOB.

82. Both E&Y's and PwC's knowledge of OSG's income taxes raised various obligations under GAAS that E&Y and PwC failed to satisfy. This was particularly the case since: (1) both E&Y and PwC, as two of the largest and most prominent certified public

accounting firms, fully understood or negligently ignored the requirements of Section 956; and (2) OSG was largely dependant on OIN's income and assets to obtain financing as OSG's international operations accounted for approximately 77%, 95%, 88%, 97%, and 94% of the Company's vessel income during the years ended December 31, 2009, 2008, 2007, 2006 and 2005, respectively, and accounted for approximately 75% of the Company's total assets between 2007 and 2009.

83.     GAAS, in Fieldwork Standard No. 3 and AU §326, *Evidential Matter*, requires auditors to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit:

> In evaluating evidential matter, the auditor considers whether specific audit objectives have been achieved.  The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation.  In designing audit procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of accounting other than generally accepted accounting principles.  In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements.  To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion.

AU §326.25 (footnotes omitted).

84.     In addition, GAAS, in AU §326, required E&Y and PwC to:

• obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit;

• consider whether specific audit objectives have been achieved in evaluating evidential matter;

• be thorough in the search for evidential matter and unbiased in its evaluation;

- design audit procedures to obtain competent evidential matter; and

- consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the client's financial statements.

85. E&Y's and PwC's responsibility, as OSG's independent auditors, was to obtain "[s]ufficient competent evidential matter . . . to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles."

86. In accumulating sufficient competent evidential matter, GAAS, in AU §330, *The Confirmation Process*, states that the auditor should direct confirmation requests to a financial institution official who is responsible for the financial institution's relationship with the client or is knowledgeable about a transaction or arrangement when confirming a client's oral and written guarantees with a financial institution. In addition, AU §337, *Inquiry of a Client's Lawyer Concerning Litigation, Claims and Assessments* provides that the audit normally include certain procedures such as obtaining information concerning loan guarantees on bank confirmation forms.

87. Had E&Y and PwC conducted their audits in accordance with GAAS, they would have learned, if they did not already know, that OIN guaranteed certain of OSG's debt obligations, thereby subjecting OSG to income tax liability under Section 956. Accordingly, both E&Y and PwC negligently failed to accumulate sufficient evidential matter about OIN's guarantees of OSG's debt obligations, including evidential matter via audit confirmations, and the resulting impact of such guarantees on OSG's tax liabilities and expenses.

88. In addition, AS No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, provides that a direct relationship

exists between the degree of risk that a material weakness could exist in a particular area of the company's internal control over financial reporting and the amount of audit attention that should be devoted to that area. Accordingly, the auditor should focus more of his or her attention on the areas of highest risk. On the other hand, it is not necessary to test controls that, even if deficient, would not present a reasonable possibility of material misstatement to the financial statements.

89. E&Y and PwC negligently violated GAAS by failing to focus their attention on the areas of highest risk associated with the Company's income taxes, which OSG characterized as a "critical accounting policy."

90. Moreover, General Standard No. 3 and AU §230, *Due Professional Care in the Performance of Work*, required E&Y and PwC to exercise "due professional care" and "professional skepticism" in their annual audits of OSG's financial results. Both E&Y and PwC violated GAAS because they negligently disregarded the dictates of Section 956 and that OIN's guarantees of OSG's debt obligations caused the Company to incur tens of millions of dollars in income tax liabilities.

91. In addition to the foregoing violations of GAAS, E&Y and PwC violated at least the following provisions of GAAS in "auditing" the financial statements in the Registration Statement and Prospectus:

(a) GAAS Standard of Reporting No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP. E&Y's opinions falsely represented that the Company's 2008 and 2007 financial statements were presented in conformity with GAAP and PwC's opinion falsely represented that the Company's 2009 financial statements were presented in conformity with GAAP, when they were not, as alleged herein;

(b)     AU §431, which provides that if management omits from the financial statements, including the accompanying notes, information that is required by GAAP, the auditor should express a qualified or an adverse opinion and should provide the required undisclosed information in its audit report;

(c)     GAAS Standard of Reporting No. 4 which requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated. E&Y's and PwC's failure to make such qualifications, corrections, modifications and/or withdrawals of its audit opinions was a violation of GAAS, including the fourth standard of reporting; and

(d)     GAAS General Standard No. 2, which requires that independence in mental attitude is to be maintained by the auditor in all matters related to the audit.

92.     In certifying the 2008 and 2007 financial statements and the 2009 financial statements, Defendants E&Y and PwC respectively represented that they conducted their audits of OSG's financial statements in accordance with each of the above-noted auditing standards, when they did not.

93.     At the time that the complaint in *Paul Otto Koether IRA Rollover v. Arntzen*, was first filed in Supreme Court of the State of New York, County of New York, the Notes were priced at $41.25 – a decline of approximately 58% from the Offering price.

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

94.     Lead Plaintiffs DSM and Indiana Treasurer repeat and reallege each and every allegation contained above as if fully set forth herein.

95. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, and is asserted against all Defendants. For purposes of this Count, Lead Plaintiffs DSM and Indiana Treasurer affirmatively state that they do not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

96. The Registration Statement and Prospectus were defective and inaccurate, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

97. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Prospectus.

98. The Individual Defendants each caused the issuance of the Registration Statement and Prospectus and/or signed the Registration Statement, either personally or through an Attorney-in-Fact. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading. In the exercise of reasonable care, the Individual Defendants knew or should have known of the material misstatements and omissions contained in the Registration Statement and Prospectus and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. As such, the Individual Defendants are liable to Lead Plaintiffs DSM and Indiana Treasurer and the Class.

99. The Underwriter Defendants were each underwriters, as that term is used in Section 11(a)(5) of the Securities Act, with respect to the Offering and the Company's securities sold through the Registration Statement and Prospectus. The Underwriter Defendants were

required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts. None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Registration Statement and Prospectus, were true, were without omission of any material facts, and/or were not inaccurate.

100.    Defendants E&Y and PwC expressly consented to having their unqualified audit opinions for OSG's financial statements incorporated by reference into the Registration Statement. As such, E&Y and PwC expressly consented to serve as accounting experts with respect to the offering of the Notes.

101.    E&Y and PwC's unqualified opinions on OSG financial statements, incorporated by reference into the Registration Statement, were materially false and misleading. Contrary to their representations, E&Y and PwC's audits of those financial statements had not been conducted in accordance with GAAS and OSG's financial condition and results of operations had not been presented in conformity with GAAP. Instead, OSG's audited financial statements contained untrue statements of material fact and failed to state other facts necessary to make the statements not misleading. In fact, the Company has now admitted that its financial statements should no longer be relied upon.

102.    As accounting experts who consented to the use of their unqualified audit opinions in the Registration Statement, E&Y and PwC are liable under Section 11 of the Securities Act for the material misrepresentations or omissions contained in their unqualified audit opinions and in OSG's financial statements, as reported and incorporated in the Registration Statement.

103. E&Y and PwC did not perform the requisite procedures and did not possess reasonable grounds for believing that their representations in their unqualified audit opinions with regard to OSG's financial statements were true, did not omit any material facts, and were not materially misleading.

104. Lead Plaintiffs DSM and Indiana Treasurer purchased the Company's Notes in the Offering, or traceable thereto, in reliance upon the defective Registration Statement and Prospectus and without knowledge of the untruths and/or omissions alleged herein and have been damaged thereby.

105. By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

106. Lead Plaintiffs DSM and Indiana Treasurer filed this complaint less than one year from the time that they discovered or reasonably could have discovered the facts upon which this complaint is based to the time that they filed this complaint. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time that this complaint was filed.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against the Individual Defendants and Underwriter Defendants

107. Lead Plaintiffs DSM and Indiana Treasurer repeat and reallege each and every allegation contained above as if fully set forth herein.

108. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of Lead Plaintiffs DSM and Indiana Treasurer and the Class, against the Individual Defendants and Underwriter Defendants. For purposes of this Count, Lead Plaintiffs

DSM and Indiana Treasurer affirmatively state that they do not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

109.    The Individual and Underwriter Defendants were sellers and offerors and/or solicitors of purchasers of the securities offered pursuant to the Registration Statement and Prospectus.    The Individual Defendants issued, caused to be issued and/or signed the Registration Statement in connection with the Offering.  The Registration Statement contained a Prospectus that was used to induce investors, such as Lead Plaintiffs DSM and Indiana Treasurer and the other members of the Class, to purchase the Notes offered by OSG.

110.    The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Prospectus for their own financial benefit.    But for their participation in the Offering, including their solicitation as set forth herein, the Offering could not and would not have been accomplished.  Specifically, the Underwriter Defendants:

(a)    made the decision to conduct the Offering and do it at the price set forth in the Prospectus.  The Underwriter Defendants drafted, revised and/or approved the Prospectus and participated in its being declared effective by the SEC.  The Prospectus was calculated to create interest in the Notes and was widely distributed by or on behalf of the Underwriter Defendants for that purpose; and

(b)    conceived and planned the Offering and orchestrated all activities necessary to affect the sale of these securities to the investing public, by issuing securities, promoting the securities and supervising their distribution and ultimate sale to the investing public.

111.    As set forth above, the Registration Statement and Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made

- 44 -

therein not misleading, and omitted to state material facts required to be stated therein. The Individual and Underwriter Defendants' actions of solicitation included preparing the defective and inaccurate Prospectus and participating in efforts to market the Offering to investors.

112. The Individual and Underwriter Defendants owed to the purchasers of the Notes, including Lead Plaintiffs DSM and Indiana Treasurer and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus and to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact. Defendants, in the exercise of reasonable care, should have known that the Registration Statement and Prospectus contained misstatements and omissions of material fact.

113. Lead Plaintiffs DSM and Indiana Treasurer and the other members of the Class purchased or otherwise acquired the Notes pursuant to the Registration Statement and Prospectus, and neither Lead Plaintiffs DSM and Indiana Treasurer nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Registration Statement and Prospectus.

114. By reason of the conduct alleged herein, the Individual Defendants and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act. Accordingly, Lead Plaintiffs DSM and Indiana Treasurer, collectively and on behalf of the Class, hereby offer to tender to Defendants those securities that Lead Plaintiffs DSM and Indiana Treasurer and the other Class members continue to own, in return for the consideration paid for those shares together with interest thereon. Class members who have sold their shares are entitled to rescissory damages.

## COUNT III

### Violation of Section 15 of the Securities Act
### Against the Individual Defendants

115.    Lead Plaintiffs DSM and Indiana Treasurer repeat and reallege each and every allegation contained above.

116.    This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.  For purposes of this Count, Lead Plaintiffs DSM and Indiana Treasurer affirmatively state that they do not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

117.    Each of the Individual Defendants was a control person of OSG by virtue of his position as a director and/or senior officer of OSG.  By reason of their senior management positions and/or directorships at the Company, as alleged above, these Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause OSG to engage in the conduct complained of herein.  In addition, the Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of OSG.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

118.    Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the Offering to be successfully completed.

### EXCHANGE ACT ALLEGATIONS

119.    For purposes of this section of the Complaint, the term "Defendants" refers only to Defendants Arntzen and Itkin.  In addition, the statements referenced in ¶¶60, 62, 64, 66, 69,

72, and 78 from the Registration Statement and Prospectus section of this complaint are incorporated herein by reference. These statements were materially false and misleading and omitted material information for the reasons set forth herein.

### Defendants Knew or Recklessly Disregarded that their
### Class Period Statements Were Materially False and/or Misleading

**Facts From the Proskauer Motion Demonstrate OSG's and Defendants' Scienter**

120. On November 18, 2013, OSG filed a legal malpractice adversary complaint against its outside legal counsel, Proskauer Rose LLP ("Proskauer"), in bankruptcy court. *See In re: Overseas Shipholding Grp., Inc.*, No. 12-20000-PJW (Bankr. D. Del.) (Dkt. No. 2026). OSG claims that, in 2011 and 2012, Proskauer erroneously advised OSG's management that (i) OSG's unsecured credit agreements, which expressly provided that OSG and its two subsidiaries, OIN and OBS, were jointly and severally liable for all principal and interest due thereunder, did not render OIN jointly and severally liable for the borrowings of OSG under the credit agreements; (ii) borrowings by OSG under the credit agreements would not have any adverse U.S. tax consequences to OSG; and (iii) it was not necessary for OSG's management to disclose the potential tax issue to OSG's Board, Audit Committee, independent auditors, regulators, or the public.

121. On January 17, 2014, Proskauer filed a motion to dismiss OSG's legal malpractice adversary complaint. *See Overseas Shipholding Grp., Inc. v. Parnes*, Adv. No. 13-52492-PJW (Bankr. D. Del.) (Dkt. No. 15). On February 3, 2014, OSG opposed Proskauer's motion, *see id.* (Dkt. No. 20), and on February 13, 2014, Proskauer filed a reply. *See id.* (Dkt. No. 29) (collectively, Proskauer's motion to dismiss and reply are referred to as the "Proskauer Motion") (incorporated herein by reference). As set forth below in ¶¶122-139, the Proskauer Motion reveals factual information that demonstrates the scienter of OSG and Defendants.

122.     In the 1990s and early 2000s, Proskauer lawyers represented OSG in connection with negotiating and documenting certain agreements to obtain unsecured revolving credit facilities for OSG, OBS, and OIN.  For instance, the credit agreement dated August 19, 1997 (the "1997 Credit Agreement") states that "[e]ach Borrower severally, and not jointly, agrees to repay to the Banks the principal of each [advance] made to such Borrower."

123.     After entering into the 1997 Credit Agreement, OSG retained Proskauer to assist with securing an additional $350 million credit facility.  The language of the repayment clause in the agreement entered into on April 18, 2000 (the "2000 Credit Agreement") was different than prior agreements, providing that "[e]ach Borrower *jointly* and severally agrees to repay to the Banks the principal of each Advance made to the Borrowers."  The following year, Proskauer was also engaged by OSG to obtain another $300 million credit facility.  The resulting agreement, dated December 12, 2001 (the "2001 Credit Agreement"), contains a "joint and several" repayment provision identical to the one in the 2000 Credit Agreement.

124.     Although OSG continued to require additional financing in the years that followed, it did not retain Proskauer in connection with those subsequent credit transactions and Proskauer provided no advice on them.  Rather, from 2002 through 2005, the negotiation and documentation of OSG's credit agreements were handled by its in-house counsel.  These agreements contain "joint and several" repayment provisions that are substantially similar to those in the 2000 Credit Agreement.

125.     In early 2006, OSG, OBS, and OIN, represented by lawyers at Clifford Chance LLP ("Clifford Chance") and OSG's own in-house counsel, entered into a $1.8 billion unsecured credit agreement (the "2006 Credit Agreement"), which was later reduced to $1.5 billion.  In connection with that transaction, OSG "terminated all of its unsecured revolving credit facilities .

. . that existed prior thereto." The 2006 Credit Agreement continued to provide that the revolving loans thereunder would be made "to the Borrowers on a joint and several basis." During this time, Defendants Arntzen and Itkin were serving, respectively, as OSG's CEO and CFO.

126. The "joint and several" structure was used again in a 2011 agreement intended to replace the 2006 Credit Agreement upon its expiration (the "Forward Start Agreement"). In connection with this engagement, Alan Parnes, a Proskauer attorney, reviewed a draft of the Forward Start Agreement prepared by the lenders and immediately identified a potential problem with the draft's provision that the revolving loans would be made "to the Borrowers on a joint and several basis." The issue applied equally to the 2006 Credit Agreement, which contained the same "joint and several" language. Proskauer immediately brought the issue to the attention of James Edelson, OSG's Senior Vice President and General Counsel.

127. Proskauer advised Edelson that the "joint and several" language was problematic for OSG under the rules governing the income tax treatment of earnings by controlled foreign subsidiaries. Specifically, Proskauer advised that if "joint and several" was interpreted to be a guarantee by OIN of OSG's obligations under its credit agreement, that interpretation could trigger income tax liability under Section 956 of the Internal Revenue Code.

128. After internal discussions at OSG, the Company asked Proskauer to analyze the issue, and Proskauer began drafting a memorandum that explored potential arguments in favor of eliminating or mitigating any tax liability arising from the "joint and several" language in the 2006 Credit Agreement (the "2011 Memorandum"). Based on information provided to Proskauer at the time, the 2011 Memorandum concluded that the parties did not intend the phrase "joint and several" to create a guarantee by OIN.

129. Critically, the 2011 Memorandum's conclusion was based on statements—which ultimately proved false—that OSG's management repeatedly made to Proskauer about its own intent and the intent of its lenders. As the 2011 Memorandum itself reflects, during discussions between Proskauer and OSG's management, OSG represented to Proskauer that "OSG would not have entered into the [2000 and 2006 Credit Agreements] . . . had senior management believed that OIN was responsible for the obligations of OSG and OSG Bulk."

