UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

IN RE OSG SECURITIES LITIGATION

------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/28/14

**OPINION AND ORDER**

**12 Civ. 7948 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.      INTRODUCTION

Lead Plaintiffs Stichting Pensioenfonds DSM Nederland, Indiana Treasurer of State, and Lloyd Crawford (collectively, "plaintiffs"), bring this action on behalf of themselves and others similarly situated on the basis of a March 2010 Senior Notes Offering ("the Offering") by Overseas Shipholding Group, Inc. ("OSG" or "the Company"). OSG filed for bankruptcy on November 14, 2012, and is not a party to this action.[1]

---

[1]      *See* Third Consolidated Amended Complaint for Violations of the Federal Securities Laws ("Complaint") ¶ 9.

Plaintiffs name the following parties as defendants:  Morten Arntzen[2], Myles R. Itkin[3], Alan R. Batkin, Thomas B. Coleman, Charles Fribourg, Stanley Komaroff, Solomon N. Merkin, Joel I. Picket, Ariel Recanati, Oudi Recanati, Thomas F. Robards, Jean-Paul Vettier, and Michael Zimmerman[4] (collectively, the "Individual Defendants"); PricewaterhouseCoopers LLP ("PwC") and Ernst & Young ("E&Y") (collectively, the "Auditor Defendants"); and Citigroup Global Markets Inc., Deutsche Bank Securities Inc., DNB Markets, Inc. (f/k/a DnB NOR Markets, Inc.), Goldman, Sachs & Co., HSBC Securities (USA) Inc., ING Financial Markets LLC, and Morgan Stanley & Co. LLC (f/k/a Morgan Stanley & Co. Incorporated) (collectively, the "Underwriter Defendants").[5]

In April and May of 2013, the Auditor Defendants, the Underwriter Defendants, and the Individual Defendants all moved to dismiss the Consolidated

---

[2]     Arntzen served as OSG's President, Chief Executive Officer ("CEO"), and a member of the Board of Directors beginning in January 2004.  *See id.* ¶ 10(a).

[3]     Itkin served as OSG's Chief Financial Officer ("CFO") and Treasurer beginning in June 1995, as Principal Accounting Officer since at least 2000, and as Executive Vice President beginning in June 2006.  *See id.* ¶ 10(b).

[4]     The other Individual Defendants served as OSG board members during all or part of the Class Period, and each signed the Registration Statement issued in connection with the Offering.  *See id.* ¶ 10(c)-(d).

[5]     *See id.* ¶¶ 10–13.

2

Amended Complaint ("Consolidated Complaint").  In an opinion dated September 10, 2013 (the "September 2013 Opinion"), I denied the Auditor Defendants' and the Underwriter Defendants' motions in full.  I denied the Individual Defendants' motion in part, but granted the motion with respect to the claims under Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), with leave to amend.[6]

On October 10, 2013, plaintiffs filed the Second Consolidated Amended Complaint ("Second Consolidated Complaint").  On November 12, 2013, Arntzen and Itkin moved to dismiss plaintiffs' claims under the Exchange Act.  While the motion was pending, OSG filed a malpractice claim against its former outside counsel, Proskauer Rose LLP ("Proskauer"), in Delaware Bankruptcy Court, which Proskauer subsequently moved to dismiss (the "Proskauer Motion").  I granted plaintiffs permission to amend the Second Consolidated Complaint once more to add factual allegations uncovered by the Proskauer lawsuit.  Both sides were permitted to submit supplemental briefing on the new allegations.  For the reasons that follow, defendants' motion to dismiss is denied.

---

[6]    *See In re OSG Sec. Litig.*, No. 12 Civ. 7948, 2013 WL 4885890 (S.D.N.Y. Sept. 10, 2013).

## II.    BACKGROUND

### A.    Business Operations and Tax Liability

OSG is a tanker company with a fleet of over one hundred vessels operating both domestically and internationally.[7]  The international fleet, which constitutes about seventy-five percent of the Company's vessels, is owned and operated entirely by foreign subsidiaries of OSG International, Inc. ("OIN"), a wholly owned subsidiary of OSG.[8]

Section 956 of Section F of the Internal Revenue Code ("Section 956") provides that, when a foreign subsidiary guarantees the loans of a United States parent company, the "accumulated 'earnings and profits' of that subsidiary are deemed to have been distributed to the U.S. parent company" up to the full amount of the loan obligation.[9]  The parent company is therefore subject to United States federal income taxation on the amount of the deemed distribution.[10] Plaintiffs allege that OSG entered into various debt arrangements for which OIN

---

[7]      *See* Complaint ¶¶ 20–21.