130. Proskauer, whose own files from nearly a decade earlier did not provide any insight on the issue, asked OSG to search its files for anything it might have that could aid the analysis in the 2011 Memorandum. In response, OSG, through Edelson, reported to Proskauer that "it could not find anything" of relevance to the memorandum.

131. Based on OSG's representations that (1) OSG had no documentary evidence bearing on the parties' intended meaning of "joint and several"; and (2) the parties "could not have intended that OSG, OSG Bulk, and OIN . . . would be co-obligors," Proskauer concluded in the 2011 Memorandum that "[S]ection 956 should not apply so as to cause OSG to include OIN's deferred earnings in OSG's income."

132. Approximately 15 months after Proskauer had written the 2011 Memorandum, OSG asked Proskauer to turn it into a "formal tax opinion." In October 2012, OSG finally informed Proskauer that it had a trove of documents easily accessible in its offices that were relevant to the parties' intent in connection with the "joint and several" language in the credit agreements.

133. OSG's revelation directly contradicted OSG's critical representation to Proskauer that it had no documents of relevance. Moreover, these documents were not merely relevant to the "joint and several" issue but, on their face, conclusively demonstrated both that the inclusion

of those words in the credit agreements was intentional and that the intended meaning was "guarantor or co-obligor."

134.    For example, OSG had in its files a mark-up of a draft term sheet for OSG's 2006 Credit Agreement, dated January 5, 2006.[2]  (Excerpt attached hereto as Ex. 1.)  The draft term sheet contains a paragraph regarding "Subsidiary Guarantors" for OSG's $1.5 billion credit facility, with a footnote from counsel to the lenders stating, "***Discuss tax implications of guarantees from non-US subsidiaries***."   The paragraph and footnote were both stricken by OSG's counsel, Clifford Chance, which added a new footnote: "No subsidiary guarantees should be required.  OSG Bulk and OSG International are the holding companies of all the group ship-owning companies and will be joint and several borrowers under the Credit Facility."   Thus, according to the Proskauer Motion, "Clifford Chance asserted that the banks did not need an upstream guarantee because, in the context of the 2006 negotiation, it equated the joint and several liability of OBS and OIN to the liability of a guarantor."

135.    On February 9, 2006, approximately one month after Clifford Chance marked up the draft term sheet, Defendant Itkin signed the finalized 2006 Credit Agreement on behalf of OSG, OBS, and OIN.

136.    Likewise, a draft of the 2000 Credit Agreement (attached hereto as Ex. 2) bears a comment from OSG's in-house counsel indicating that OSG was rejecting the "joint & several" language and "offer[ing]" instead "OSG & OBS with OSG guarantee of OIN" – evidencing an appreciation that "joint and several" would make OIN a guarantor of OSG.  Notably, the in-house counsel repeatedly struck the "joint and several" language from the 2000 Credit

---

[2]    The date "1/5/06" is written by hand at the top of the document.  However, the date "January 5, 2005" also appears on the document, ostensibly by mistake.  Defendants Arntzen and Itkin have acknowledged that the document is a "draft credit agreement from 2006."  (Dkt. No. 136 at 1).

Agreement, replacing it in one section with "severally and not jointly" and adding OSG as "Guarantor" on the signature page. Apparently, however, the in-house counsel's suggested changes were rejected by someone at OSG with greater authority.

137. Moreover, in an e-mail exchange among the bank lenders regarding the 2000 Credit Agreement (attached hereto as Ex. 3), the lenders had asked whether "the Borrowers [are] jointly and severally liable for all obligations?" OSG wrote next to that question "OK," evidencing a clear intent that OSG and OIN should, in fact, be responsible for the obligations of the other.

138. In addition, in the 2011 Memorandum, Proskauer noted that its contemporaneous time records from the drafting of the 2000 Credit Agreement indicated that the tax implications of the "joint and several" language were discussed with OSG: "It seems clear from our time records that the issue of the tax implications of the joint and several language of the credit agreement was identified during the 2000 loan negotiations and discussed not only internally at Proskauer and with OSG, but also with counsel to the lenders."

139. Individually and together, these documents are unambiguous and demonstrate that since 2006, and as early as 2000, OSG understood and intended that the "joint and several" structure operate as a guarantee between the entities. The import of the documents in OSG's files is so clear that, after the documents' existence was disclosed to Proskauer, Proskauer refused to issue a formal tax opinion on the "joint and several" issue.

**Statements From OSG's Former Treasurer Demonstrate OSG's and Defendants' Scienter**

140. As part of their investigation into the facts underlying this action, counsel for Plaintiffs interviewed a former treasurer at OSG, who served in that capacity until December 2001 (the "Former Treasurer"). In addition to the factual information revealed in the Proskauer Motion, facts revealed by the Former Treasurer further demonstrate OSG's and Defendants'

scienter. Indeed, facts in the Proskauer Motion reinforce the strong inference of scienter raised by the Former Treasurer.

141. In 2012, the Former Treasurer was deposed by OSG's bankruptcy counsel, at which time he was shown documents to help refresh his recollection. During the Former Treasurer's deposition, OSG's tax issue was discussed and he was asked questions related to OSG's foreign and domestic subsidiaries.

142. The Former Treasurer, who reported directly to Defendant Itkin and was involved in negotiating the terms of the 2001 Credit Agreement, informed counsel for Plaintiffs that he knew (and that anybody in a finance position would probably know too), that it was in OSG's best interests to avoid having foreign subsidiaries jointly and severally liable with domestic entities on credit agreements and that OSG tried to avoid having foreign companies guarantee the debt of domestic companies.

143. Specifically, the Former Treasurer stated during an interview with Plaintiffs' counsel that "I do know that [having foreign subsidiaries jointly and severally liable with domestic entities on credit agreements] was something that I would personally try to avoid having happened." According to the Former Treasurer, this was "because you had a deemed tax event if the foreign companies were guaranteeing the obligations of the domestic companies . . . ."

144. The Former Treasurer explained: "I was given a lot of latitude to negotiate these documents and I would point out to senior members of OSG, what I considered to be critical issues." The Former Treasurer added that "if I knew [there was a concern with having foreign subsidiaries jointly and severally liable with domestic entities on credit agreements], I would

suspect other people were aware of that issue. . . . [I] would think if I knew it, anybody in a finance position would probably know it."

145.    In addition, the Former Treasurer noted that Defendant Itkin would "be on the original distribution list" when draft credit agreements were circulated, and that Defendant Itkin would be present during some of the credit facility negotiations.   According to the Former Treasurer, ***"I could tell you that we tried to avoid having foreign companies guarantee [the debt] of domestic companies."***

146.    The Former Treasurer's contemporaneous understanding of the tax implications of the "joint and several" language in the credit agreements is confirmed by the documents attached to the Proskauer Motion.   Indeed, these documents demonstrate that the Former Treasurer participated in negotiating not only the 2001 Credit Agreement, but the 2000 Credit Agreement as well, because his name appears on the e-mail exchange in Exhibit 3.   Significantly, as described in ¶¶122-139, Exhibits 2 and 3 and Proskauer's contemporaneous time records substantiate the Former Treasurer's statements that he and others at OSG understood the tax implications of the "joint and several" language, and that he tried to avoid the inclusion of such language in OSG's credit agreements because of the negative tax consequences it would have for OSG.

**Defendants Understood U.S. Income Tax
Regulations Associated With Foreign-Source Income**

147.    Furthermore, as alleged herein, during the Class Period, Defendants were aware of the U.S. income tax rules and regulations associated with foreign source income and their significance to OSG's operations.

148.    For example, following the Company's 2011 fiscal fourth quarter and year-end earnings announcement, Defendants held a conference call with analysts and investors, wherein

Defendant Arntzen acknowledged that OSG representatives had been lobbying certain members of Congress about changing existing tax laws relating to the repatriation of foreign source income.

149. In addition, senior OSG officials spent significant resources during the Class Period trying to persuade federal officials to enact changes in the tax law that were favorable to the Company. Defendant Arntzen himself testified at a hearing on Maritime Tax Issues in front of the U.S. House of Representatives' Ways and Means Committee (the "Committee") on February 1, 2012. At the hearing, Defendant Arntzen advocated for the passage of the American Shipping Reinvestment Act of 2011 ("ASRA"). The ASRA, which was never enacted, aimed to repeal Internal Revenue Code section 955, which, like section 956, is part of subpart F. In Defendant Arntzen's written statement to the Committee, he described the history of section 955, the effect of the passage of the Tax Reform Act of 1986, as well as the effect of the American Jobs Creation Act of 2004 ("JOBS Act"), on U.S. shipping companies. He further detailed how the JOBS Act created "*lowered tax barriers that prevented U.S. companies which did business internationally from bringing foreign earnings earned prior to 2004 back for investment in the U.S.*" and argued that as long as "s*ection 955 remains law, U.S. shipping companies still must maintain investments in foreign shipping assets made decades ago, pre-1987. Any net decrease in those investments results in an immediate tax. This vestigial quirk in the tax law has caused capital of U.S. shipping companies to be left offshore, effectively preventing those companies from investing their earnings back into the U.S. economy.*"

150. In "A Perfect Experiment: 'Deferral' and the U.S. Shipping Industry," an article by Ken Kies in the September 10, 2007 issue of Tax Notes, Defendant Arntzen stated, regarding

the relationship between the passage of the JOBS Act and the Company taking on new investments:

> The restoration of deferral dramatically improved OSG's financial position, strengthening our balance sheet, increasing our profitability, and making us confident about our ability to compete going forward in the global shipping marketplace. The financial assurance we gained from this enhanced financial position has allowed us to take investment risks, associated with our expansion in the U.S. domestic portion of our business, that we never would have contemplated while weakened financially by current taxation under subpart F. Our commitment to finance the construction of ships at Aker without securing employment of the ships ahead of time was a direct manifestation of this confidence in our future performance.

151. These statements and actions taken by the Defendants required that they be completely knowledgeable about Subpart F of the Internal Revenue Code. In fact, on June 23, 2011, Eric Smith, Vice President & Head of Government Affairs for OSG, provided his "Statement For The Record" for a hearing on "Tax Reform and Foreign Investment in the United States" before the U.S. House Committee on Ways and Means Subcommittee on Select Revenue Measures wherein he noted, among other things, that OSG was thoroughly knowledgeable and familiar with Subpart F and that federal taxation under Subpart F "***may [sic] triggered if a company issues debt to invest in nonshipping operations***," stating, in pertinent part, as follows:

> More specifically, between 1975 and 1986, "foreign base company shipping income" was included as a category of subpart F income. Under this provision, subpart F income generally did not include foreign base company shipping income to the extent it was reinvested during the taxable year in certain qualified shipping investments. If, however, in a subsequent year a net decrease in qualified shipping investments occurred, the amount of previously excluded subpart F income equal to such decrease was treated as subpart F income. In other words, any net decrease in these investments resulted in an immediate tax penalty.

> Although the deferral for shipping income provision was completely repealed in 1986, the pre-1987 net investment in qualified shipping assets under section 955 of the tax code was retained. As a result, decreases in investments in qualified shipping operations from pre-1987 level continue to trigger subpart F income. These rules apply even after section 415 of the American Jobs Creation Act of

2004 ("2004 Jobs Act") repealed the subpart F rules applicable to foreign base company shipping income.

This quirk in the tax law has created a perverse system that distorts the investment decisions and increases the transaction costs of U.S. companies, particularly with respect to structuring a financing strategy or deciding whether to acquire or divest qualified shipping assets.

For example, because of the method for calculating amounts invested in qualified shipping assets, a company's investment may decrease due to the depreciation of its assets, rather than due to any affirmative action that it takes to withdraw from shipping. In such circumstances, a company may be forced to invest its resources in a way that is not economically optimal in order to avoid triggering subpart F income, regardless of market conditions or business need.

Additionally, Subpart F inclusion may [sic] triggered if a company issues debt to invest in non-shipping operations, thereby deterring a company from financing the expansion and diversification of their enterprises. At end, even though these companies have a strong desire to reinvest their foreign earnings in the U.S. and inject money into the economy, they are effectively unable to do so. Instead, the practical consequence is that these earnings are permanently invested abroad.

### Materially False and Misleading
### Statements Made During the Class Period

152. The Class Period commences on October 29, 2007, when OSG issued a press release announcing its financial results for the third quarter of 2007, the period ended September 30, 2007. The press release reported that the Company's net income was $26.6 million, a decline from $90.8 million quarter-over-quarter.

153. On October 30, 2007, OSG filed its Form 10-Q with the SEC for the third quarter of 2007. That same day, the Company held a conference call with analysts and investors to discuss the Company's financial results. During the conference call, the following exchange took place concerning OSG's taxes:

Analyst: Okay, great. And then just last, a quick question for Myles. Myles, can you just let us know what we should be looking for in terms of provision credit for federal income taxes?

Defendant Itkin: For the fourth quarter, if you take a look at a credit of approximately $2 million to $3 million, that would be our guidance.

154.     On February 26, 2008, OSG issued a press release announcing its financial results for the fourth quarter and full year 2007, the period ended December 31, 2007. The press release reported that the Company's net income was $21.0 million, a decline from $113.2 million quarter-over-quarter.

155.     Following the Company's 2007 fiscal fourth quarter and year-end earnings announcement, on February 27, 2008, OSG held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, the following exchanges took place in which the Defendants made false and misleading statements and demonstrated their knowledge of the tax ramifications associated with the repatriation of foreign source income:

> Analyst: Then for Myles. Actually, I just want to go back to this tax repatriation issue. From the free use of cash you have obviously paying back stock and dividend, if you decide to, like, do let's say a 700 million or 1 billion of share buyback, let's assume that that's the case, how much of this comes back (inaudible) and how much do you have to pay tax on that? Or is there a difference on the use of cash?

> Defendant Itkin: Jerry, do you have a specific number on repatriation and tax implications?

> Jerry Miller (OSG's Controller): We have about, at the end of the year we have about $550 million of earnings on which we previously paid tax. So theoretically, we could bring back $550 million without any further tax consequences.

> Analyst: And the tax of that is 35%?

> Jerry Miller: No. There would be no taxes.

> Analyst: No, over that?

> Defendant Itkin: The amount of the excess, yes.

> Analyst: Is there any difference from treatment between let's say asset sales or time chartering meaning that if you generate revenue from time chartering to tax at the same rate or?

> Defendant Itkin: No. You're not taxable until you repatriate.

Analyst: Revenues you generate from owned vessels and from time chartering vessels is the same, right?

Jerry Miller: That's right.

Defendant Itkin: Yes.

\* \* \*

Analyst: Good morning. I don't know whether you addressed the tax credit in the fourth quarter. If so, I'm sorry, but can you talk a little bit about that what it came from?

Defendant Arntzen: Myles, you want to take it?

Defendant Itkin: Jerry, if you take it.

Defendant Arntzen: All right.

Jerry Miller: The level of taxes that we end up paying is due to a large degree by what's called foreign personal holding company income so it's the earnings on the cash that is sitting offshore. That level was higher at the beginning of the year due to the sales of DHT stock. In a normal situation the income that you generate on the domestic side also takes into account placement of the debt that the corporation has. And for the most part, the debt sits on the U.S. side. So the reason for the credit is that you had lower foreign nonshipping income and level amounts of interest expense on the domestic side.

Analyst: Are there implications for 2008 in terms of your guidance?

Jerry Miller: Well, we think that everything else being equal, we don't expect taxes to be very high in 2008. We don't -- the tax rules basically allow you a two-year carryback. From a taxable income perspective, we haven't had a taxable income in the U.S. in 2005 - 2006 or likely in '07. So we don't expect taxes to be very high in 2008.

\* \* \*

Analyst: Hi. Sorry. I just have one question on the taxes for Myles. When you say that there's approximately $500 and change million of cash that you could repatriate without being taxed on it, is that potentially how much you can use to repay debt without facing any negative consequences?

Defendant Itkin: Yes.

156. On April 29, 2008, OSG issued a press release announcing its financial results for the first quarter of 2008, the period ended March 31, 2008. The press release reported that the

Company's net income was $112.4 million, a 33% increase from $84.7 million quarter-over-quarter.

157.     Following the Company's 2008 fiscal first quarter earnings announcement, on April 30, 2008, OSG held a conference call with analysts and investors to discuss the Company's earnings and operations.   During the conference call, Defendants made false and misleading statements and demonstrated their knowledge of the tax ramifications associated with the repatriation of foreign source income. The following exchange took place:

> Analyst: Just following on the balance sheet question you ended the quarter with a balance I think about $518 million in cash. Can you give us a breakdown of how much of that is overseas and what the tax impact will be if that were repatriated?

> Defendant Itkin: The vast majority, Natasha, is overseas. There would be no tax effect inherited repatriated $545 million of that amount, which constitutes previously taxed income.

> Analyst: Okay. Now I think on your taxes that you had described in the notes that you had, I think as of December 2007, about $700 million had not been taxed. Is that correct?

> Unidentified Company Representative: It is really $2 billion.

> Analyst: $2 billion have not been taxed?

> Unidentified Company Representative: Right.