[8]      *See id.* ¶¶ 22, 25.

[9]      *Id.* ¶¶ 34–35.

[10]      *See id.*

was jointly and severally liable, triggering millions of dollars in income tax liability for OSG.[11]

Effective September 27, 2012, G. Allen Andreas III resigned from his position on OSG's Board of Directors and Audit Committee.[12]  His letter of resignation stated: "My resignation results from a disagreement with the Board as to the process the Board is taking in reviewing a tax issue. In taking this action, I urge you to report this issue to our auditors, PricewaterhouseCoopers LLP . . . . I had hoped in prior discussions to convince the Board and Audit Committee to follow a different direction."[13]

On October 22, 2012, OSG filed a Form 8-K with the SEC indicating that its previously issued financial statements for "at least three years ended December 31, 2011 . . . should no longer be relied upon."[14]  Later that day, S&P

---

[11]     *See id.* ¶ 37.

[12]     *See id.* ¶ 41.

[13]     *Id.*

[14]     *Id.* ¶ 42.

lowered OSG's credit rating based on the "high probability of very near-term default."[15]   On November 14, 2012, OSG filed for bankruptcy protection.[16]

In connection with OSG's bankruptcy proceeding, the IRS filed a Proof of Claim stating that OSG owed the federal government over 35 million dollars in corporate income tax, plus 13.7 million dollars in interest, accrued in 2004, 2005, and 2009–2011.[17]   On February 8, 2013, the IRS filed an amended Proof of Claim stating that OSG owed the federal government over 435 million dollars in corporate income tax plus 27.9 million dollars in interest.[18]   According to OSG's Form 8-K from December of 2013, OSG agreed to settle its tax liability from 2010 and 2011 with the IRS for 264 million dollars.[19]   However, the settlement does not cover taxes incurred in 2012 and 2013, which OSG anticipates will be substantial.[20]

### B.   The Consolidated Complaint and the First Motion to Dismiss

---

[15]   *Id.* ¶ 43.

[16]   *See id.* ¶ 45.

[17]   *See id.* ¶ 47.

[18]   *See id.* ¶ 48.

[19]   *See id.* ¶ 49.

[20]   *See id.*

The Consolidated Complaint alleged that Arntzen and Itkin knew about or recklessly disregarded OSG's tax liability under Section 956. Specifically, plaintiffs contended that Arnzen and Itkin understood other related tax provisions applicable to the Company and appreciated the importance of tax policy to OSG's bottom line.[21]  Plaintiffs further argued that the size of the tax liability, the length of time that it went undisclosed, the presence of GAAP violations, and Defendant Andreas' resignation from OSG's Board of Directors collectively supported the inference of scienter.

In the September 2013 Opinion, I found the above allegations insufficient to establish "strong circumstantial evidence" of scienter.  I noted that "[i]t is certainly plausible that Arntzen and Itken might have understood certain tax provisions affecting the Company . . . without appreciating the intricacies of Section 956."[22]  While the magnitude and duration of the miscalculation and the existence of GAAP violations are relevant to scienter, "they are generally not

---

[21]     *See* Consolidated Complaint ¶ 183 (alleging that defendants were "aware of the principal U.S. tax laws applicable to the Company, the subjectivity of foreign source income to U.S. federal income taxes and the 'critical' nature of OSG's policy of accounting for income taxes").  *See also id.* ¶ 184 (noting that senior OSG officials "spent significant resources trying to persuade federal officials to enact changes in the tax law that were favorable to the Company").