> Analyst: And when does that come due?

> Unidentified Company Representative: It doesn't as long as we continue to reinvest in foreign shipping assets.

> Analyst: Okay, so that is just deferred sort of infinitely until you keep investing?

> Unidentified Company Representative: Exactly.

158.     On July 29, 2008, OSG issued a press release announcing its financial results for the second quarter of 2008, the period ended June 30, 2008.  The press release reported that the Company's net income increased 10% to $86.9 million from $79.0 million quarter-over-quarter.

159.    Following the Company's 2008 fiscal second quarter earnings announcement, on July 30, 2008, OSG held a conference call with analysts and investors to discuss the Company's earnings and operations.   During the conference call, Defendants made false and misleading statements and demonstrated their knowledge of the tax ramifications associated with the repatriation of foreign source income.   The following exchange took place:

> Analyst: First question is wanted to ask, decision to repatriate the (inaudible) cash now as opposed to earlier. What the deciding factor was driving that decision?

> Defendant Itkin: It's frankly a spread on margins more than anything else. We have had the ability    to repatriate the cash for flexibility purposes. We have kept that cash as overseas cash. The adjusted appears to be economically more desirable to bring it back today.

> Analyst: Great. Assuming that that was substantially all of the cash that could be repatriated with no cash consequences, was that substantially all of it now?

> Defendant Arntzen: That's the previously untapped stake and although there is a possibility of pending legislation, which would afford an opportunity to repatriate an additional $0.5 billion at a tax favored rate of 5.25%.

> Analyst: Right. How is that sort of pending legislation? How does that look? Or is that something you can't really comment on?

> Defendant Arntzen: We -- it's speculation, of course, but we are fairly [sanguine].

160.    On October 30, 2008, OSG issued a press release announcing its financial results for the third quarter of 2008, the period ended September 30, 2008.   The press release reported that the Company's net income increased 7-fold to $197.8 million from $26.6 million quarter-over-quarter.

161.    On March 2, 2009, OSG issued a press release announcing its financial results for the fourth quarter and full year of 2008, the period ended December 31, 2008.   The press release reported that the Company's full year 2008 net income was $317.7 million or $10.65 per diluted share, compared with $211.3 million, or $6.16 per share in the same period of 2007.

162.    Following the Company's 2008 fiscal fourth quarter earnings announcement, OSG held a conference call with analysts and investors to discuss the Company's earnings and operations.   During the conference call, Defendants made false and misleading statements concerning the Company's tax matters.  Defendant Itkin stated, in pertinent part:

> The income tax benefit increased by $28 million to $32 million in the fourth quarter of 2008. The income tax calculations are based on pretax results of the Company's US subsidiaries and adjusted to include non-shipping income of the Company's foreign subsidiaries. The major drivers for the tax benefit for 2008 are the carry-back of approximately $4 million of 2008 tax losses, against the non-shipping income of the Company's foreign subsidiaries generated in 2007.

> In addition, the vessel write-downs on the US flag fleet gave rise to the reversal of previously established deferred tax liabilities in the amount of $26 million. As it relates to specifics, the write-down taken on the ATV 352, of $50.7 million times 35% amounts to approximately $17.8 million of this reversal of deferred tax liabilities. The write-downs on the integrity and the M-300 of $24.3 million multiplied by 35% or $8.5 million, the same reversal of deferred tax liabilities and then the carry-back I mentioned to you as well as other reversals of previously established deferred tax liabilities that were determined no longer to be required.

163.    On May 4, 2009, OSG issued a press release announcing its financial results for the first quarter of 2009, the period ended March 31, 2009.  The press release reported that the Company's net income attributable to the Company was up 8% to $121.8 million from $112.4 million in the same quarter last year.

164.    On August 5, 2009, OSG issued a press release announcing its financial results for the second quarter of 2009, the period ended June 30, 2009.  The press release reported that the Company's net loss attributable to the Company was $8.8 million, or $0.33 per diluted share, compared with net income attributable to the Company of $86.9 million, or $2.81 per diluted share in the same period a year ago.

165.    On November 2, 2009, OSG issued a press release announcing its financial results for the third quarter of 2009, the period ended September 30, 2009.  The press release reported that the Company's net loss attributable to the Company was $19.6 million or $0.73 per diluted

share compared with net income attributable to the Company of $197.8 million, or $6.69 per diluted share in the same period a year ago.

166.    Following the above referenced press releases, the Company filed Forms 10-Q and 10-K with the SEC, which contained false and misleading financial statements. Specifically, the figures in the financial statements that were false were line items concerning, among other things, (i) net income; and (ii) taxes, including, but not limited to, Credit for Federal Income Taxes, Other receivables, including federal income taxes recoverable, Deferred Federal Income Taxes and Other Liabilities, and Provision / (credit) for deferred federal income taxes.

167.    The Forms 10-Q containing false and misleading statements were filed on May 1, 2008, for the period ended March 31, 2008;  on August 1, 2008, for the period ended June 30, 2008; on November 3, 2008, for the period ended September 30, 2008; and on May 6, 2009, for the period ended March 31, 2009.  These Forms 10-Q were signed by Defendants Arntzen and Itkin.

168.    The Forms 10-K containing false and misleading statements were filed on February 29, 2008, for the fiscal year ended December 31, 2007; and on March 2, 2009, for the fiscal year ended December 31, 2008. These Forms 10-K were signed by Defendants Arntzen and Itkin, and included false and misleading representations regarding the Company's accounting policies and practices, internal disclosure controls and credit facilities.

169.    The statements and/or  documents referenced above in ¶¶152-168 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts, which were known or recklessly disregarded by Defendants:

(a)      that OIN was party to and jointly and severally liable on certain of OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations and triggering

deemed distributions of OIN's then current and accumulated earnings and profits that subjected

OSG to tens of millions of dollars in undisclosed federal income tax expense and liabilities;

(b)     that OSG's financial results were materially misstated and should not be

relied upon due to OSG's failure to properly account for income taxes;

(c)     that OSG's disclosed policies for income taxes and related income tax

disclosures were materially false and misleading;

(d)     that OSG's financial results were presented in violation of GAAP;

(e)     that OSG's disclosure controls and internal controls over income taxes

were materially deficient and not operating effectively;

(f)     that certifications issued by Defendants Arntzen and Itkin associated with

the Company's internal and disclosure controls were materially false and misleading; and

(g)     based on the foregoing, Defendants lacked a reasonable basis for their

positive statements about the Company's earnings, guidance or income taxes.

170.    On March 1, 2010, OSG issued a press release announcing OSG's financial

results for its 2009 fourth quarter and year end, the periods ended December 31, 2009. The press

release reported that the Company's revenues for the 2009 fourth quarter and year end

respectively totaled $204.1 million and $952.6 million and that the Company had a loss of $23.2

million, or $0.86 per diluted share in the fourth quarter and earned $70.2 million, or $2.61 per

diluted share, for the year. In addition, OSG represented that its credit for federal income taxes

for the year totaled $30.5 million and that at December 31, 2009, its other receivables, including

federal income taxes recoverable, totaled $100.1 million and its deferred federal income taxes

and other liabilities totaled $261.7 million. Defendant Arntzen commented on the results,

stating, in pertinent part, as follows:

While market conditions were tough last year, the commercial, financial and operational platforms of OSG performed well and enabled OSG to enter 2010 in solid shape. Indeed, we commenced the year with a fully financed new building program, a modern fleet, a cash and short term investments position of $525 million and liquidity of approximately $1.6 billion. Shareholders, creditors, customers and employees can count on us to continue prudent financial discipline and to maintain our long standing commitment to operate the safest, cleanest and most reliable fleet in the industry.

With respect to OSG's income taxes, the press release stated, in pertinent part, as follows:

The tax benefit for 2009 reflects the income statement impact of a carryback of approximately $34 million (the cash carryback is approximately $42 million) of 2009 tax losses against earnings generated in 2004. On November 6, 2009, the Worker, Homeownership, and Business Assistance Act of 2009 was enacted, which included a provision allowing taxpayers to elect an increased carryback for net operating losses incurred in 2009.

171. Following the Company's 2009 fiscal fourth quarter and year end earnings announcement, OSG held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's tax matters. The following exchange took place:

Defendant Arntzen:

Importantly, tax laws signed in the fourth quarter allowed us to carryback 2009 tax losses and will enable us to recover $42 million in cash in 2010 from the federal government under the Workers, Homeowners (sic), and Business Assistance Act of 2009, part of the stimulus package. Myles will go into more detail later in the call.

\*       \*       \*

In addition, the tax stimulus package that I mentioned earlier contained provisions that allowed us to claim accelerated depreciation in 2009 as a result of acquiring and operating the Cascade. This benefit, approximately $21 million, is included in the tax refund of $42 million previously mentioned.

Defendant Itkin:

I would like to highlight taxes for a moment. The Company recognized a tax benefit of $30.5 million during the quarter. On November 6, 2009, the president of the United States signed the Worker, Homeownership, and Business Assistance Act of 2009. The impact of this change in law is recognized in the period of

enactment, Q4 2009, and is significant for OSG because it included a provision allowing taxpayers to elect an increased carryback for net operating losses incurred in 2009.

This meant that by increasing the normal carryback period from two years to five years we could access taxable earnings from 2004 before the passage of the American Jobs Creation Act of 2004 which exempted foreign earnings from current taxation.

Additionally, for tax purposes in 2008 the Company had a tax loss which it could not then carryback and created a full valuation allowance for the tax impact of the resulting carryforward. That is the Company did not recognize any P&L benefit for such loss. With the new act, however, the Company was able to reverse the valuation allowance creating a tax benefit in 2009. Accordingly, the 2009 $34 million impact -- income statement impact reflected in our press release is made up of the $42.2 million cash benefit that we received from the carryback less an $8.3 million change in deferred tax liabilities.

In addition, during the conference call, Defendant Itkin noted that OSG drew down on its credit facility, thereby subjecting the Company to undisclosed income tax expense and liabilities, stating, in pertinent part, as follows:

Total debt, both current and long-term portions, increased by $423 million as the Company drew down $299 million on the secured debt agreement with the Export-Import Bank of China, CEXIM, as well as drawing down an additional $189 million from our long-term revolving credit facilities offset by repayments on loans of $65 million. In September 2009 the Company deposited $7.9 million in restricted cash to secure the maximum amount available to us under the CEXIM facility.

Later, during the question and answer session of the conference call, Defendant Itkin issued guidance about the Company's 2009 taxes. The following exchange took place:

Jon Chappell - JPMorgan Chase & Co. - Analyst:

Good morning, guys. Want to put my detailed questions out there first. Myles, just to be sure I understand this correctly on the tax carryback, is this a one-time event? You got the entire $42.2 million before the end of 2009 so that is in all the financial statements that are in your press release and we won't see any of that from that going forward?

Defendant Itkin:

That is correct.

<u>Jon Chappell - JPMorgan Chase & Co. - Analyst</u>:

Okay. And you didn't give taxes guidance on your guidance page and I can't remember if you have in the past, but it's typically negligible. What should we be looking for on the taxes line in 2010?

<u>Defendant Itkin</u>:

Say something in the neighborhood of approximately $3 million.

<u>Jon Chappell - JPMorgan Chase & Co. - Analyst</u>:

$3 million benefit or negative?

<u>Defendant Itkin</u>:

Benefit.

172.    The statements referenced above in ¶¶170-171 were materially false and misleading because they misrepresented and failed to disclose the following facts which were known or recklessly disregarded by Defendants:

(a)    that OIN was party to and jointly and severally liable on certain of OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations and triggering deemed distributions of OIN's then current and accumulated earnings and profits that subjected OSG to tens of millions of dollars in undisclosed federal income tax expense and liabilities;

(b)    that the OSG's financial results were materially misstated and should not be relied upon due to OSG's failure to properly account for income taxes;

(c)    that OSG's disclosed policies for income taxes and related income tax disclosures were materially false and misleading;

(d)    that OSG's financial results were presented in violation of GAAP;

(e)    that OSG's disclosure controls and internal controls over income taxes were materially deficient and not operating effectively;

(f)     that certifications issued by Defendants Arntzen and Itkin associated with the Company's internal and disclosure controls were materially false and misleading; and

(g)     based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's earnings, guidance or income taxes.

173.     Also on March 1, 2010, Defendants filed OSG's 2009 Form 10-K with the SEC. The 2009 Form 10-K, signed by Defendants Arntzen and Itkin, represented that the financial statements were presented in conformity with GAAP as noted in ¶¶55-59, and included the representations about the Company's accounting tax policies as noted in ¶¶60, 62 and 64, internal and disclosure controls as noted in ¶71-72 and Defendants Arntzen and Itkin's certifications thereon as noted in ¶72.

174.     The representations and certifications in ¶72, which were materially false and misleading when made for the reasons set forth in ¶73, were repeated in all material respects in the Forms 10-K and 10-Q that OSG filed with the SEC during the remainder of the Class Period.

175.     On March 4, 2010, Defendants filed the Registration Statement with the SEC on Form S-3 to register the sale of an "indeterminate number of shares of common stock and debt securities of the registrant as may from time to time be issued at indeterminate prices" in the future. The Registration Statement expressly incorporated by reference certain past filings the Company had made with the SEC, including the Company's March 1, 2010 press release and 2009 Form 10-K, as well as "any future filings made with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, or the Exchange Act, until this offering has been completed."

176.     That same day, March 4, 2010, the Company announced that it had agreed to sell 3.5 million shares of its common stock in an underwritten public offering and, in relevant part,

that "OSG intend[ed] to use the net proceeds from this offering for general corporate purposes, including, without limitation, capital expenditures and working capital," and that the Company might "use a portion of the net proceeds from this offering to pay down certain of its existing debt, including its revolving credit facilities, but ha[d] not yet determined the amount of net proceeds, if any, to be used for this purpose." The press release further stated that Goldman Sachs would serve as the sole underwriter for the stock offering.

177.    On March 9, 2010, OSG announced that it completed an underwritten public stock offering of 3.5 million shares of OSG common stock at $45.50 per share, raising more than $159 million in gross proceeds before expenses and underwriting costs.

178.    On March 19, 2010, Moody's Investors Service ("Moody's") affirmed the Company's Ba2 Corporate Family and Ba2 Probability of Default corporate debt ratings. Moody's also downgraded the rating for the Company's senior unsecured debt to Ba3 from Ba2, changed the ratings outlook to negative and assigned OSG an SGL-2 Speculative Grade Liquidity Rating.

179.    On March 22, 2010, OSG announced its intention to sell the Notes and to use the net proceeds from the Offering to reduce outstanding indebtedness under its unsecured revolving credit facility and that Defendants Citigroup, Morgan Stanley and HSBC would serve as joint book-running managers for the Offering. According to the price sheet the Company filed with the SEC on March 25, 2010, the 8 1/8% bonds due March 30, 2018 would be sold at 98.5763% of face amount, raising $295.7 million in gross proceeds.

180.    On March 29, 2010, OSG announced the closing of the Offering.

181.    On May 4, 2010, OSG issued a press release announcing the financial results for its 2010 first quarter, the period ended March 31, 2010. For the quarter, OSG reported that its

revenues and net loss totaled $229.9 million and $9.4 million, or $0.34 per diluted share, respectively. In addition, OSG represented that its credit for federal income taxes for the quarter totaled $992,000 and that at March 31, 2010, its other receivables, including federal income taxes recoverable, totaled $102.0 million and its deferred federal income taxes and other liabilities totaled $263.1 million. The press release also stated that "[d]ebt and equity market transactions during the quarter [had] strengthened the Company's capital structure and generated nearly $450 million, net of expenses," that the "Company repaid $400 million on its unsecured credit facility," and quoted Defendant Arntzen as stating, in pertinent part, that the Company had "raised nearly $450 million in new capital to enhance [its] liquidity and strengthen the balance sheet, continued progress on cost control efforts on shore and at sea, and completed three of [its] more challenging newbuilding/conversion projects."

182.    Following the Company's 2010 fiscal first quarter earnings announcement, OSG held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's operations, and Jerry Miller ("Miller"), the Company's Controller, commented about OSG's 2010 guidance, stating, in pertinent part, that "[e]quity and income guidance is updated and is expected to be in the range of $10 million to $15 million in comparison to the previous guidance of $15 million to $20 million."

183.    On May 7, 2010, OSG filed with the SEC its Form 10-Q for the quarter ended March 31, 2010, which was signed by Defendants Arntzen and Itkin, and included representations about the Company's policies and accounting for income taxes, internal and disclosure controls and Defendants Arntzen's and Itkin's certifications thereon. In addition, the Form 10-Q represented that:

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. They do not include all of the information and footnotes required by generally accepted accounting principles. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.