[22]     *In re OSG*, 2013 WL 4885890, at *12.

persuasive absent more concrete evidence of knowledge or recklessness."[23]  In fact, given that the "joint and several" language in the relevant agreements was fully disclosed, the size and duration of the misstatement might even lend "support to the theory that Section 956's applicability was unclear, rather than the theory that Arntzen and Itkin concealed an obvious or known tax liability."[24]  I noted that plaintiffs had not pointed to any specific documents, conversations, or exchanges from which defendants knew or should have known about the tax liability, and that "the nuances of Section 956 seem to have eluded multiple independent auditors in addition to Arntzen and Itkin."[25]  Finally, I concluded that, although Andreas's resignation indicated that Arntzen and Itkin knew about the tax issue in October of 2012, it did not necessarily demonstrate knowledge during the Class Period.[26]

## C.   New Allegations

The Complaint adds many new factual allegations to those contained in the Consolidated Complaint.  It asserts that Arntzen resigned as CEO of OSG on February 11, 2013, the same day the IRS amended its Proof of Claim to demand

---

[23]     *Id.*

[24]     *Id.*

[25]     *Id.*

[26]     *See id.*

463 million dollars as opposed to 48 million dollars.[27]  Additionally, Itkin departed

OSG on April 4, 2013, allegedly as a result of "a reduction in force intended to

improve operational efficiencies in connection with the Company's restructuring

efforts."[28]

   In June of 2013, OSG's Audit Committee conducted an inquiry into

the Company's financial disclosures and determined that "there were material

misstatements [regarding Section 956 tax liability] in its previously issued

financial statements for each of the twelve calendar years in the twelve year period

ended December 31, 2013."[29]  The Audit Committee concluded that OSG's

financial statements had been "presented in violation of GAAP and the Company's

publicly stated policies of accounting,"[30] and that the Company had implemented

"insufficient processes to identify and evaluate adequately the income tax

---

[27] *See* Complaint ¶ 234.  The Complaint also points out that Arntzen was required to forfeit "all unvested shares of restricted stock, stock options, restricted stock units and performance units" as a result of his resignation.  *Id.*

[28] *Id.* ¶ 235.

[29] *Id*. ¶ 39.  By contrast, the Consolidated Complaint alleged that OSG had admitted material misstatements in its financial statements during only a three year period.  *See* Consolidated Complaint ¶ 39.

[30] Complaint ¶ 247.

accounting impact of Section 956."[31]  OSG subsequently disclosed on its Form 10-K of August 26, 2013 that its financial statements from the previous twelve years contained material misstatements and should be restated.[32]  The same month, OSG disclosed that the Company was under investigation by the SEC as a result of OSG's tax liability under Section 956.[33]

The Complaint also presents factual allegations from a former treasurer at OSG (the "Former Treasurer") who was involved in negotiating the terms of the 2001 Credit Agreement.  The Former Treasurer explained that he personally tried to avoid having foreign subsidiaries jointly and severally liable with domestic entities on credit agreements because it resulted in a "deemed tax event if the foreign companies were guaranteeing the obligations of the domestic companies."[34]  He stated that if he understood the risk of Section 956 tax liability at the time of the negotiations, then "anybody in a finance position would probably [have] know[n] it."[35]  The Former Treasurer testified that Itkin was usually on the

---

[31]     *Id.* ¶ 240.

[32]     *See id.* ¶ 58.

[33]     *See id.* ¶ 40.

[34]     *Id.* ¶ 143.

[35]     *Id.* ¶ 144.

original distribution list when draft credit agreements were circulated, and that Itkin participated in some of the credit facility negotiations.[36]

The Complaint also draws from information uncovered by OSG's malpractice lawsuit against Proskauer in Delaware Bankruptcy Court. OSG engaged Proskauer in 2011 to review the language of a draft credit agreement for unsecured revolving credit facilities (the "2011 Credit Agreement").[37] Consistent with the Company's previous credit agreements dating back to 2000, the 2011 Credit Agreement provided that OSG, OIN, and another OSG subsidiary would be jointly and severally liable for the balance of the loan.[38] Proskauer immediately realized that if the "joint and several" language were interpreted as a guarantee, the credit agreement would trigger income tax liability under Section 956.[39] Proskauer brought the issue to the attention of OSG's Senior Vice President and General

---

[36]   *See id.* ¶ 145.

[37]   *See id.* ¶ 126.

[38]   *See id.*

[39]   *See id.* ¶ 127.

11

Counsel, James Edelson.[40]  OSG subsequently asked Proskauer to investigate the potential Section 256 liability and any arguments for eliminating or mitigating it.[41]

In connection with its research, Proskauer asked OSG to search its files for any documents that might shed light on the Company's and the lenders' intent with respect to the "joint and several" language in the credit agreements from previous years.  In response, Edelson indicated that he could not find anything of relevance in OSG's files.[42]  OSG's management told Proskauer that they would not have entered into the credit agreements if they had believed that OIN would be responsible for OSG's obligations.[43]  Based upon these representations, Proskauer drafted a memorandum (the "2011 Memorandum") concluding that the parties did not intend the phrase "joint and several" to constitute a guarantee by OIN, and that Section 956 therefore should not apply.[44]

---

[40]     *See id.* ¶ 126.