184.     The statements referenced above in ¶¶181-183 were each materially false and misleading because they misrepresented and failed to disclose the following adverse facts, which were known or recklessly disregarded by Defendants:

(a)     that OIN was party to and jointly and severally liable on certain of OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations and triggering deemed distributions of OIN's then current and accumulated earnings and profits that subjected OSG to tens of millions of dollars in undisclosed federal income tax expense and liabilities;

(b)     that OSG's financial results were materially misstated and should not be relied upon due to OSG's failure to properly account for income taxes;

(c)     that OSG's disclosed policies for income taxes and related income tax disclosures were materially false and misleading;

(d)     that OSG's financial results were presented in violation of GAAP;

(e)     that OSG's disclosure controls and internal controls over income taxes were materially deficient and not operating effectively;

(f)     that the certifications issued by Defendants Arntzen and Itkin associated with the Company's internal and disclosure controls were materially false and misleading; and

(g)     based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's earnings, guidance or income taxes.

185.     On June 22, 2010, OSG presented at the Morgan Stanley Shipping Conference. During the presentation, Defendant Arntzen acknowledged the Defendants' understanding and

knowledge of the taxation associated with OSG's foreign source income and, in fact, indicated that OSG, with the support of various unions, was responsible for the passage of the Jones Act and its related foreign source shipping income tax exemption. Defendant Arntzen stated, in pertinent part, as follows:

> The other thing you should understand about the Jones Act -- in 2004, up to November 2004, OSG paid 35% corporate tax on its foreign-sourced shipping income, unlike companies like Frontline [Denmark], who are foreign domicile, did not pay it.
>
> **We were able to change that and get deferral of our foreign-source shipping income. We got that with the support of the AFL-CIO and all the major Maritime unions, SIU, MEBA, AMO**. You should know that the AFL-CIO is strongly against deferral because they think it exports US jobs. The one exception is the shipping industry, and that was based on a commitment by OSG that we would invest in our U.S. Flag business if we got deferral, and we have done that.
>
> Now, we didn't do it just for deferral. We did it because we saw an opportunity to become a leader; but this was a necessary condition. **Had we maintained the old tax regime, we would have paid about $645 million more in taxes during the ensuing period. So, that alone was reason for us to do that**. On the other hand, we think we see an improving market.

186. The statements referenced above in ¶185 were each materially false and misleading because they misrepresented and failed to disclose that OIN was party to and jointly and severally liable on certain of OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations and triggering deemed distributions of OIN's then current and accumulated earnings and profits that subjected OSG to tens of millions of dollars in undisclosed federal income tax expense and liabilities.

187. On August 3, 2010, OSG issued a press release announcing the financial results for its 2010 second quarter, the period ended June 30, 2010. For the quarter, OSG reported that its revenues and net loss totaled $231.7 million and $37.9 million, or $1.26 per diluted share, respectively. In addition, OSG represented that its credit for federal income taxes for the quarter totaled $1.1 million and that at June 30, 2010, its other receivables, including federal income

taxes recoverable totaled $109.2 million and its deferred federal income taxes and other liabilities totaled $263.5 million. Defendant Arntzen commented on the results, stating, in pertinent part, as follows:

> While the second quarter rate environment was mixed, the markets we serve are showing signs of recovery. Our products business is seeing improving rates as the use of product carriers as floating storage has fallen 75% and refinery utilization in the United States has increased to 90% in some areas. For the same reasons, our spot ships in the U.S. Flag market are spending less time waiting for cargoes. In general, despite current market weakness, our crude fleet continues to earn in excess of market expectations and FFA levels. I am confident that the improving market conditions we are seeing, combined with our continued cost vigilance, will lead to improving results from our balanced growth model.

188. Following the Company's 2010 fiscal second quarter earnings announcement, OSG held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's operations, including Defendant Itkin's statements about OSG's 2010 guidance.

189. On August 6, 2010, OSG filed its Form 10-Q for the quarter ended June 30, 2010, with the SEC which was signed by Defendants Arntzen and Itkin, and included representations about the Company's policies and accounting for income taxes, internal and disclosure controls and Defendants Arntzen's and Itkin's certifications thereon. In addition, the Form 10-Q represented that:

> The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. They do not include all of the information and footnotes required by generally accepted accounting principles. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.

190. The statements referenced above in ¶¶187-189 were each materially false and misleading because they misrepresented and failed to disclose the following adverse facts, which were known or recklessly disregarded by Defendants:

(a)　　　that OIN was party to and jointly and severally liable on certain of OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations and triggering deemed distributions of OIN's then current and accumulated earnings and profits that subjected OSG to tens of millions of dollars in undisclosed federal income tax expense and liabilities;

(b)　　　that OSG's financial results were materially misstated and should not be relied upon due to OSG's failure to properly account for income taxes;

(c)　　　that OSG's disclosed policies for income taxes and related income tax disclosures were materially false and misleading;

(d)　　　that OSG's financial results were presented in violation of GAAP;

(e)　　　that OSG's disclosure controls and internal controls over income taxes were materially deficient and not operating effectively;

(f)　　　that certifications issued by Defendants Arntzen and Itkin associated with the Company's internal and disclosure controls were materially false and misleading; and

(g)　　　based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's earnings, guidance or income taxes.

191.　　On November 2, 2010, OSG issued a press release announcing the financial results for its 2010 third quarter, the period ended September 30, 2010. For the quarter, OSG reported that its revenues and net loss totaled $208.6 million and $31.8 million, or $1.06 per diluted share, respectively. In addition, OSG represented that its credit for federal income taxes for the quarter totaled $1.5 million and that at September 30, 2010, its other receivables, including federal income taxes recoverable, totaled $121.7 million and its deferred federal income taxes and other liabilities totaled $261.3 million. Defendant Arntzen commented on the announcement, stating, in pertinent part, as follows:

We continue to improve and execute our newbuilding and conversion program and took delivery of Overseas Anacortes which began a three year charter to Tesoro at an attractive level. We completed another round of restructuring our Products newbuilding contracts resulting in a win for OSG. The FSO Africa commenced a three year service contract, which will significantly improve the results on this vessel in the fourth quarter and beyond. I am pleased that we continue to control expenses both ashore and at sea without diminishing the quality of service to our customers or the technical performance of our fleet.

The pace of the global economic recovery remains uncertain, thus continued financial discipline is critical. I am confident that our market leading commercial and technical platforms in Crude, Products and U.S. Flag, combined with our strong balance sheet and liquidity position, will enable OSG to emerge at the head of the pack when our markets recover.

192.    Following the Company's 2010 fiscal third quarter earnings announcement, OSG held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's operations.

193.    On November 5, 2010, OSG filed its Form 10-Q for the quarter ended September 30, 2010, with the SEC which was signed by Defendants Arntzen and Itkin, and included representations about the Company's policies and accounting for income taxes, internal and disclosure controls and Defendants Arntzen's and Itkin's certifications thereon. In addition, the Form 10-Q represented that:

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. They do not include all of the information and footnotes required by generally accepted accounting principles. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.

194.    The statements referenced above in ¶¶191-193 were each materially false and misleading because they misrepresented and failed to disclose the following adverse facts, which were known or recklessly disregarded by Defendants:

(a)     that OIN was party to and jointly and severally liable on certain of OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations and triggering deemed distributions of OIN's then current and accumulated earnings and profits that subjected OSG to tens of millions of dollars in undisclosed federal income tax expense and liabilities;

(b)     that OSG's financial results were materially misstated and should not be relied upon due to OSG's failure to properly account for income taxes;

(c)     that OSG's disclosed policies for income taxes and related income tax disclosures were materially false and misleading;

(d)     that OSG's financial results were presented in violation of GAAP;

(e)     that OSG's disclosure controls and internal controls over income taxes were materially deficient and not operating effectively;

(f)     that certifications issued by Defendants Arntzen and Itkin associated with the Company's internal and disclosure controls were materially false and misleading; and

(g)     based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's earnings, guidance or income taxes.

195.    On February 28, 2011, OSG issued a press release announcing OSG's financial results for its 2010 fourth quarter and year end, the periods December 31, 2010.  The press release reported that the Company's revenues for the 2010 fourth quarter and year end respectively totaled $183.2 million and $853.3 million and that the Company's loss for the 2010 fourth quarter and year end respectively totaled $55.3 million, or $1.83 per diluted share and $134.2 million, or $4.55 per diluted share. In addition, OSG represented that its income tax benefit for the year totaled $3.8 million and that at December 31, 2010, its income taxes recoverable totaled $68.0 million and its deferred income taxes and other liabilities totaled

$274.7 million. Defendant Arntzen commented on the announcement, stating, in pertinent part, as follows:

> . . . [W]e made substantial progress on a number of fronts that will benefit the Company in 2011 and beyond. We made further strides forward in our G&A reduction campaign; we kept ship operating costs in check; we put the two state of the art FSOs we have in joint venture with Euronav to work in Qatar on long term charters; we equipped our U.S. Flag business unit with the assets, contracts and cost base to return to profitability; and we continued to enhance our already strong commercial platforms.
>
> We will continue to focus on internal actions that can enhance our competitive position and improve our margins in 2011. With critical mass in our three main businesses, Crude, International Products and U.S. Flag, in 2011 we will concentrate on flawless execution of our balanced growth strategy.

Concerning OSG's income taxes, the press release stated, in pertinent part, as follows:

> In January 2011, the Company received a $41.1 million tax refund resulting from a November 2009 change in U.S. tax rules that permitted an extended carryback period and accelerated depreciation on vessels placed in service in 2009.

196.    Following the Company's 2010 fiscal fourth quarter and year end earnings announcement, OSG held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendant Itkin made positive statements about the Company's tax matters, stating, in pertinent part, as follows:

> A few points to emphasize the Company's financial strength -- liquidity at December 31, 2010 was $1.3 billion. Remaining construction contract commitments at December 31 were $222 million, of which only $152 million is due during 2011. Scheduled debt amortizations total only $45 million in 2011. Additionally, we continue to have significant headroom under our debt covenants and 2011's cash from operating activities will reflect the $41 million tax refund resulting from the workers, Homeowners, and Business Assistance Act of 2009 that increased the loss carryback period from two to five years.

197.    On March 1, 2011, OSG filed its annual financial report on Form 10-K for the fiscal year ended December 31, 2010 (the "2010 10-K") with the SEC. The 2010 10-K, signed by Defendants Arntzen and Itkin, represented that the financial statements for the years ended December 31, 2010, 2009 and 2008 contained therein were presented in conformity with GAAP,

and included the representations about the Company's accounting tax policies, internal and disclosure controls, and Defendants Arntzen and Itkin certifications thereon.

198. The statements referenced above in ¶¶195-197 were each materially false and misleading because they misrepresented and failed to disclose the following adverse facts, which were known or recklessly disregarded by Defendants:

(a) that OIN was party to and jointly and severally liable on certain of OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations and triggering deemed distributions of OIN's then current and accumulated earnings and profits that subjected OSG to hundreds of millions of dollars in undisclosed federal income tax expense and liabilities;

(b) that OSG's financial results were materially misstated and should not be relied upon due to OSG's failure to properly account for income taxes;

(c) that OSG's disclosed policies for income taxes and related income tax disclosures were materially false and misleading;

(d) that OSG's financial results were presented in violation of GAAP;

(e) that OSG's disclosure controls and internal controls over income taxes were materially deficient and not operating effectively;

(f) that certifications issued by Defendants Arntzen and Itkin associated with the Company's internal and disclosure controls were materially false and misleading; and

(g) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's earnings, guidance or income taxes.

199. On May 3, 2011, OSG issued a press release announcing the financial results for its 2011 first quarter, the period ended March 31, 2011. For the quarter, OSG reported that its revenues and net loss totaled $206.6 million and $34.6 million, or $1.15 per diluted share,

respectively. In addition, OSG represented that its income tax benefit for the quarter totaled $1.6 million and that at March 31, 2011, its other receivables, including income taxes recoverable, totaled $59.8 million and its deferred income taxes and other liabilities totaled $274.0 million. Defendant Arntzen commented on the results, stating, in pertinent part, as follows:

> . . . [W]e believe our business is moving in the right direction. Our International Products fleet is now booking higher rates than we have seen since early 2009, and we believe the demand and supply outlook in this segment portends a multi year rebound. Our LNG carriers and FSOs are delivering the earnings and cash flows we expect. Expenses on shore and at sea remain under control. The turnaround in our U.S. Flag fleet has taken hold; our Delaware Bay lightering volumes have picked up nicely and both of our shuttle tankers are on charter to Petrobras. Even though our Crude business will likely remain supply challenged through the rest of 2011, we expect continued global recovery to increase the call on Middle East OPEC crude, leading to more activity in the second half of 2011 than in the first.

200. Following the Company's 2011 fiscal first quarter earnings announcement, OSG held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's operations, including Defendant Itkin's statements about OSG's 2011 guidance, stating, in pertinent part:

> Our expectations for 2011 are in line with the guidance provided on our February 28th conference call. The only change to P&L guidance is the interest expense. Interest expense guidance is being revised downward to a range between $90 million and $100 million compared with prior guidance of $95 million to $110 million.

201. On May 5, 2011, OSG filed its Form 10-Q for the quarter ended March 31, 2011, with the SEC which was signed by Defendants Arntzen and Itkin, and included representations about the Company's policies and accounting for income taxes, internal and disclosure controls and Defendants Arntzen's and Itkin's certifications thereon. In addition, the Form 10-Q represented that:

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. They do not include all of the information and footnotes required by generally accepted accounting principles. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.

202. The statements referenced above in ¶¶199-201 were each materially false and misleading because they misrepresented and failed to disclose the following adverse facts, which were known or recklessly disregarded by Defendants:

(a) that OIN was party to and jointly and severally liable on certain of OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations and triggering deemed distributions of OIN's then current and accumulated earnings and profits that subjected OSG to hundreds of millions of dollars in undisclosed federal income tax expense and liabilities;

(b) that OSG's financial results were materially misstated and should not be relied upon due to OSG's failure to properly account for income taxes;

(c) that OSG's disclosed policies for income taxes and related income tax disclosures were materially false and misleading;

(d) that OSG's financial results were presented in violation of GAAP;

(e) that OSG's disclosure controls and internal controls over income taxes were materially deficient and not operating effectively;

(f) that certifications issued by Defendants Arntzen and Itkin associated with the Company's internal and disclosure controls were materially false and misleading; and

(g) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's earnings, guidance or income taxes.

203. On June 2, 2011, OSG filed a Form 8-K with the SEC that included as an exhibit a $900 million unsecured revolving credit agreement among various lenders and OSG, OIN and

OBS.  Under the terms of the agreement, OSG may begin utilizing the facility on February 8,

2013, the date which OSG's existing revolving credit facility expires.  The new credit agreement

incorporates an "accordion feature" permitting an increase in total availability up to $1.25 billion

through additional bank subscriptions entered into before February 8, 2013.

204.    On August 2, 2011, OSG issued a press release announcing the financial results

for its 2011 second quarter, the period ended June 30, 2011.  For the quarter, OSG reported that

its revenues and net loss totaled $207.3 million and $37.3 million, or $1.24 per diluted share.  In

addition, OSG represented that its income tax benefit for the quarter totaled $1.2 million and that

at June 30, 2011, its other receivables, including income taxes recoverable totaled $62.0 million

and its deferred income taxes and other liabilities totaled $273.4 million.  The press release also

represented that the Company had "[s]igned a $900 million unsecured forward start revolving

credit agreement, extending OSG's access to committed unsecured revolving credit through the

end of 2016." Defendant Arntzen commented on the announcements stating, in pertinent part,

that the Company's "U.S. Flag business [was] delivering improved results,"  and that:

> The Company continues to execute well operationally, and we have taken
> important steps to ensure the ongoing financial strength of our balance sheet,
> including the successful completion of our forward start facility in late May,
> pushing back our major refinancing needs to the end of 2016.  We continue to
> reduce G&A even further, control costs at sea and improve the performance of
> our portfolio of chartered-in International Flag tankers.  I am confident that OSG
> is extremely well positioned to remain one of the strongest-performing companies
> in the sector, both during a prolonged downturn and throughout the eventual
> recovery in the shipping market.

205.    Following the Company's 2011 fiscal second quarter earnings announcement,

OSG held a conference call with analysts and investors to discuss the Company's earnings and

operations.    During  the  conference  call,  Defendants  made  positive  statements  about  the

Company's  operations. Defendant  Itkin  made  the  following  statement  about  OSG's  2011

financial guidance:

We are reducing guidance in 2011 vessel expenses, depreciation and amortization, and interest expense. Vessel expense guidance is being revised downward to a range between $290 million and $305 million compared with the prior guidance of $295 million to $310 million. This decrease primarily reflects delays in estimated dates for 2011 shipyard deliveries. Depreciation and amortization expense guidance is being revised downward to a range between $180 million and $190 million compared with prior guidance of $185 million to $195 million. This decrease reflects the similar delays in the 2011 newbuild deliveries and reductions in drydock amortization due to changes in the timing of drydocking. Interest expense guidance is being revised downward to a range between $80 million and $90 million compared with prior guidance of $90 million to $100 million. This decrease reflects changes in assumed timing for the issuance of Title XI financing, which is now expected to be in place during Q4 2011. Our guidance for drydock costs for the balance of this year is approximately $35 million. Drydocks will full be performed on 22 vessels including tugs. Q3, $24 million; Q4, $11 million. Our guidance for capital expenditures for the balance of 2011 is approximately $88 million, which includes progress payments on newbuilds, vessel improvements on capitalized interest. Q3, $45 million and Q4, $43 million.