[41]     *See id.* ¶ 128.

[42]     *See id.* ¶ 130.

[43]     *See id.* ¶ 129.

[44]     *See id.* ¶ 128.

About fifteen months later, OSG asked Proskauer to turn the 2011 Memorandum into a formal tax opinion.[45]  In October 2012, OSG produced for the first time a "trove" of documents relevant to the intended meaning of the "joint and several" language in the Company's credit agreements.[46]  The documents directly contradicted OSG's previous representations and "conclusively demonstrated" that the parties intended to make the subsidiaries guarantors or co-obligors of OSG's loan.[47]  As a result of the new revelations, Proskauer refused to issue a formal tax opinion based on the 2011 Memorandum.[48]

## III.   STANDARD OF REVIEW AND PLEADING STANDARD

### A.      Rule 12(b)(6) Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor."[49]  The court may consider "the complaint, [] any documents attached thereto or incorporated by reference and

---

[45]     *See id.* ¶ 132.

[46]     *Id.*

[47]     *Id.* ¶ 133.

[48]     *See id.* ¶ 139.

[49]     *Grant v. County of Erie*, 542 Fed. App'x 21, 23 (2d Cir. 2013).

documents upon which the complaint relies heavily,"[50] as well as "legally required public disclosure documents filed with the SEC[] . . . ."[51]

   The court evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal*.[52]  Under the first prong, a court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."[53]  For example, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[54]  Under the second prong of *Iqbal*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[55]  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

---

[50] *Building Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 187 (2d Cir. 2012) (quotation marks omitted).

[51] *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007).

[52] *See* 556 U.S. 662, 678–79 (2009).

[53] *Id.* at 679.

[54] *Id.* at 678.

[55] *Id.* at 679.

misconduct alleged."[56]  "The plausibility standard is not akin to a probability requirement" because it requires "more than a sheer possibility that a defendant has acted unlawfully."[57]

### B. Heightened Pleading Standard Under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA")

Claims under Section 10(b) must meet the heightened pleading standards of both Federal Rule of Civil Procedure 9(b) and the PSLRA.  *First*, Rule 9(b) requires plaintiffs to allege the circumstances constituting fraud with particularity.  However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[58]

*Second*, the PSLRA provides that, in actions alleging securities fraud, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[59]

## IV. APPLICABLE LAW

### A. Section 10(b) of the Exchange Act and Rule 10b-5

---

[56]   *Id.* at 678.

[57]   *Id.* (quotation marks omitted).

[58]   Fed. R. Civ. P. 9(b).

[59]   15 U.S.C. § 74u-4(b)(2).

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance. . . ."[60]  Rule 10b-5, promulgated thereunder, makes it illegal to "make any untrue statement of a material fact or to omit to state a material fact . . . in connection with the purchase or sale of any security."[61]  To sustain a claim for securities fraud under Section 10(b), "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[62]

The required level of scienter under Section 10(b) is either "intent to deceive, manipulate, or defraud"[63] or "reckless disregard for the truth."[64]  Plaintiffs

---

[60]     *Id.* § 78j(b) (1934).

[61]     17 C.F.R. § 240.10b-5 (1951).

[62]     *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

[63]     *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

[64]     *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("By reckless disregard for the truth, we mean 'conscious recklessness — *i.e.*, a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*.'" (quoting *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000)).

may meet this standard by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[65]  Under the latter theory, plaintiffs must allege that the defendants have engaged in "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[66]  "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."[67]  An inference of scienter "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[68]

---

[65]    *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens United Co.*, 228 F.3d 154, 168–69 (2d Cir. 2000)).

[66]    *Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir. 2001) (quotation marks and citations omitted).

[67]    *Novak,* 216 F.3d at 308.