206. On August 5, 2011, OSG filed with the SEC its Form 10-Q for the quarter ended June 30, 2011, which was signed by Defendants Arntzen and Itkin, and included representations about the Company's policies and accounting for income taxes, internal and disclosure controls and Defendants Arntzen's and Itkin's certifications thereon. In addition, the Form 10-Q represented that:

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. They do not include all of the information and footnotes required by generally accepted accounting principles. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.

207. The statements referenced above in ¶¶204-206 were each materially false and misleading because they misrepresented and failed to disclose the following adverse facts, which were known or recklessly disregarded by Defendants:

(a)     that OIN was party to and jointly and severally liable on certain of OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations and triggering

deemed distributions of OIN's then current and accumulated earnings and profits that subjected

OSG to hundreds of millions of dollars in undisclosed federal income tax expense and liabilities;

(b)    that OSG's financial results were materially misstated and should not be

relied upon due to OSG's failure to properly account for income taxes;

(c)    that OSG's disclosed policies for income taxes and related income tax

disclosures were materially false and misleading;

(d)    that OSG's financial results were presented in violation of GAAP;

(e)    that OSG's disclosure controls and internal controls over income taxes

were materially deficient and not operating effectively;

(f)    that certifications issued by Defendants Arntzen and Itkin associated with

the Company's internal and disclosure controls were materially false and misleading; and

(g)    based on the foregoing, Defendants lacked a reasonable basis for their

positive statements about the Company's earnings, guidance or income taxes.

208.    On September 7, 2011, OSG presented at Jefferies & Co.'s Global Shipping

Conference.  During the conference, Defendant Itkin noted that OSG replaced its credit facility,

stating, in pertinent part, as follows:

> On an anticipatory basis, we have essentially replaced our $1.65 billion revolving
> credit agreement with two instruments.  A $900 million unsecured revolving
> credit facility, which begins upon the expiry of the existing facility in February
> 2013 and matures at year end 2016.  The second will be $425 [million] in Title XI
> financing, U.S. Government guaranteed 25 year final maturity at an interest rate
> today that if issued would be 4% or sub 4%.  This is being done in two traunches.
> The first has been approved by the Marine Administration, the second is in the
> approval process.

209.    On November 1, 2011, OSG issued a press release announcing the financial

results for its 2011 third quarter, the period ended September 30, 2011.  For the quarter, OSG

reported that its revenues and net loss respectively totaled $186.2 million and $71.1 million, or

$2.35 per diluted share. In addition, OSG represented that its income tax benefit for the quarter totaled $329,000 and that at September 30, 2011, its other receivables, including income taxes recoverable, totaled $57.1 million and its deferred income taxes and other liabilities totaled $272.3 million. Defendant Arntzen commented on the announcement stating, in pertinent part, as follows:

> In the midst of the weakest markets in decades, we remain focused on strengthening the Company on a number of fronts. We continue to control costs at sea and ashore, and are redelivering or renegotiating higher cost charters-in wherever possible. Our joint ventures are now producing a steady stream of earnings and our U.S. Flag unit continues to perform ahead of plan. Our employees remain focused on taking all actions within their power to improve the competitiveness of the Company, while providing safe, clean and reliable service to our customers.

210. Following the Company's 2011 fiscal third quarter earnings announcement, OSG held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's operations. Defendant Itkin made the following statements about OSG's 2011 guidance:

> In addition to 2011 G&A that I mentioned earlier, we are reducing guidance in 2011 vessel expenses, charter hire expense, depreciation and amortization, and interest expense. Vessel expense guidance is being tightened to range between $290 million and $295 million, compared with prior guidance of $290 million to $305 million. Charter hire expense is being tightened to range between $385 million and $390 million, compared with prior guidance of $380 million to $395 million. Depreciation and amortization expense guidance is also being tightened to range within $180 million and $185 million, compared with prior guidance of $180 million to $190 million. And interest expense guidance is being revised downward to a range between $79 million and $84 million. This decrease reflects changes in assumed timing for the issuance of Title XI financing, previously assumed to be a 2011 event. Our guidance for drydock costs for the balance of this year is approximately $17 million. Drydocks will be performed on 11 vessels. Full year drydock expense will amount to $45 million. Our guidance for capital expenditures for the balance of 2011 is approximately $44 million, which includes progress payments and new build, vessel improvements, and capitalized interest. Full year capital expenditures will amount to $207 million.

In addition, Defendants Itkin represented that OSG had $700 million available under its credit facility maturing in 2013, stating, in pertinent part, as follows:

> A few points about the Company's liquidity and cash flow obligations -- as of September 30, 2011, cash and short-term investments stood at $182 million, and availability under the credit facility maturing in February 2013 at an additional $700 million.

211.    On November 4, 2011, OSG filed with the SEC its Form 10-Q for the quarter ended September 30, 2011, which was signed by Defendants Arntzen and Itkin, and included representations about the Company's policies and accounting for income taxes, internal and disclosure controls and Defendants Arntzen's and Itkin's certifications thereon.  In addition, the Form 10-Q represented that:

> The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X.  They do not include all of the information and footnotes required by generally accepted accounting principles. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.

212.    The statements referenced above in ¶¶208-211 were each materially false and misleading because they misrepresented and failed to disclose the following adverse facts, which were known or recklessly disregarded by Defendants:

(a)     that OIN was party to and jointly and severally liable on certain of OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations and triggering deemed distributions of OIN's then current and accumulated earnings and profits that subjected OSG to hundreds of millions of dollars in undisclosed federal income tax expense and liabilities;

(b)     that OSG's financial results were materially misstated and should not be relied upon due to OSG's failure to properly account for income taxes;

(c)     that OSG's disclosed policies for income taxes and related income tax disclosures were materially false and misleading;

(d)     that OSG's financial results were presented in violation of GAAP;

(e)     that OSG's disclosure controls and internal controls over income taxes were materially deficient and not operating effectively;

(f)     that certifications issued by Defendants Arntzen and Itkin associated with the Company's internal and disclosure controls were materially false and misleading; and

(g)     based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's earnings, guidance or income taxes.

213.    On February 9, 2012, OSG issued a press release announcing that its Board of Directors had suspended the payment of regular quarterly dividends and that no dividend will be paid in the first quarter of 2012.   Defendant Arntzen commented on the action, stating, in pertinent part, as follows:

> Today's action should be seen as part of the longer term program at OSG to preserve liquidity, control costs and reduce general and administrative expenses throughout the Company, an effort that has seen such expenses come down from $144 million in full year 2008 to under $90 million last year.  More recent actions include reduction in Director compensation, elimination of cash bonuses for 2011 and salary increases in 2012 for the entire senior management team, and return of vessels under loss making charters-in.   Management is committed to further reducing costs in 2012.

214.    On February 13, 2012, OSG issued a press release announcing that it had filed a Form S-3 registration statement with the SEC to offer and sell from time to time, in one or more offerings, OSG's common stock, preferred stock, debt securities, warrants, units or any combination thereof with a maximum aggregate offering price of $500 million.

215.    On February 28, 2012, OSG issued a press release announcing OSG's financial results for its 2011 fourth quarter and year end, the periods ended December 31, 2011.  The press

release reported that the Company's revenues for the 2011 fourth quarter and year end respectively totaled $190.1 million and $790.2 million and that the Company's loss for the 2011 fourth quarter and year end respectively totaled $50.0 million, or $1.65 per diluted share and $192.9 million, or $6.39 per diluted share.  In addition, OSG represented that its income tax benefit for the year totaled $1.9 million and that at December 31, 2011, its income taxes recoverable totaled $27.4 million and its deferred income taxes and other liabilities totaled $277.1 million.  Defendant Arntzen commented on the announcement, stating, in pertinent part, as follows:

> . . . [W]e made progress on a number of fronts that will position us well for the future.  We reduced G&A costs by an additional $17 million in 2011, part of a long-term transformation that has seen G&A costs fall to $83 million in 2011 from $144 million for 2008.  Our U.S. Flag business returned to profitability and is now generating the steady and dependable cash flows we expected from it.  With the delivery of four newbuildings over the last 12 months, our International Products fleet renewal program is now complete, and our fleet of 43 owned and chartered-in product carriers ideally positions us to participate in the cyclical recovery in the Products market that we believe is already underway.  Our LNG and FSO joint ventures performed well and provide a solid source of locked-in earnings for the Company.  And finally, our sea staff delivered another year of safe, dependable, incident-free shipping services.

Concerning the Company's anticipated 2012 results, Defendant Arntzen stated as follows:

> Looking ahead to 2012, we expect rates in our major International markets, including our crude business, to improve somewhat this year, as reflected in our first quarter performance so far.  Nevertheless, we will continue to run the Company conservatively.  We are actively pursuing a range of near-term initiatives that will improve the financial flexibility of the Company and position us to capitalize on the recovery in our International markets.

216.  Following the Company's 2011 fiscal fourth quarter and year end earnings announcement, OSG held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the question and answer session of the conference call, Defendant Arntzen represented that OSG had been in touch with certain members of Congress

about changing the existing tax laws relating to the repatriation of foreign source income. The following exchange took place:

Jon Chappell - Evercore Partners – Analyst:

Morten, one thing you did not put on your list of potential levers to pull, which is probably because it is in the early stages, but we had read that you were down in Washington asking for some just level playing field as far as taxes on repatriation of cash. Can you give us an update as to where that process stands right now, and then also the magnitude of any cash repatriation if that were to be approved at some point?

Defendant Arntzen:

I think it was reported in the press, the mention is about $500 million of income that we could bring back. I think what was positive in Washington was that we have support on both sides of the aisle from probably the most liberal Democrats to the most conservative Republicans on the House Ways and Means Committee. In fact, we haven't found one Senator or Congressman who objects to what we are trying to do, which is just a fix, almost more of a fairness. The problem is that since legislative gridlock in Washington, that I think we have all read about, and it is strictly getting it appendaged to a Bill that then moves forward. We have been operating without a budget in Washington for three years, and typically that would be the kind of thing that these types of corrections would be attached to. So we have very solid bipartisan support, and as soon as we can get it into a Bill, there are no objectors to it. So we think it can go forward, but it is Washington and it is an election year, and so that is the uncertainty.

In addition, Defendant Itkin represented that OSG had accessed its credit facility, thereby subjecting the Company to undisclosed income tax expense and liabilities, stating, in pertinent part, as follows:

As of December 31, our cash and short-term investments stood at $55 million and we had $723 million of availability under our credit facility maturing in February 2013. That would translate into $573 million after the $150 million step-down in availability in February 2012. We've accessed cash through draw-downs from our unsecured revolver and have recently restored the cash balance to over $200 million through a $150 million draw under the revolver on February 10. Our non-operating cash flows during 2012 are manageable.

217. On February 29, 2012, OSG filed with the SEC its annual financial report on Form 10-K for the fiscal year ended December 31, 2011 (the "2011 Form 10-K"). The 2011

Form 10-K was signed by Defendants Arntzen and Itkin, represented that the financial statements for the years ended December 31, 2011, 2010 and 2009 contained therein were presented in conformity with GAAP, and included representations about the Company's accounting tax policies, internal and disclosure controls, and Defendants Arntzen and Itkin certifications thereon.

218. The statements referenced above in ¶¶215-217 were each materially false and misleading because they misrepresented and failed to disclose the following adverse facts, which were known or recklessly disregarded by Defendants:

(a)     that OIN was party to and jointly and severally liable on certain of OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations and triggering deemed distributions of OIN's then current and accumulated earnings and profits that subjected OSG to hundreds of millions of dollars in undisclosed federal income tax expense and liabilities;

(b)     that OSG's financial results were materially misstated and should not be relied upon due to OSG's failure to properly account for income taxes;

(c)     that OSG's disclosed policies for income taxes and related income tax disclosures were materially false and misleading;

(d)     that OSG's financial results were presented in violation of GAAP;

(e)     that OSG's disclosure controls and internal controls over income taxes were materially deficient and not operating effectively;

(f)     that certifications issued by Defendants Arntzen and Itkin associated with the Company's internal and disclosure controls were materially false and misleading; and

(g)     based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's earnings, guidance or income taxes.

219.    On May 1, 2012, OSG issued a press release announcing the financial results for its 2012 first quarter, the period ended March 31, 2012.  For the quarter, OSG reported that its revenues and net loss respectively totaled $214.0 million and $34.8 million, or $1.15 per diluted share.  In addition, OSG represented that its income tax benefit for the quarter totaled $1.3 million and that at March 31, 2012, its other receivables totaled $51.8 million and its deferred income taxes and other liabilities totaled $277.2 million.  Defendant Arntzen commented on the announcement stating, in pertinent part, as follows:

> Rates in our International Flag segments continue to be weak and volatile, but have improved from the last six months of 2011, which we believe was the bottom of the tanker cycle. . . . We began this quarter with healthier crude rates and a more balanced products market as the driving season in the U.S. approaches.  At the same time, we are getting satisfying contributions from our U.S. Flag, LNG and FSO businesses.  We remain intensely focused on executing a number of actions to strengthen the Company operationally and financially.  These include further expense reduction initiatives on shore, a fleetwide effort to reduce fuel consumption at sea and a number of initiatives to increase liquidity.  In this volatile environment, we will continue our patient approach to acquisitions, charter-in opportunities and newbuilding projects.

220.    Following the Company's 2012 fiscal first quarter earnings announcement, OSG held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants made positive statements about the Company's operations.  Defendant Itkin stated the following about OSG's 2012 financial guidance:

> Our expectations for 2012 are tracking in-line with the guidance provided to you on our prior conference call.  The only changes to P&L guidance are to vessel OpEx. Vessel expense guidance is being revised downward to a range between $295 million and $305 million.  Our estimated 2012 charter hire expense remains consistent with the guidance provided on the February call of $350 million to $360 million. We've included some additional details with respect to the guidance.  As we previously indicated, short-term charters, defined as charters less than one year in duration at inception, are not included in our fleet list, nor are the spot charters-in executed by our International Flag Lightering operation.

$40 million to $50 million of the annual guidance figure represents estimates for these short-term charters and spot charters-in. It should also be noted that the level of quarterly charter hire expense is expected to decrease sequentially during the remainder of 2012 from the $96 million of actual charter hire expense incurred in the first quarter. Forecasted charter hire expense by quarter for the vessels on our fleet list for the remainder of 2012 is as follows -- Q2 $79 million; Q3 $76 million; and Q4 $72 million. Short-term charters and spot charters-in make up the balance of the difference, representing $29 million to $40 million, which can be spread ratably over the three remaining quarters, $10 to $13 million per quarter. Our guidance for drydock costs for the balance of the year is approximately $31 million. Drydocks will be performed on 23 vessels -- Q2 $20 million, Q3 $3 million, Q4 $8 million. Our guidance for capital expenditures for the balance of 2012 is approximately $30 million, which includes progress payments on newbuilds, vessel improvements, and capitalized interest -- Q2 $10 million, Q3 $17 million, and Q4 $3 million.

In addition, Defendant Itkin represented that OSG had $344 million available under its credit facility maturing in 2013, stating, in pertinent part, as follows:

Just a few points about the Company's liquidity and cash flow obligations. We remain in compliance with the financial covenants contained in our debt agreements and expect to maintain compliance with all of our financial covenants during the next 12 months. As of March 31, 2012, our cash and short-term investments stood at $227 million and we have $344 million of availability under our credit facility maturing in February of '13. Non-operating cash outflows during the remaining nine months of 2012 are manageable, and more than 70% of our vessel net book value remains unsecured. Only 15 of our vessels are pledged as collateral.

221. On May 7, 2012, OSG filed with the SEC its Form 10-Q for the quarter ended March 31, 2012, which was signed by Defendants Arntzen and Itkin, and included representations about the Company's policies and accounting for income taxes, internal and disclosure controls and Defendants Arntzen's and Itkin's certifications thereon. In addition, the Form 10-Q represented that:

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. They do not include all of the information and footnotes required by generally accepted accounting principles. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.

222.    The statements referenced above in ¶¶219-221 were each materially false and misleading because they misrepresented and failed to disclose the following adverse facts, which were known or recklessly disregarded by Defendants:

(a)    that OIN was party to and jointly and severally liable on certain of OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations and triggering deemed distributions of OIN's then current and accumulated earnings and profits that subjected OSG to hundreds of millions of dollars in undisclosed federal income tax expense and liabilities;

(b)    that OSG's financial results were materially misstated and should not be relied upon due to OSG's failure to properly account for income taxes;

(c)    that OSG's disclosed policies for income taxes and related income tax disclosures were materially false and misleading;

(d)    that OSG's financial results were presented in violation of GAAP;

(e)    that OSG's disclosure controls and internal controls over income taxes were materially deficient and not operating effectively;

(f)    that certifications issued by Defendants Arntzen and Itkin associated with the Company's internal and disclosure controls were materially false and misleading; and

(g)    based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's earnings, guidance or income taxes.