[68]    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007).  *Accord Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 295

### B.      Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act creates a cause of action against "control persons" of the primary violator.[69]  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."[70]  Where there is no primary violation, there can be no "control person" liability under Section 20(a).[71]

## V.     DISCUSSION

### A.      Plaintiffs Have Adequately Alleged Arntzen's and Itkin's Scienter Under Section 10(b)

The Complaint identifies extensive circumstantial evidence suggesting that Arnken and Itkin knew about or recklessly disregarded the Company's tax liability under Section 956.  The Complaint's additional scienter allegations are

---

(S.D.N.Y. 2011) (noting that "the tie . . . goes to the plaintiff" (quotation marks and citations omitted)).

[69]      *See* 15 U.S.C. § 78t(a).

[70]      *ATSI*, 493 F.3d at 108.

[71]      *See id.  See also In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297–98 (S.D.N.Y. 2006).

significantly stronger than those contained in the Consolidated Complaint, and collectively suffice to state a claim under Section 10(b).

For example, the Consolidated Complaint did not reveal whether the applicability of Section 956 was abstruse and indiscernible, or clear enough that it should have been obvious to top OSG officials.[72]  By contrast, the Complaint alleges that a former OSG treasurer involved in the 2001 Credit Agreement negotiations understood contemporaneously that "joint and several" language constituted a guarantee, and believed that anyone in a position of financial decision-making authority would have possessed the same knowledge.[73]  Because the Former Treasurer reported directly to Itkin, it is likely that Itkin possessed the same understanding of Section 956.[74]

Although Arntzen was not yet CEO during the Former Treasurer's tenure at the Company, OSG continued to utilize the same "joint and several"

---

[72]     *See In re OSG,* 2013 WL 4885890, at *13 ("[I]t cannot be inferred [from the Consolidated Complaint] that the applicability of Section 956 was so obvious that the defendant[s] must have been aware of it. . . .") (quotation marks and citations omitted).

[73]     *See* Complaint ¶¶ 143–144.

[74]     Moreover, the Complaint alleges that both Itkin and Arntzen had "extensive financial backgrounds," and therefore likely understood the risk of incurring tax liability under Section 956.  *Id.* ¶ 258.

language in credit agreements for years after Arntzen assumed control.[75]  It is implausible that OSG treasurers would have understood the implications of "joint and several" liability in 2001, yet failed to communicate that knowledge to Arntzen with respect to subsequent credit agreements employing the same language.

In the September 2011 Opinion, I noted that plaintiffs had not identified any specific documents, conversations, or exchanges from which defendants should have known about the Section 956 liability.[76]  By contrast, the Complaint alleges that Proskauer attorneys explicitly discussed the issue with OSG senior management,[77] and that "OSG's General Counsel withheld from Proskauer a number of documents relevant to OSG's tax liability under Section 956."[78]  Even after the revelation of those documents, OSG "asked Proskauer to issue a formal tax opinion about OSG's Section 956 liability despite knowing there were contradictory documents in its files."[79]  While the Proskauer Motion does not explicitly implicate Arntzen and Itkin in the deceptive acts, the most plausible inference is that Arntzen

---

[75]     *See id.* ¶¶ 124–126.

[76]     *See In re OSG,* 2013 WL 4885890, at *13.

[77]     *See* Complaint ¶¶ 126, 129–130, 291.

[78]     *Id.* ¶ 291.

[79]     *Id.*

and Itkin were aware of Edelson's actions if not directly in control of them.[80]

Moreover, I take judicial notice of the fact that Proskauer recently sued Itkin and

Edelson for fraud in New York Supreme Court based on their allegedly deliberate

withholding of documents relevant to OSG's tax liability.[81]  Because I must

presume plaintiffs' factual allegations to be true on a motion to dismiss, any

question of credibility regarding the Proskauer allegations is irrelevant at this stage.

   The Complaint makes several other scienter allegations against

Arntzen and Itkin.  *First,* plaintiffs argue that the timing of Arntzen's and Itkin's

resignations supports an inference of scienter.  Arntzen resigned the day the IRS

announced a massive amendment to its Proof of Claim in bankruptcy court, while

Itkin resigned a few months later for a seemingly pretextual reason.[82]  The

---

[80] Federal income tax policy was critical to OSG's profitability, and the credit agreements provided nearly 4.5 billion dollars of credit to the Company over the course of over ten years.  *See id.* ¶ 297.  Consequently, it is unlikely that Arntzen and Itkin were unaware of the Section 956 issue and their General Counsel's actions.  Moreover, such unawareness would likely constitute "an extreme departure from the standards of ordinary care" given the importance of the issue to the Company's financial health.  *Kalnit,* 264 F.3d at 142.