223.    On August 1, 2012, OSG issued a press release announcing the financial results for its 2012 second quarter, the period ended June 30, 2012.  For the quarter, OSG reported that its revenues and net loss respectively totaled $210.0 million and $55.3 million, or $1.83 per diluted share.  In addition, OSG represented that its income tax provision for the quarter totaled $1.9 million and that at June 30, 2012, its other receivables totaled $49.0 million and its deferred

income taxes and other liabilities totaled $280.5 million. The press release also represented that the Company's loss had widened and that in July 2012 the Company had borrowed the full amount remaining of its revolving credit facility, or $343 million. The Company also represented that it was then talking to investment bankers concerning long-term financing options "to manage through an extended downturn." Defendant Arntzen commented on the announcements stating, in pertinent part, as follows:

> On a bright note, our U.S. Flag unit continued to perform ahead of plan and the prospects for this business improved following the announcement of the sale of Conoco's Trainer refinery to Delta Air Lines and Sunoco's transfer of its Philadelphia refinery to a joint venture with Carlyle.

> In July we drew down the full remaining availability under our revolving credit facility and now have cash reserves of over $550 million. We believe this was a prudent step given the ongoing difficult market conditions. We are in discussions with our main banks to put in place long-term financing that provides sufficient liquidity to manage through an extended downturn in our International Flag tanker markets. At the same time, we are pursuing other liquidity raising options available to the Company.

> 224.   Following the Company's 2012 fiscal first quarter earnings announcement, OSG held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's operations. Defendant Itkin made the following statement about OSG's income taxes during the quarter:

> In addition, the tax line moved from the benefit of $1.2 million in the 2011 quarter to a provision of $1.9 million in the 2012 quarter -- a negative swing of $3.1 million. This principally reflects a change in the intra-period tax allocation in 2012. It is worth noting that the non-cash nature of certain of these charges contributed to a $10 million growth in cash provided by operations compared to the prior year's quarter.

In addition, Defendant Arntzen explained that during the quarter, the Company drew down on its credit facility, thereby subjecting OSG to undisclosed income tax expense and liabilities, stating, in pertinent part:

In July, the Company drew down $343 million remaining available under its $1.5 billion revolving credit facility. We believe this was a prudent step to take today to ensure continued liquidity, considering the difficult market environment we're operating in, including the uncertain outlook for the global economy and the credit markets. Combined with cash already in hand, we now have over $550 million on our balance sheet. The vast majority of this money is being held in domestic accounts by our US companies as invested in short-term Treasury securities and similar high-quality, highly liquid money market instruments. We are working with our banks to put in place long-term financing for the Company that provides sufficient liquidity for us to manage through this extended downturn in our international flag markets. At the same we are exploring other options to enhance liquidity also.

225.    On August 7, 2012, OSG filed with the SEC its Form 10-Q for the quarter ended June 30, 2012, which was signed by Defendants Arntzen and Itkin, and included representations about the Company's policies and accounting for income taxes, internal and disclosure controls and Defendants Arntzen's and Itkin's certifications thereon. In addition, the Form 10-Q represented that:

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. They do not include all of the information and footnotes required by generally accepted accounting principles. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included.

226.    The statements referenced above in ¶¶223-225 were each materially false and misleading because they misrepresented and failed to disclose the following adverse facts, which were known or recklessly disregarded by Defendants:

(a)    that OIN was party to and jointly and severally liable on certain of OSG debt obligations to third party lenders, thereby guaranteeing such debt obligations and triggering deemed distributions of OIN's then current and accumulated earnings and profits that subjected OSG to hundreds of millions of dollars in undisclosed federal income tax expense and liabilities;

(b)     that OSG's financial results were materially misstated and should not be relied upon due to OSG's failure to properly account for income taxes;

(c)     that OSG's disclosed policies for income taxes and related income tax disclosures were materially false and misleading;

(d)     that OSG's financial results were presented in violation of GAAP;

(e)     that OSG's disclosure controls and internal controls over income taxes were materially deficient and not operating effectively;

(f)     that certifications issued by Defendants Arntzen and Itkin associated with the Company's internal and disclosure controls were materially false and misleading; and

(g)     based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's earnings, guidance or income taxes.

227.    On October 3, 2012, OSG filed a Form 8-K with the SEC representing that Andreas had resigned, effective September 27, 2012, from his positions on OSG's Board of Directors and its Audit Committee. The Form 8-K attached Andreas's resignation letter wherein Andreas cited a disagreement with OSG's Board of Directors process in reviewing an unidentified "tax issue," and that Andreas "had hoped in prior discussions to convince the Board and Audit Committee to follow a different direction," but that he "was unsuccessful in those efforts;" "[a]s a result, [Mr. Andreas had] decided to tender [his] resignation."

228.    Then, on October 22, 2012, OSG filed the October 22nd 8-K with the SEC representing that in furtherance of the investigation into the tax issues raised in connection with Andreas's resignation, the Board's Audit Committee, "on the recommendation of management," had, on October 19, 2012, "concluded that the Company's previously issued financial statements **for at least the three years ended December 31, 2011** and associated interim periods, and for

the fiscal quarters ended March 31 and June 30, 2012, **should no longer be relied upon**." According to the October 22nd 8-K, the "Audit Committee and authorized officers ha[d] informed the Company's independent registered public accountants of this conclusion" and the "Company [was] continuing its review processes, including determining whether a restatement of those financial statements may be required, and the nature and amount of any potential restatement." The October 22nd 8-K also stated that "the Company [was] evaluating its strategic options, including the potential voluntary filing of a petition for relief to reorganize under Chapter 11 of the Bankruptcy Code." Later in the day on October 22, 2012, S&P lowered its credit rating on OSG to CCC, nine steps into junk territory, because of the "high probability of very near-term default," and S&P's belief that the Company is in a liquidity crisis and the likelihood that OSG's covenants would be breached unless the Company developed a "credible plan" to avert the breach or its lenders provided a covenant waiver. Moody's also downgraded OSG to Caa1 because of the looming bankruptcy filing.

229. In response to the Company's announcement, the price of OSG common stock declined precipitously, falling from $3.50 per share to $1.40 per share, and the Company's Notes declined from $50 per Note to $33.50 per Note.

230. Thereafter, on November 13, 2012, OSG filed a notice with the SEC confirming that the Company still could not bring its financial statements current. The filing stated, in pertinent part, as follows:

> As previously disclosed in a Form 8-K filed with the Securities and Exchange Commission on October 22, 2012, the Audit Committee of the Board of Directors of Overseas Shipholding Group, Inc. (the Company), on the recommendation of management, has concluded that the Company's previously issued financial statements for at least the three years ended December 31, 2011 and associated interim periods, and for the fiscal quarters ended March 31 and June 30, 2012, should no longer be relied upon. The Company is continuing its review processes, including determining whether a restatement of those financial

statements may be required, and the nature and amount of any potential restatement. The time frame for completing this review is not currently known. However, it is anticipated to be beyond the November 14, 2012 permitted extension of the prescribed due date for the Form 10-Q.

231. Then, on November 14, 2012, OSG filed for bankruptcy protection. In its filing with the SEC disclosing the bankruptcy filing, OSG also stated that "[o]n November 14, 2012, NYSE Regulation, Inc. ("NYSE Regulation") announced the immediate suspension of trading on the New York Stock Exchange of the common stock of OSG,": that "NYSE Regulation determined that OSG is no longer suitable for listing in light of the filing of the Voluntary Petitions, which is sufficient grounds for the commencement of delisting procedures according to Section 802.01D of the NYSE's Listed Company Manual," and that "[a]t this time OSG does not intend to take any action to appeal the NYSE's decision and therefore, it is expected that OSG's common stock will be delisted after completion by the NYSE of application to the Securities and Exchange Commission."

232. In response to the news that OSG had filed for bankruptcy protection, the price of OSG common stock declined from $1.13 per share to $0.45 per share.

**Post-Class Period Events**

233. On January 29, 2013, the SEC issued a formal order of private investigation of the Company.

234. On February 11, 2013, the Company announced Defendant Arntzen's resignation from the Company after nine years as Chief Executive Officer. Artzen's resignation came on the same day the IRS announced its was filing an amendment to the Proof of Claim with the Bankruptcy Court, claiming that OSG owed the U.S Government more than $463 million in corporate income tax and interest, and not the $48 million in corporate income tax and interest that was originally announced. In the 2012 Form 10-K, the Company stated "As a result of his

resignation, all unvested shares of restricted stock, stock options, restricted stock units and performance units held by Mr. Arntzen were forfeited, including all of the stock options and restricted stock units that were granted to him in connection with his October 2011 employment letter agreement. In addition, all vested but unexercised stock options terminated unexercised at the expiration of the 30 day period after his resignation."

235. On April 4, 2013 OSG announced the departure of Defendant Itkin, who had managed OSG's finances for 18 years. In a press release, the Company stated "it has implemented a reduction in force intended to improve operational efficiencies in connection with the Company's restructuring efforts. As part of the reduction in force, Myles R. Itkin has left the Company as Executive Vice President, Chief Financial Officer and Treasurer of the Company."

236. On August 5, 2013, OSG filed a protective order in its bankruptcy proceeding disclosing that the Company had received a subpoena from the SEC on August 1, 2013. The subject matters of the subpoena were (1) credit agreements entered into by OSG from 2000 to 2011, and any other agreements dated prior to 2000 to which OSG, OBS and OIN were parties and pursuant to which OSG or OBS borrowed funds (collectively, the "Credit Agreements"); and (2) any potential tax consequences arising out of the Credit Agreements pursuant to Section 956 of the Internal Revenue Code.

237. The disclosure significantly widened the scope of the tax problem related to the Credit Agreements, which OSG had first reported in October 2012. Whereas OSG had originally warned shareholders that financial statements dating back to at least 2009 could no longer be trusted due to a tax issue stemming from the fact that the Company is based in the U.S. but has substantial overseas operations, the Company now indicated that the credit agreements at issue date back to 2000.

238.    On August 26, 2013 the Company revealed that, in addition to the previously issued financial statements for the past three years ended December 31, 2011, after further investigation the Company discovered that the past twelve years' financial statements contained false statements.  The Company stated: "In connection with the inquiry process, on October 19, 2012, the audit committee of the board of directors of the Company (the "Audit Committee"), on the recommendation of management, concluded that the Company's previously issued financial statements for at least the three years ended December 31, 2011 and associated interim periods, and for the quarters ended March 31 and June 30, 2012, should no longer be relied upon.  Upon completion of the inquiry in June 2013, it was determined that there were errors in the Company's previously issued financial statements for each of the years in the twelve year period ended December 31, 2011 (including the interim periods within those years), and for each of the calendar quarters ended March 31, 2012 and June 30, 2012, and such financial statements should be restated."

239.    The basis for the Restatement was just as the Company had explained at the end of the Class Period:[3]

> Specifically, because OSG International, Inc. ("OIN"), a wholly-owned subsidiary of the Company incorporated in the Marshall Islands, was a co-obligor with OSG and OSG Bulk Ships, Inc. ("OBS"), a wholly-owned subsidiary of the Company incorporated in the U.S., on a joint and several basis for amounts drawn under the Credit Facilities, the Company determined that OIN could be deemed under Section 956 of the U.S. Internal Revenue Code ("Section 956") to have made taxable distributions to OSG for each taxable year in which such joint and several liability existed. Under the relevant tax rules, the amount of any deemed distributions for any taxable year that would be considered taxable income as a result of this issue generally (and subject to certain complex variables) would be determined by reference to the excess of: (i) the average of the quarter-end outstanding balances under the Credit Facilities for that year, over (ii) the average of the quarter-end balances for prior years, plus any other amounts that might

---

[3]    Dollar amounts mentioned in connection with the Company's August 26, 2013 Restatement are in thousands.

have given rise to deemed distributions for prior years. In the case of OIN and OSG, this calculation could produce an aggregate amount of up to $884,750, $1,166,730 and $1,317,500 of earnings deemed repatriated from OIN through December 31, 2011, September 30, 2012 and December 31, 2012, respectively, as a result of drawdowns under the Credit Facilities, although the final determination of the amount will depend upon several interrelated issues that have yet to be settled with the Internal Revenue Service ("IRS"). Furthermore, the Company determined that it had not properly accounted for the tax consequences of intercompany balances that have existed between domestic and international entities within the Company.

240. The Company explained that its financial statements for the past twelve years were inaccurate "due to insufficient processes to identify and evaluate adequately the income tax accounting impact of Section 956 to certain intercompany balances, these intercompany balances could be deemed under Section 956 to have been taxable distributions to OSG in the years in which such balances existed. This resulted in the Company recording deemed dividend income aggregating $77,000 for taxable years 2012 and earlier. The Company's financial statements for years prior to 2012 and for each of the quarters ended March 31, 2012 and June 30, 2012 did not properly take account of these issues and, therefore, these errors caused the financial statements to be misstated."

241. According to OSG, it "believes, based on its analysis and its interactions with the IRS to date, that the actual amount of tax that the Company ultimately will be required to pay to the IRS in respect of the potential deemed dividends and other adjustments discussed above will be significant and could be as high as *$460,000*, or potentially higher, for all periods ending on or before December 31, 2012, not taking in account any potential penalties but including interest."

242. OSG's Restatement revealed the extent of Defendants' fraud:

- overstated income taxes recoverable (a component of other receivables) and retained earnings by $21,789 and $533,938, respectively, and understated the reserve for uncertain tax positions and deferred income taxes and other liabilities by $318,599 and $193,550, respectively as of December 31, 2011;

- both understated the income tax benefit and overstated the comprehensive loss by $9,877 and $346, for the three and nine month periods ended September 30, 2011, respectively;

- understated the income tax provision by $1,875 for the three month period ended March 31, 2012 and understated the income tax benefit by $2,768 and $893 for the three and six month periods ended June 30, 2012, respectively; and

- overstated income taxes recoverable by $21,434 and $20,112 as of March 31, 2012 and June 30, 2012, respectively;

- understated noncurrent deferred income taxes and the noncurrent reserve for uncertain tax positions by $191,376 and $323,003, respectively, as of March 31, 2012 and by $182,328 and $330,605, respectively, as of June 30, 2012; and

- overstated total equity by $535,813 and $533,045 as of March 31, 2012 and June 30, 2012, respectively.

## Additional Scienter Allegations

243. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding OSG, their control over, and/or receipt and/or modification of OSG's admittedly materially false and misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

244. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The multi-year fraudulent activity alleged herein could not have been perpetrated during the Class Period

without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including Defendants Arntzen and Itkin.

245. Even without the facts obtained from the Proskauer Motion, the Former Treasurer, and those demonstrating Defendant Arntzen's understating of the income tax ramifications associated with the repatriation of OGS's foreign source income, other facts alleged herein demonstrate that Defendants acted with scienter.

246. For example, Defendants were executive officers of OSG and, at a minimum, should have been aware of key facts related to the Company's operations. Here, management deemed, and represented to investors, that OSG's policy of accounting for income taxes to be "critical" in nature. In addition, the operations of OSG's principal foreign operating subsidiary, OIN, owned or operated approximately 75% of OSG's vessels. Thus, Defendant Itkin, as the Company's CFO, would have been aware of the special tax implications associated with foreign operating subsidiaries. Accordingly, scienter can be imputed to Defendant Itkin on this basis.

247. In addition, OSG has admitted that the financial statements it issued during the Class Period (and for numerous years before) "should no longer be relied upon" and were presented in violation of GAAP and the Company's publicly stated policies of accounting. OSG's undisputed violations of GAAP further support an inference of scienter.

248. The sheer magnitude and duration of OSG's improper financial reporting provides additional evidence that Defendants knew of the alleged fraud or disregarded it. OSG has now admitted that its previously issued financial statements *for each of the twelve calendar years* in the twelve year period ended December 31, 2011 were materially misstated and should no longer be relied upon.

249.    In addition, on November 13, 2012, the Company received a request for documents from the staff of the SEC related to the Company's improper accounting for income taxes.  Thereafter, on January 29, 2013, the SEC issued a formal order of private investigation, which further supports a finding of scienter.

250.    Further, OSG's undisputed failure to maintain effective internal controls over its financial reporting over a multi-year period supports a finding of scienter.  The scienter of the Defendants is further evidenced by their Sarbanes-Oxley mandated certifications on OSG's internal controls, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about OSG, including information related to its income taxes, was made known to them.

251.    Additionally, the resignations and/or terminations of Defendants supports a finding of scienter, particularly when one considers that Defendant Arntzen "resigned" on the same day that the IRS announced that OSG owed the U.S. Government more than $463 million in taxes and that he forfeited all unvested OSG shares of restricted stock, stock options, restricted stock units and performance units in connection with his resignation.