[81] *See* Complaint in *Proskauer Rose LLP v. Edelson,* Index. No. 650596/2014 (Sup. Ct. N.Y. Cnty.), Ex. B to Lead Plaintiffs' Opposition to Defendants Morten Arntzen and Myles R. Itkin's Memorandum of Law in Response to the Third Consolidated Amended Complaint.

[82] *See* Complaint ¶¶ 234–235 (alleging that Itkin resigned as a result of "a reduction in force intended to improve operational efficiencies in connection with the Company's restructuring efforts").

circumstances and timing of the resignations suggest that both defendants were "terminated in relation to the undisclosed tax issue."[83]   Although the decision to terminate the defendants does not negate the possibility of mere negligence in mismanaging the Section 956 issue, it more likely suggests a higher level of wrongdoing approaching recklessness or even conscious malfeasance.[84]

Second, plaintiffs argue that OSG's internal controls were inadequate, and that defendants signed false statements certifying the sufficiency of those controls.[85]   A lack of adequate internal controls may support the inference of scienter.[86]   While defendants argue that Section 956 was so nuanced that multiple

---

[83]   See Lead Plaintiffs' Memorandum of Law in Opposition to Defendants Morten Arntzen and Myles R. Itkin's Motion to Dismiss the Second Consolidated Amended Complaint ("Pl. Mem.") at 11–12.

[84]   See Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (noting that "highly unusual or suspicious" resignations "add to the overall pleading of circumstantial evidence of fraud," including "when independent facts indicate that the resignation was somehow tied to the fraud alleged"); Hall v. The Children's Place Retail Stores, Inc., 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (finding that resignations of company's CEO and auditor supported inference of scienter); In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) (noting that "the resignations of [the defendants], although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud").

[85]   See Pl. Mem. at 11–12.

[86]   See Hall, 580 F. Supp. 2d at 233 ("[T]he Company admitted that it had material weaknesses in its internal controls — weaknesses probative of scienter."); In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 232

22

independent auditors overlooked the provision,[87] this argument loses its force in light of OSG's admission that, as of December 31, 2012, the Company had "insufficient processes to [] identify and evaluate adequately the income tax accounting of Section 956" and ensure that "any potential income tax consequences related to Section 956 were brought to the attention of the Company's Audit Committee . . . on a timely basis."[88]

        Finally, several factual allegations from the Consolidated Complaint — specifically the magnitude and duration of the misstatements and the existence of GAAP violations — support the inference of scienter against Arntzen and Itkin. While I concluded in the September 2013 Opinion that these allegations were insufficient on their own to sustain plaintiffs' Section 10(b) claims,[89] they add

---

(S.D.N.Y. 2006) ("[A]s this court has recognized, a failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter.").

[87]    *See* Memorandum of Law in Support of Morten Arntzen and Miles R. Itkin's Motion to Dismiss the Second Consolidated Amended Complaint ("Def. Mem.") at 20. *See also In re OSG,* 2013 WL 488589, at *13.

[88]    OSG's Form 10-K for fiscal year 2012, Ex. A to 12/11/13 Declaration of David A. Rosenfeld, Counsel to plaintiffs, at 152–153. *Accord* Complaint ¶ 240.

[89]    *See In re OSG*, 2013 WL 4885890, at *12 ("Plaintiffs contend that the sheer size of the tax liability, and the length of time that it went undisclosed, support an inference of scienter. Although both factors are properly considered, they are generally not persuasive absent more concrete evidence of knowledge or recklessness."). *See also id.* at *13 ("[M]ost courts have found GAAP violations to

incremental support to the many other allegations in the Complaint.[90]  Given the

totality of the circumstantial evidence alleged, the inference of scienter against

Arntzen and Itkin is at least as strong as any competing inference.

> ### B.   Plaintiffs Have Adequately Stated a Claim for "Control Person" Liability Under Section 20(a)

Defendants argue that plaintiffs' Section 20(a) claim must be

dismissed for failing to state a primary violation of Section 10(b) by Arntzen and

--------------------------------------------------

be insufficient to state a claim.").