252.    Taken collectively, the twelve year duration of OSG's improper accounting, coupled with the violations of the Company's "critical" accounting policies and GAAP, the Defendants' resignations and/or terminations, the SEC investigation and the material internal control deficiencies over a multi-year period - which were repeatedly certified by Defendant Arntzen and Itkin - demonstrate a strong inference that Defendants acted with scienter.

253.    Moreover, Defendants also knowingly engaged or consciously ignored the fraud alleged herein because they were troubled about additional downgrades of OSG's debt by rating agencies while the Company was engaged in capital raising activities.  Defendants' allegedly

material false and/or misleading statements were made willfully so as to maximize the amount of money that the Company could raise in the Offering. Defendants knowingly engaged or consciously ignored the fraud alleged herein so as to facilitate OSG's access to much needed capital at a time when the Company was incurring tax liabilities totaling in the hundreds of millions of dollars and its operations were consuming tens of millions of dollars in cash.

254. Furthermore, Defendants possessed substantial motives for misrepresenting OSG's financial status, operations, and prospects throughout the Class Period, given their knowledge of the state of the then accelerating decline in the shipping industry. Defendants' knowledge of the declining industry trends and the financial condition of OSG and the positive statements made contemporaneously with that knowledge caused OSG's securities to trade at artificially inflated prices.

255. From 2000 until his departure in 2013, Defendant Itkin did not purchase a single share of OSG stock on the open market. From 2004, when he joined OSG, until his departure in 2013, Defendant Arntzen made only one purchase of OSG stock on the open market, consisting of 3,987 shares.

256. Because of their positions with OSG, the Defendants had access to non-public information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

257. The Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, income taxes, financial statements, and financial condition, as alleged herein. These Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

258. Defendants Itkin and Arntzen both have extensive financial backgrounds. Itkin was OSG's Chief Financial Officer and Treasurer for 18 years, as well as the Company's Principal Accounting Officer. Itkin is also currently the Chairman of the Audit Committee of Danaos Corporation. He also earned an MBA degree.

259. Prior to joining OSG in 2004, Arntzen was CEO of American Marine Advisors, Inc. ("AMA"), a United States-based merchant banking firm specializing in maritime industry merger and acquisition advisory work and corporate restructuring for a global client base. Prior to his work at AMA, Arntzen ran the Global Transportation Group for Chase Manhattan Bank ("Chase"). Chase pioneered the introduction of shipping companies to the high yield market and under Arntzen's leadership, was the largest arranger of shipping loans in the world. Arntzen held the same position at Chemical Bank before it merged with Chase. Arntzen was also a member of the audit committees of other international companies, including Chiquita Brands International Inc. from 2002 through 2008, and Royal Caribbean Cruises Ltd. from 2008 through

2013. In addition, Arntzen earned a Masters of International Affairs, with a specialization in International Business and International Economics.

260. OSG was at the forefront of the U.S. shipping industry's efforts to lobby members of Congress about changing existing tax laws relating to the repatriation of foreign source income under Subpart F of the Internal Revenue Code – the same subpart that contained Section 956 at issue here.

261. Indeed, Defendant Arntzen was so well-versed in Subpart F of the Internal Revenue Code that he personally testified before the U.S. House of Representatives' Ways and Means Committee on February 1, 2012 at a hearing on Maritime Tax Issues. At the hearing, Defendant Arntzen advocated for the passage of the ASRA. The ASRA, which was never enacted, aimed to repeal Section 955 of Subpart F of the Internal Revenue Code.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

262. At all relevant times, the markets for OSG securities were efficient for the following reasons, among others:

(a)     OSG common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, OSG filed periodic public reports with the SEC and the NYSE;

(c)     OSG regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     OSG was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

263.    As a result of the foregoing, the markets for OSG securities promptly digested current information regarding OSG from all publicly available sources and reflected such information in the prices of OSG's securities.  Under these circumstances, all purchasers of OSG securities during the Class Period suffered similar injury through their purchase of OSG securities at artificially inflated prices and a presumption of reliance applies.

## Loss Causation/Economic Loss

264.    For the purposes of this section of the Complaint, the term "Defendants" refers only to Defendants Arntzen and Itkin.

265.    The material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class.

266.    As described herein, during the Class Period, Defendants engaged in the fraudulent scheme, and made or caused to be made a series of materially false or misleading statements about OSG and its financial performance.

267.    The scheme, including the material misstatements and omissions, had the cause and effect of creating in the market an unrealistically positive assessment of OSG's business and its financial performance and condition, thus causing OSG securities to be overvalued and artificially inflated during the Class Period.  Defendants' scheme, including the materially false and misleading statements made during the Class Period, resulted in Lead Plaintiffs purchasing OSG securities at artificially inflated prices.

268.    On October 22, 2012, the day following the Company's after-hours announcement that its previously issued financial statements for the quarters ended March 31, 2012 and June 30, 2012 and its financial statements for at least the three years (and related interim periods) ended December 31, 2011 should "no longer be relied upon," OSG's common stock declined by **60%** to close at $1.40 per share.  Similarly, OSG Notes declined from $50 per Note to $33.50 per Note.

269.    Then, in response to the news on November 14, 2012, that OSG had filed for bankruptcy protection, the price of OSG common stock declined from $1.13 per share to $0.45 per share.

270.    The declines in the prices of OSG securities after the above disclosures was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price declines in OSG securities negates any inference that the losses suffered by Lead Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of OSG securities and the subsequent significant decline in the value of OSG securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

271.    As a result of these revelations, and the corresponding drop in the prices of OSG securities , Lead Plaintiffs and Class members suffered real economic loss.

**No Safe Harbor**

272.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of OSG who knew that those statements were false when made.

## COUNT IV

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against Defendants Arntzen and Itkin

273.    Lead Plaintiffs incorporate herein ¶¶1-272 by reference.

274.    In this Count, the term "Defendants" refers only to Defendants Arntzen and Itkin.

275.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

276.    In addition, Defendant Itkin was on the original distribution list when draft credit agreements were circulated, and Itkin was present at some of the negotiations. Itkin signed the 2006 Credit Agreement approximately one month after Clifford Chance marked up the draft term sheet (Ex. 1), which demonstrates that OSG's counsel equated the joint and several liability of

OBS and OIN to the liability of a guarantor. It is reasonable to infer that Itkin – as the sole signatory to the 2006 Credit Agreement on behalf of OSG, OBS, and OIN, and as OSG's CFO – discussed the marked-up draft term sheet with OSG's counsel.

277. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

278. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of OSG securities during the Class Period.

279. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for OSG securities. Lead Plaintiffs and the Class would not have purchased OSG securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

280. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of OSG

securities during the Class Period and Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT V

### Violation of Section 20(a) of the Exchange Act
### Against Defendants Arntzen and Itkin

281.    Lead Plaintiffs incorporate herein ¶¶1-280 by reference.

282.    In this Count, the term "Defendants" refers only to Defendants Arntzen and Itkin.

283.    Defendants acted as controlling persons of OSG within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of OSG, Defendants had the power and authority to cause OSG to engage in the wrongful conduct complained of herein.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

284.    OSG, the entity controlled by Defendants Arntzen and Itkin, is liable for violating Section 10(b).  During the Class Period, OSG recklessly or knowingly made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading to Lead Plaintiffs.  The purpose and effect of said false and misleading statements was, among other things, to induce Lead Plaintiffs to purchase shares in OSG.

285.    OSG's knowledge of the falsity of its public statements is demonstrated by factual information included in the Proskauer Motion.  As described in detail in ¶¶122-139, OSG's in-house counsel was involved in negotiating the 2000, 2001, and 2006 Credit Agreements.

286.    The draft term sheet for the 2006 Credit Agreement contains a paragraph regarding "Subsidiary Guarantors" for OSG's $1.5 billion credit facility, with a footnote from counsel to the lenders stating, "***Discuss tax implications of guarantees from non-US***

*subsidiaries*."   (Ex. 1).   The paragraph and footnote were both stricken by OSG's outside counsel, Clifford Chance, who added a new footnote: "No subsidiary guarantees should be required.  OSG Bulk and OSG International are the holding companies of all the group ship-owning companies and will be joint and several borrowers under the Credit Facility."   Thus, according to the Proskauer Motion, "Clifford Chance asserted that the banks did not need an upstream guarantee because, in the context of the 2006 negotiation, it equated the joint and several liability of OBS and OIN to the liability of a guarantor."

287.    Similarly, a draft of the 2000 Credit Agreement bears a comment from OSG's in-house counsel indicating that OSG was rejecting the "joint & several" language and "offer[ing]" instead "OSG & OBS with OSG guarantee of OIN" – evidencing an appreciation that "joint and several would make OIN a guarantor of OSG.  (Ex. 2).  The in-house counsel repeatedly struck the "joint and several" language from the 2000 Credit Agreement, replacing it in one section with "severally and not jointly" and adding OSG as "Guarantor" on the signature page. However, the in-house counsel's suggested changes were rejected by someone at OSG with greater authority.

288.    Also, in an e-mail exchange among the bank lenders regarding the 2000 Credit Agreement, the lenders had asked whether "the Borrowers [are] jointly and severally liable for all obligations?"  (Ex. 3).  One of OSG's in-house counsel wrote next to that question "OK," evidencing a clear intent that OSG and OIN should, in fact, be responsible for the obligations of the other.

289.    Additionally,   in   the   2011   Memorandum,   Proskauer   noted   that   its contemporaneous time records from the drafting of the 2000 Credit Agreement indicated that the tax implications of the "joint and several" language were discussed with OSG: "It seems clear

from our time records that the issue of the tax implications of the joint and several language of the credit agreement was identified during the 2000 loan negotiations and discussed not only internally at Proskauer and with OSG, but also with counsel to the lenders."

290.   Individually and together, these documents demonstrate that since 2006, and as early as 2000, OSG understood and intended that the "joint and several" structure operate as a guarantee between the entities.

291.   Moreover, the Proskauer Motion contends that OSG's General Counsel withheld from Proskauer a number of documents relevant to OSG's tax liability under Section 956. It also contends that OSG asked Proskauer to issue a formal tax opinion about OSG's Section 956 liability despite knowing there were contradictory documents in its files.

292.   OSG's knowledge of the falsity of its public statements is also demonstrated by the Former Treasurer. As described in detail in ¶¶141-145, the Former Treasurer reported directly to Defendant Itkin and was involved in negotiating OSG's credit agreements with banks in 2000 and 2001.

293.   The Former Treasurer explained that Defendant Itkin would "be on the original distribution list" when draft credit agreements were circulated, and Itkin would be present at some of the negotiations.

294.   The Former Treasurer further stated: "I do know that [having foreign subsidiaries jointly and severally liable with domestic entities for credit agreements] was something that I would personally try to avoid having happened." The Former Treasurer explained that this was "because you had a deemed tax event if the foreign companies were guaranteeing the obligations of domestic companies . . . ." According to the Former Treasurer, "I could tell you that we tried to avoid having foreign companies guarantee[] that [debt] of domestic companies."

295.     Describing whether other people also knew this was an issue, the Former Treasurer stated, "if I knew it I would suspect other people were aware of that issue, because I was aware of the issue for the 14 years I was treasurer of Maritime Overseas. . . . [I] would think if I knew it, anybody in a finance position would probably know it."  The Former Treasurer reiterated, "If I knew it, I would think that other people in financial positions of decision making authority would also be of like mind."

296.     The Former Treasurer stated, "I was given a lot of latitude to negotiate these documents and I would point out to senior members of OSG, what I considered to be critical issues . . . I did have a lot of flexibility and authority to negotiate these things and if I had thought that something was going the wrong way, I would certainly point out to seniors of the company."

297.     Moreover, the credit agreements for which OSG's foreign subsidiaries were jointly and severally liable spanned 12 years and provided nearly $4.5 billion of credit to the Company.  They were thus material to the Company, and it is utterly implausible that senior corporate officers of OSG would not have been aware of the true terms of the credit agreements, or the tax implications thereof.

298.     These facts create a strong inference that someone whose intent could be imputed to OSG – OSG's in-house counsel (including its General Counsel), the "senior members of OSG," and "other people in financial positions of decision making authority" described by the Former Treasurer – acted with the requisite scienter.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as class representatives and Lead Counsel as Class Counsel;

B.     Awarding Lead Plaintiffs and other members of the Class damages together with interest thereon;

C.     With respect to Count II, ordering that the Offering be rescinded;

D.     Awarding Lead Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.     Awarding Lead Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

DATED: February 18, 2014    ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                        SAMUEL H. RUDMAN
                                        DAVID A. ROSENFELD
                                        ALAN I. ELLMAN
                                        CHRISTOPHER M. BARRETT

                                        DAVID A. ROSENFELD

                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)
                                        srudman@rgrdlaw.com
                                        drosenfeld@rgrdlaw.com
                                        aellman@rgrdlaw.com
                                        cbarrett@rgrdlaw.com

## CERTIFICATE OF SERVICE

I, David A. Rosenfeld, hereby certify that on February 18, 2014, I caused a true and correct copy of the attached Third Consolidated Amended Complaint for Violations of the Federal Securities Laws to be: (i) filed by hand with the Clerk of the Court; and (ii) served by electronic mail and U.S. first-class mail on all counsel on the attached service list.

David A. Rosenfeld

**Counsel for Defendant(s)**

Craig A. Stewart
Arnold & Porter LLP
399 Park Avenue
New York, NY  10022
  212/715-1179
  212/715-1399 (Fax)

Scott B. Schreiber
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, DC  20004-1206
  202/942-5000
  202/942-5999 (Fax)

David H. Kistenbroker
Joni S. Jacobsen
Ashley J. Burden
Dechert LLP
77 West Wacker Drive, Suite 3200
Chicago, IL  60601
  312/646-5811
  312/646-5858 (Fax)

Miles N. Ruthberg
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY  10022-4802
  212/906-1200
  212/751-4864 (Fax)

Stanley J. Parzen
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL  60606
  312/782-0600
  312/701-7711 (Fax)

Richard A. Rosen
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY  10019-6064
  212/373-3000
  212/757-3990 (Fax)

Stuart J. Baskin
Adam S. Hakki
Daniel H.R. Laguardia
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY  10022-4676
  212/848-4000
  212/848-7179 (Fax)

**Counsel for Plaintiff(s)**

Samuel H. Rudman
David A. Rosenfeld
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY  11747
  631/367-7100
  631/367-1173(Fax)

Darren J. Robbins
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
  619/231-1058
  619/231-7423(Fax)

# EXHIBIT  1

*R B G* *1/5/06*
*Comments*

CONFIDENTIAL

[Draft: (New York) ~~ember 20~~Comments: Clifford Chance LLP - Janu~~~ 5, 2005]

EXHIBIT A

## OVERSEAS SHIPHOLDING GROUP, INC.

### $1,500 MILLION SENIOR UNSECURED REVOLVING CREDIT FACILITY
### SUMMARY OF TERMS AND CONDITIONS

*$1.5 Billion ?*
*$1,500,000,000 ?*

| | |
|---|---|
| **Borrowers:** | Overseas Shipholding Group, Inc., a corporation incorporated under the laws of the State of Delaware ("OSG" or the ""Parent""), OSG Bulk Ships, Inc., a corporation incorporated under the laws of the State of New York ("OSG Bulk"), and OSG International, Inc., a corporation incorporated under the laws of the Republic of the Marshall Islands ("OSG International"), on a joint and several basis (each a "Borrower" and collectively the ""Borrowers""). |
| ~~Subsidiary Guarantors:~~ | ~~Any direct or indirect subsidiary of the Parent (other than OSG Bulk or OSG International), that is liable for Indebtedness in existence at, or coming into existence after, the Closing Date (each a "Subsidiary Guarantor" and collectively the "Subsidiary Guarantors").~~[1] |
| **Lead Arrangers and Bookrunners:** | Nordea and one other financial institution, to be mutually agreed between Nordea and OSG, with each institution underwriting fifty percent of the Credit Facility (the "Lead Arrangers" or the ""Bookrunners""). |
| **Administrative Agent:** | Nordea. |
| **Lenders:** | The Lead Arrangers and a syndicate of financial institutions arranged by the Lead Arrangers and reasonably acceptable to OSG (the "Lenders"). |
| **Credit Facility:** | A fully underwritten senior unsecured revolving credit facility in the aggregate principal denominated amount of $1,500 million (the "Credit Facility"), (with a sub-limit of $_____ for letters of credit, if required, and a sub-limit of $_____ for a swing line allowing same day borrowings in United States Dollars). |
| **Multi-Currency Option:** | The Credit Facility will be available for borrowings in United States Dollars, Euro, British Pound Sterling, Swiss Francs, and Japanese Yen, (each a ""Permitted Currency"" and collectively the ""Permitted Currencies""), provided that maximum fifty percent of |

---

[1] ~~Discuss tax implications of guarantees from non-US subsidiaries.~~

[1] *[No subsidiary guarantees should be required. OSG Bulk and OSG International are the holding companies of all the group ship-owning companies and will be joint and several borrowers under the Credit Facility.]*

# EXHIBIT  2



$350,000,000

CREDIT AGREEMENT

AMONG

OVERSEAS SHIPHOLDING GROUP, INC.,
OSG BULK SHIPS, INC.,
OSG INTERNATIONAL, INC.