[90]     *See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 200 (2d Cir. 2009) ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. . . . Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient.") (quotation marks and citations omitted); *Varghese v. China Shenghuo Pharm. Holdings, Inc.,* 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) ("[A]lthough GAAP violations do not independently sustain an inference of scienter, they may contribute to that inference."); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F. Supp. 2d 474, 488–89 (S.D.N.Y. 2004) ("When a company is forced to restate its previously issued financial statements, the mere fact that the company had to make a large correction is some evidence of scienter.").

In the September 2011 Opinion, I noted that the length and magnitude of the misstatements could actually *support* defendants' case if the relevant underlying information was disclosed to the public and the Company's auditors. *See In re OSG,* 2013 WL 488589, at *12.  However, the Complaint alleges that pertinent information was withheld from the public, the auditors, and the Company's own outside counsel.

Itkin.[91]  Because I find that plaintiffs have stated a claim for a primary violation by Arntzen and Itkin, defendants' argument is without merit.

In their reply brief, defendants belatedly argue that plaintiffs have not established that an agent of OSG acted with the required mental state, or that Arntzen and Itkin were "culpable participants" in the alleged fraud.[92]  Because defendants raise these arguments for the first time on reply, they need not be considered.[93]  Defendants had ample notice from the Complaint that plaintiffs alleged a primary violation by OSG, yet failed to address the theory in their opening memorandum of law.[94]

---

[91]     *See* Def. Mem. at 20 ("Because the Second Consolidated Complaint does not allege a primary violation of Section 10(b) and Rule 10b-5 by Arntzen and Itkin, Plaintiffs have not established control person liability pursuant to Section 20(a).").

[92]     *See* Reply Memorandum of Law in Further Support of Morten Arntzen and Miles R. Itkin's Motion to Dismiss the Second Consolidated Amended Complaint at 8–10.

[93]     *See Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (declining to consider argument raised for the first time on reply).  *See also Scheffer v. Civil Serv. Emp. Ass'n, Local 828,* 610 F.3d 782, 790 n.6 (2d Cir. 2010) (same); *LinkCo, Inc. v. Naoyuki Akikusa,* 367 Fed. App'x 180, 184 (2d Cir. 2010) ("By failing to raise the issue in its opening brief, LinkCo waived its argument. . . .").

[94]     *See, e.g.,* Complaint ¶ 284 ("OSG, the entity controlled by Defendants Arntzen and Itkin, is liable for violating Section 10(b).").

Even if not waived, however, defendants' arguments fail on the merits. Plaintiffs have adequately alleged that Arntzen, Itkin, and Edelson acted with scienter, and their scienter may be imputed to OSG by virtue of their positions of authority at the Company.[95] Moreover, the scienter allegations against Arntzen and Itkin are more than sufficient to constitute "culpable participation."[96] Therefore, defendants' motion to dismiss the Section 20(a) claim is denied.

## VI.   CONCLUSION

For the foregoing reasons, Arntzen and Itkin's motion to dismiss is denied. The Clerk of Court is directed to close this motion (Dkt. No. 125). A conference is scheduled for May 22, 2014 at 4:30 pm.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April   28, 2014

---

[95]   *See New Orleans Emp. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x 10, 15 (2d Cir. 2011) (finding corporate scienter adequately alleged based on scienter of company's CEO and CFO).

[96]   *See In re Tronox, Inc. Sec. Litig.*, No. 09 Civ. 6220, 2010 WL 2835545, at *15 (S.D.N.Y. June 28, 2010) ("[A]lthough the meaning of 'culpable participation' is unclear, there is strong reason to believe that it is [a less demanding standard than] scienter.").

**-Appearances-**

**For Lead Plaintiffs:**

Samuel H. Rudman, Esq.
David A. Rosenfeld, Esq.
Alan I. Ellman, Esq.
Christopher M. Barrett, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100


**For Defendant Morten Arntzen:**

Scott B. Schreiber, Esq.
Craig A. Stewart, Esq.
Daniel R. Bernstein, Esq.
Arnold & Porter
Thurman Arnold Building
555 Twelfth Street, N.W.
Washington, DC 20004-1206
(202) 942-5000


**For Defendant Myles R. Itkin:**

David H. Kistenbroker, Esq.
Joni S. Jacobsen, Esq.
Ashley J. Burden, Esq.
Dechert LLP
115 S.Lasalle Street
Chicago, IL 60661
(312) 646-5800