AND

THE BANKS LISTED HEREIN,

NEDSHIP BANK NV,
as Syndication Agent,

DEN NORSKE BANK ASA,
as Facility Agent,

AND

ING BANK N.V.,
as Documentation Agent

Dated as of April •, 2000

CREDIT AGREEMENT

THIS CREDIT AGREEMENT (the "Agreement") is made as of the • day of April, 2000, by and among (1) OVERSEAS SHIPHOLDING GROUP, INC., a corporation incorporated under the laws of the State of Delaware ("OSG") with offices at 511 Fifth Avenue, New York, New York 10017, (2) OSG BULK SHIPS, INC., a corporation incorporated under the laws of the State of New York ("OSG Bulk"), with offices at 511 Fifth Avenue, New York, New York 10017, (3) OSG INTERNATIONAL, INC., a corporation incorporated under the laws of the Republic of the Marshall Islands with offices at 511 Fifth Avenue, New York, New York 10017 ("OSG International," jointly and severally with OSG and OSG Bulk, the "Borrowers," each a "Borrower"), (4) the banks and financial institutions whose names and addresses are set out in Schedule I hereto (together with any assignee pursuant to Section 10, the "Banks," each a "Bank"), (5) NEDSHIP BANK NV, as syndication agent for the Banks (the "Syndication Agent"), (6) DEN NORSKE BANK ASA, as facility agent for the Banks (the "Facility Agent"), and (7) ING BANK N.V., as documentation agent for the Banks (the "Documentation Agent;" together with the Syndication Agent and the Facility Agent, the "Agents" or the "Arrangers").

WITNESSETH THAT:

WHEREAS, at the request of the Borrowers, each of the Agents has agreed to act in its respective capacity as set forth herein and the Banks have agreed to provide to the Borrowers a revolving credit facility in the amount of $350,000,000 on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises set forth above, the covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as set forth below:

1.  DEFINITIONS

1.1.  Defined Terms.  In this Agreement the words and expressions specified below shall, except where the context otherwise requires, have the meanings attributed to them below:

| | |
|---|---|
| "Adjusted Consolidated Net Income" | shall mean for any period, the Consolidated Net Income for such period; provided that the following items shall be excluded in computing Adjusted Consolidated Net Income (without duplication): (i) the net income of any Person that is not a Recourse Subsidiary, except to the extent of the amount of dividends or other distributions actually paid to OSG or any of the Recourse Subsidiaries by such Person during such period; (ii) the net income (or loss) of any Person accrued prior to the date it becomes a Recourse Subsidiary or is merged into or consolidated with OSG or any of the Recourse Subsidiaries or substantially all of the property or assets of such Person are acquired by OSG or any of the Recourse Subsidiaries; (iii) the net income of any |

(d) <u>Fees</u>.  The Creditors shall have received payment in full of all other fees and expenses due to each thereof pursuant to the terms hereof on the date when due including, without limitation, all fees and expenses due under Section 12 of this Agreement.

(e) <u>Environmental Claims</u>.    The Banks shall be satisfied that none of the Borrowers nor any Subsidiary is subject to any Environmental Claim which could <u>reasonably be expected to</u> result in a Material Adverse Change.

(f) <u>Legal Opinions</u>.  The Facility Agent shall have received opinions addressed to the Agents and the Banks from (i) Proskauer Rose LLP, special counsel to the Borrowers, (ii) Robert N. Cowen, Esq., Senior Vice President and Chief Operating Officer of OSG and counsel to OSG and OSG Bulk, (iii) Mark A. Lowe, Esq., counsel to OSG International, and (iv) Seward & Kissel LLP, special counsel to the Agents, in such form as the Agents may agree, as well as such other legal opinions as the Banks shall have required as to all or any matters under the laws of the State of Delaware, the United States of America and the State of New York covering the conditions and representations and warranties which are the subjects of Sections 3 and 7, respectively.

(g) <u>Appointment of Process Agent</u>.  The Facility Agent shall have received a duly executed copy of the acceptance by [North American Ship Agencies, Inc.] <u>OSG Ship Management, Inc.</u> of its appointment as agent for service of process for OSG International.

(h) <u>Officer's Certificate</u>.   The Facility Agent shall have received a certificate signed by the President or chief financial officer of OSG certifying that (i) the commitments of the banks or other lenders under the Existing Credit Facility shall have been, or simultaneously will be, reduced to $425,000,000. and (ii) no Borrower shall be compelled by law to withhold or deduct any Taxes from any amounts to become payable to the Facility Agent for the account of the Banks or other Creditors hereunder.

(i) <u>Insurance</u>.  Receipt by the Facility Agent of evidence satisfactory to it of the existence and effectiveness of the insurance required to be maintained by or on behalf of OSG, the Subsidiaries and the Joint Ventures pursuant to Section 8.1(l).

3.2.    <u>Further Conditions Precedent</u>.  The obligation of the Banks to make an Advance available to the Borrowers shall be expressly and separately from the foregoing conditional upon, on each Drawdown Date:

(a)    <u>Drawdown Notice</u>.   The Facility Agent having received a Drawdown Notice in accordance with the terms of Section 2.2.

(b)    <u>Representations and Warranties True</u>.   The representations stated in Section 7 being true and correct as if made on that date; <u>provided</u>, <u>however</u>, that any representation and warranty which relates solely to an earlier date shall be true and accurate on and as of such earlier date.

(c)    <u>No Default</u>.  No Default or Event of Default having occurred and being continuing or would result from the making of an Advance.

(d)    No Material Adverse Change.  There having been no Material Adverse Change since December 31, 1999.

3.3.    Satisfaction after Drawdown.  Without prejudice to any of the other terms and conditions of this Agreement, in the event all of the Banks elect, in their sole discretion, to make an Advance prior to the satisfaction of all or any of the conditions referred to in Sections 3.1 and 3.2, the Borrowers hereby covenant and undertake to satisfy or procure the satisfaction of such condition or conditions within seven (7) days after the Drawdown Date (or such longer period as the Majority Banks, in their sole discretion, may agree).

4.    REPAYMENT AND PREPAYMENT

4.1.    Repayment.  Each Borrower jointly and severally agrees to repay to the Banks the principal of each Advance made to the Borrowers on the last day of the Interest Period therefor and any then outstanding principal of any and all of the Advances made to such Borrower on the Final Payment Date.

4.2.    Prepayment.  Subject to the provisions of Section 11.6 in the case of any Advance on any day other than the last day of the Interest Period w: Advance, the Borrowers may, at their option, without penalty or premium, on prepay all or any portion of the principal of any Advance; provided, that an shall be an integral multiple of $1,000,000 with a minimum amount of provided further that on the date of such prepayment all accrued interest t prepayment shall be paid in full with respect to the Advances or portions the The Borrowers shall deliver to the Facility Agent (which shall promptly fur Bank) notice of such prepayment on not less than five (5) three (3) Banking shall be irrevocable and shall specify the date and amount of prepayment).

4.3.    Borrowers' Obligations Absolute.  The Borrowers' obligations to hereunder and under the Notes shall be absolute, unconditional and irrevocab strictly in accordance with the terms hereof and thereof, under any and all irrespective of any setoff, counterclaim or defense to payment which the Borrowers or any of them may have or have had against the Creditors.

5.    INTEREST AND RATE

5.1.    Payment of Interest; Interest Rate.  (a)  Each Borrower hereby jointly and severally promises to pay to the Banks interest on the unpaid principal amount of each outstanding Advance made to such Borrower for the period commencing on the date of such Advance until but not including the stated maturity thereof (whether by acceleration or otherwise) or the date of prepayment thereof at the Applicable Rate which shall be the rate per annum which is equal to the aggregate of (a) the LIBOR Rate for the relevant Interest Period plus (b) the Applicable Margin.  The Applicable Rate with respect to each Advance shall be determined by the Facility Agent two Banking Days prior to the first day of the relevant Interest Period.  The Facility Agent shall promptly notify the Borrowers and the Banks in writing of the Applicable Rate and the duration of each Interest Period as and when determined.  Each such determination, absent manifest error, shall be conclusive and binding upon the Borrowers.

(b) Notwithstanding the foregoing, each Borrower ~~jointly and severally~~ agrees that after the occurrence and during the continuance of an Event of Default or a failure to pay any interest on the Advances or any other amount becoming payable under this Agreement and under the Notes or under any of them on the date when due, each outstanding Advance shall bear interest at a rate per annum equal to the greater of (A) two percent (2%) plus the Applicable Rate in effect with respect to such Advance and (B) two percent (2%) plus the sum of (x) the Applicable Margin plus (y) the LIBOR Rate for overnight or weekend deposits (the "Default Rate"). In addition, each Borrower hereby promises to pay interest on any Advance made to such Borrower or any installment thereof and (to the extent that the payment of such interest shall be legally enforceable) on any overdue installment of interest, and on any other amount payable by such Borrower hereunder which shall not be paid in full when due (whether at stated maturity, by acceleration or otherwise), for the period commencing on the due date thereof until but not including the date the same is paid in full at the Default Rate.

(c) Except as provided in the next sentence, accrued interest on each Advance shall be payable (i) on the last day of each Interest Period, except that if the Borrowers shall select an Interest Period in excess of three (3) months, accrued interest shall be payable during such Interest Period on each three (3) month anniversary of the commencement of such Interest Period and upon the last day of such Interest Period, and (ii) with each repayment of principal thereof. Interest payable at the Default Rate shall be payable from time to time on demand of the Facility Agent.

5.2.   <u>Calculation of Interest</u>.  All interest shall accrue from day-to-day and be calculated on the actual number of days elapsed and on the basis of a three hundred sixty (360) day year.

5.3.   <u>Maximum Interest</u>.   Anything in this Agreement or the Notes to the contrary notwithstanding, the interest rate on any Advance shall in no event be in excess of the maximum rate permitted by Applicable Law.

6.  <u>PAYMENTS</u>

6.1.   <u>Place of Payments, No Set Off</u>.

All payments to be made hereunder by the Borrowers shall be made in Dollars, ~~not later than 10:00 a.m. New York City time (any payment received after 10:00 a.m. New York City time shall be deemed to have been paid on the next Banking Day)~~ on the due date of such payment, to the Facility Agent at its office located at 200 Park Avenue, New York, New York 10166-0396 or to such other branch of the Facility Agent as the Facility Agent may direct, without set-off or counterclaim and free from, clear of and without deduction for, any Taxes; <u>provided</u>, <u>however</u>, that if the Borrowers shall at any time be compelled by law to withhold or deduct any Taxes from any amounts payable to the Facility Agent for the account of the Banks or the other Creditors hereunder, then, the Borrowers shall pay such additional amounts as may be necessary in order that the net amounts received after withholding or deduction shall equal the amounts which would have been received if such withholding or deduction were not required and, in the event any withholding or deduction is made, whether for Taxes or otherwise, the Borrowers shall promptly send to the Facility Agent any documentary evidence they have with respect to such withholding or deduction. No Bank shall change its lending office if such change would result in the Borrowers being compelled by law to withhold or deduct any Taxes from any

29

IN WITNESS whereof the parties hereto have caused this Agreement to be duly executed by their duly authorized representative as of the day and year first above written.

OVERSEAS SHIPHOLDING GROUP, INC., as
        Borrower

By_____
  Name:
  Title:


OSG BULK SHIPS, INC., as
        Borrower

By_____
  Name:
  Title:


OSG INTERNATIONAL, INC., as
        Borrower

By_____
  Name:
  Title:


NEDSHIP BANK NV, as
        Syndication Agent and Bank

By_____
  Name:
  Title:


DEN NORSKE BANK ASA,
        as Facility Agent
        and Bank

By_____
  Name:
  Title:

By_____
  Name:
  Title:

01029.011#163655

# EXHIBIT  3





David Ayres
04/13/2000 03:55 PM

To:      Mark Lowe/NY/OSG@OSG
cc:

Subject:   FW: Overseas Shipholding Group

-------------------- Forwarded by David Ayres/NY/OSG on 04/13/2000 03:47 PM --------------------

 "Degener, Carol" <degener@sewkis.com> on 04/13/2000 02:56:15 PM

To:      David Ayres/NY/OSG@OSG, "James Waddington Esq. (E-mail)" <jwaddington@proskauer.com>
cc:      "Rob Heijliger (E-mail)" <rob.heijliger@mail.ing.nl>, "Hugh Baker (E-mail)" <hugh.baker@mail.ing.nl>, "Kevin O'Hara (E-mail)"
         <k.ohara.nedship@con.rabobank.com>, "Nikolai Nachamkin (E-mail)" <nikolai.nachamkin@dnb.no>

Subject:   FW: Overseas Shipholding Group

> -----Original Message-----
> From:      Richard_Katz@lnotes5.bankofny.com
> [SMTP:Richard_Katz@lnotes5.bankofny.com]
> Sent:      Thursday, April 13, 2000 2:13 PM
> To:  degener@sewkis.com
> Cc:  Judith_Tse@lnotes5.bankofny.com;
> Matthew_G._Pacifico@lnotes5.bankofny.com
> Subject:   Overseas Shipholding Group
>
> The following are the additional comments to the credit agreement (based,
> except
> for item 4 below, on my conversation with the lenders) and the comments to
> the
> exhibits:
>
>
>            1.   In respect of the definition of "Applicable Margin" on page
> 2,
>      the margin should change when there is a change in the applicable
> rating or
>      ratio, rather than at the end of each Interest Period.
>
>            2.   On the fifth line of the definition of "Compliance
> Certificate"
>      on page 5, insert either "and the Banks" or "(which shall deliver
> copies to
>      the Banks)" after "Facility Agent".
>
>            3.   Add the following at the end of the definition of "Debt" on
> page
>      7:
>

```
>                          ", (iv) all obligations of any third party secured by
>                          property or assets of such Person (regardless of
> whether or
>                          not such Person is liable for repayment of such
>                          obligations), (v) all payment obligations of such
> Person
>                          with respect to interest rate or currency protection
>                          agreements, (vi) all obligations (absolute, contingent
> or
>                          otherwise) of such Person as an account party or
> applicant
>                          in respect of any letter of credit or in respect of
> bankers <<ATT22711.txt>>
```

?

                    acceptances, and (vii) all obligations of any partnership of
                    which such Person is a general partner"

    4.    In respect of the definition of "Interest Period" on pages 10-11,
would the "except" clause (which starts on the fifth line on page 11) apply
if the Interest Period were not a whole number of months?

    5.    In respect of whether or not the Borrowers are jointly and
severally liable, (a) Section 4.1 on page 26 provides for liability for
"the principal of each Advance made to the Borrowers", (b) Section 5.1 on
page 26 provides for liability for "interest on the unpaid principal amount
of each outstanding Advance made to such Borrower", and (c) the Note
provides for a promise to pay "the aggregate unpaid principal amount of the
Advances from time to time outstanding made by the Banks to the Borrower".
Given the foregoing, are the Borrowers jointly and severally liable for all
obligations?

    6.    In respect of Exhibit B:

        a.    On the first line of Section 1 on page 1, insert ", without
recourse," after "Assignee".

        b.    On the first line of Section 3 on page 1, change "[Three]"
to "Three".

        c.    On the first line of Section 8 on page 2, delete the comma
after "ASSIGNEE".

    7.    In respect of Exhibit C:

        a.    As we discussed, there should be one Note from each Borrower
for each Bank.

        b.    See item 5 above.

        c.    On the fifth to sixth lines of the second paragraph on page
2, delete "under the Credit Agreement".

        d.    On the last line of the second paragraph on page 2, delete
the comma after "forthwith".

    8.    In respect of Exhibit D:

a.   On the second line on page 2, delete "(as such terms are defined in the Credit Agreement)".  This is covered by the end of the first paragraph on page 1.

b.   In the first full paragraph on page 2, (a) move "fully harmless" from the fifth line to after "hold" on the fourth line and (b) on the fifth line, delete the comma after "losses".

9.   In respect of Exhibit E:

a.   At the end of the first line of the opening paragraph on page 1, insert "as amended from time to time at the start of the parenthetical.

b.   On the fourth to fifth lines of the opening paragraph on page 1, change "whose names and addresses are set out in Schedule I" to "which are parties".

c.   On the eighth line of the opening paragraph on page 1, change "meaning" to "meanings".

d.   At the end of the next to last line of the opening paragraph on page 1, insert "and the Banks" after "Facility Agent".

e.   On the second to third lines of paragraph (i) on page 1, delete "and for the _____ period then ended".

f.   On the fourth line of paragraph (i) on page 1, change "such period" to "the _____ period then ended".

Please call me at 635-1143 with any questions or comments regarding the above comments.