UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

IN RE OSG SECURITIES LITIGATION

-------------------------------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/29/15
```

**OPINION AND ORDER**

**12 Civ. 7948 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

Overseas Shipholding Group ("OSG") is a tanker company whose international operations generate considerable tax liability under section 956 of the Internal Revenue Code.[1]  However, for a twelve year period, culminating in 2012, OSG's leadership maintained the position — and made public representations to the effect — that the company owed no section 956 taxes.  This position turned out to be mistaken — an error that eventually forced OSG into bankruptcy, and led to the filing of the present suit for securities fraud.

To date, all claims but one have settled.  The remaining claim, which

---

[1]     Familiarity with the underlying facts will be assumed for the purpose of this Opinion.

1

arises under section 11 of the Securities Act of 1933,[2] is against Ernst & Young ("E&Y"), who served as OSG's outside auditors from 1969 until 2009.  In the 2009 fiscal year, PricewaterhouseCoopers ("PwC") took over as OSG's outside auditors.  According to plaintiffs, E&Y's failure to recognize the section 956 issue in its auditing reports — *i.e.*, its decision to sign off on OSG's financials, despite the existence of significant unreported tax liability — contributed to the company's fraud, and to the corresponding harm to investors.

On September 10, 2013, I held that the section 11 allegations against E&Y were sufficiently pleaded to survive dismissal.[3]  Now, E&Y has moved for summary judgment on the ground that plaintiffs cannot show loss causation in connection with E&Y's actions as OSG's outside auditor.  In the section 11 context, loss causation is not an affirmative element of liability.  Instead, the absence of loss causation is a *defense* to liability.  As the Second Circuit has explained, "it is the defendant who bears the burden of demonstrating that something other than the misstatement at issue caused plaintiff's losses,"[4] a

---

[2]     *See* 15 U.S.C. § 77k.

[3]     *See In re OSG Sec. Litig.*, 971 F. Supp. 2d 387 (S.D.N.Y. 2013).

[4]     *In re Flag Telecom Holdings Sec. Litig.*, 574 F.3d 29, 35-36 (2d Cir. 2009).

2

defense known as "negative causation."[5]  Here, however, the difference between an
affirmative defense and an element of liability (and the corresponding difference in
burden of proof) is immaterial, because E&Y's argument is that plaintiffs cannot
point to *any evidence* that demonstrates loss causation.  Thus, E&Y argues that it is
entitled to summary judgment as a matter of law — because there is no way, given
the plaintiffs' complete dearth of evidence, that E&Y could fail to demonstrate
negative causation.

Plaintiffs disagree.  For support, they lean primarily on an October 22,
2012 8-K filing ("October 8-K"), in which OSG disclosed, in relevant part, that

> [t]he Company's previously issued financial statements for at least
> the three years ended December 31, 2011 and associated interim
> periods . . . should no longer be relied upon.  The Audit
> Committee and authorized officers have informed the Company's
> independent registered public accountants of this conclusion.[6]

It is undisputed that the October 8-K was a corrective disclosure (1) as to OSG's
financial statements, which are referenced directly, and (2) as to PwC's work,
which is identified implicitly in the phrase "three years ended December 2011," a
time period during which PwC — *not* E&Y — served as OSG's outside auditor.[7]

---

[5]    *In re OSG*, 971 F. Supp. 2d at 396.

[6]    E&Y's Statement of Material Facts in Support of Its Motion for
Summary Judgment ("Def. 56.1") ¶ 8.

[7]    *Id.* ¶¶ 1-3.

3

The question is whether the October 8-K also reaches E&Y's work. Plaintiffs argue that it does, for two reasons. *First*, plaintiffs argue that the phrase "at least," as in, "at least the three years ended December 31, 2011," indicates that the October 8-K intended to correct financial statements that issued *before* 2009 — *i.e.*, on E&Y's watch. *Second*, plaintiffs argue that the use of the plural form when referencing "the Company's independent registered public *accountants*" suggests that the October 8-K had in mind *multiple* accounting firms.

Putting these arguments regarding corrective disclosure to one side, plaintiffs also maintain that loss causation can be sustained on a "materialization of the risk" theory. According to plaintiffs, "it was foreseeable to [E&Y] that OSG's massively understated tax liability would cause OSG's financial statements to be unreliable," and "[that] risk[] materialized on October 22, 2012, when OSG announced that its financial statements for at least [2009, 2010, and 2011] should no longer be relied upon and that it was evaluating the potential filing of a petition for bankruptcy."[8] In E&Y's view, this argument merely restates the corrective disclosure theory in different words, because it hinges on the same key fact — that the fraud came to light when the October 8-K was filed. As such, E&Y believes the two theories suffer from the same defect. Whether the October 8-K is taken as

---

[8]     Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Opp. Mem."), at 20.

a corrective disclosure, or rather as evidence that economic risks had materialized, the upshot is the same — the 8-K does not reach E&Y's auditing years.

## II.   APPLICABLE LAW

Loss causation concerns the relationship between "the fraudulent statement or omission" and "the actual loss suffered."[9] This relationship can be established in two ways. *First*, loss causation can be established by showing that "the market reacted negatively to a corrective disclosure of the fraud."[10] *Second*, loss causation can be established by showing "that the loss was foreseeable and caused by the materialization of the risk concealed by the [fraud]."[11]

To prevail on a "materialization of the risk" theory, a plaintiff must show that "'the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, *when disclosed*, negatively affected the value of the

---

[9]      *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014). *Accord Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.  2005) (describing loss causation as "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff") (internal citations omitted).

[10]     *In re Omnicon Grp. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010).

[11]     *Id.* at 513.

5

security.'"[12]  In other words, a plaintiff must show that the particular misstatement

or omission for which a given defendant was responsible — here, E&Y's auditing

reports for the years before 2009 — "concealed [a particular] risk," and that the

particular risk subsequently "[came] to light in a series of revealing events that

negatively affect[ed] [the] stock price."[13]

## III.  DISCUSSION

### A.  Plaintiffs' Corrective Disclosure Theory Fails[14]

Plaintiffs offer arguments in favor of parsing the October 8-K as a

corrective disclosure of E&Y's role in the fraud. *First*, they argue that the phrase

"at least," in the context of "at least the three years ended December 31, 2011,"

implies that the October 8-K related to E&Y's auditing years in addition to PwC's.

---

[12]     *In re Initial Public Offerings Sec. Litig.*, 544 F. Supp. 2d 277, 289
(S.D.N.Y. 2008) (quoting *Lentell*, 396 F.3d at 173) (emphasis added).

[13]     *In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 586, 598
(S.D.N.Y. 2009).

[14]     In addition to plaintiffs' argument, addressed below, that the October
8-K was a corrective disclosure, they also maintain that another corrective
disclosure occurred on August 26, 2013 — when OSG filed a 10-K that explicitly
widened the time period during which misstatements occurred (including years
when E&Y served as OSG's outside auditors).  This argument is unavailing.  It is
black letter law, at least in the Second Circuit, that disclosures made after the close
of the class period cannot be "corrective" for the purpose of establishing loss
causation.  *See, e.g.*, *Masters v. GlaxoSmithKline*, 271 Fed. App'x 46, 51 (2d Cir.
2008).  The August 26, 2013 disclosure occurred after the close of the class period.
Accordingly, it is not a corrective disclosure.

*Second*, plaintiffs argue that the use of the plural — "the Company's independent registered public accountants," rather than *accountant* — implies the same.

Plaintiffs' argument about the meaning of "at least" fails as a matter of law. There can be no dispute that disclosures about specific time periods are not disclosures about earlier time periods.[15] It is therefore undisputed that plaintiffs' claim would fail if the October 8-K *only* made reference to "the three years ended December 31, 2011." The question is whether there is a meaningful distinction between this (hypothetical) language and the language from the actual 8-K. Is the phrase "at least the three years ended December 31, 2011" a disclosure about a specified time period or an open-ended disclosure about problems that reach back in time?[16]

Neither the parties nor this Court have been able to locate a case — in this jurisdiction or any other — that resolves this question. Absent clear guidance,

---

[15]    *See, e.g.*, *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 154-55 (S.D.N.Y. 2010) (rejecting plaintiffs' attempt to interpret corrective disclosures made in filings in 2005 and 2006 as corrective disclosures regarding filings in 2004); *Janbay v. Canadian Solar*, No. 10 Civ. 4430, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) (a press release referring to the fourth quarter of 2009 does not reveal anything to the market about the *third* quarter of 2009). For examples of appellate case law from other jurisdictions that agree with this proposition, see *Alaska Elec. Pension v. Flowserve Corp.*, 572 F.3d 221, 230-31 (5th Cir. 2009); *Tricontinental Indus. v. PwC*, 475 F.3d 824, 842-44 (7th Cir. 2007).

[16]    *See* Def. 56.1 ¶ 8.

I conclude that the phrase "at least the three years ended December 31, 2011" is a disclosure about a specific period — from 2009-2011 — *not* a reference to potentially longstanding problems. Drawing the contrary conclusion would give rise to a vexing line-drawing problem that plaintiffs have failed to confront. Simply put, the words "at least" could refer to *any* period, even many years (or decades!) before the specific date range identified. A principle so broad has no place in the securities laws.[17]

Here, plaintiffs only wish to extrapolate the corrective disclosure to years that fell directly before the time period referenced in the October 8-K. But on their reasoning, the October 8-K could, in theory, constitute a corrective disclosure for *any year* that E&Y was OSG's outside auditor. So construed, the October 8-K could — again, in theory — satisfy the loss causation prong of a securities fraud action against E&Y in connection with literally any work product that it delivered to OSG. To the extent that plaintiffs' construction of the phrase "at least" renders such an outcome possible, it must be rejected.

Plaintiffs' second argument — that the use of the plural formulation, "public accountants," indicates that the October 8-K referred to E&Y in addition to

---

[17]     *Cf. In re Omnicon*, 597 F.3d at 512 (expressing doubt that a document that gestures toward "implied [] problems" with a company's "accounting" can serve as a corrective disclosure).

PwC — fares no better.  Taken in context, the reference to "accountants" is plainly a reference to an accounting *firm*, and furthermore, to the specific accounting firm that was serving as OSG's outside auditor when the October 8-K issued.  The full phrase is "informed the Company's independent registered public accountants." When the October 8-K was filed, E&Y was not "the Company's independent registered public accountants."  PwC was.

This fact alone forecloses plaintiffs' interpretation.  Suppose a company issues a press release announcing an upcoming merger, which includes the line, "We have informed our lawyers of this decision."  Would anyone understand the release to be talking about *past* counsel in addition to the firm (or firms) presently retained?  Of course not.  Plaintiffs' argument tries to exploit linguistic ambiguity to their advantage — by creating purely "metaphysical doubts as to the material facts."[18]  That is not enough to defeat summary judgment.[19]

**B.     Plaintiffs' Materialization of the Risk Theory Also Fails**

In the alternative, plaintiffs fall back on a materialization of the risk theory.  *First*, they argue that the "risk of misstated financials and bankruptcy

---

[18]     *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quotation marks and citations omitted).

[19]     *See id.* (explaining that the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts," and "may not rely on conclusory allegations or unsubstantiated speculation").

materialized on October 22, 2012," when OSG issued the October 8-K.[20]  This

argument merely rehashes the corrective disclosure claim.  If the October 8-K did

not correct misstatements from any of E&Y's audit years, neither did it "[bring] to

light" a specific risk that E&Y's audit reports had "concealed."[21]  The point of the

foregoing analysis is that, as a matter of law, the October 8-K disclosed *nothing*

about E&Y's audit reports — and it follows, *a fortiori*, that the October 8-K did

not disclose anything about specific risks concealed by those reports.

  *Second*, plaintiffs argue — for the first time since this case was filed

nearly three years ago — that "the risk of bankruptcy began to materialize on

October 16, 2012," when industry buzz started to build about the possibility of

OSG facing restructuring.[22]  Even assuming, *arguendo*, that plaintiffs can win the

factual point — *i.e.*, that a jury, having heard the evidence, would conclude that the

risk of bankruptcy really *did* start to materialize on October 16, 2012 — plaintiffs

have provided no theory, much less any evidence, tying this general risk to E&Y's

audit reports.

  Ultimately, plaintiffs do not cite a single case in support of the

---

[20] *See* Opp. Mem. at 20.

[21] *In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d at 598.

[22] *See* Opp. Mem. at 22.

proposition that generalized economic problems (which is just another way of saying "the risk of bankruptcy") can prove loss causation in a case like this. The lack of authority is not a surprise. Nor is it a surprise that federal appellate courts are in agreement that "loss caused solely by a general impression in the market that 'something is wrong' is insufficient to establish causation."[23] On plaintiffs' theory, any time a company faced the possibility of bankruptcy — and the risk of that possibility began to materialize in the market — the element of loss causation would necessarily be satisfied. In addition to defying common sense, this result is also contrary to Second Circuit law, for it would mean that "loss causation as an element of [securities fraud] would be completely subsumed by the element of misstatement.[24]

## IV.    CONCLUSION

---

[23]    *Alaska Elec. Pension*, 572 F.3d at 232. *Accord Glickenhaus & Co. v. Household Intern, Inc.*, No. 13 Civ. 3532, 2015 WL 2408028, at *9 (7th Cir. May 21, 2015) ("In order to prove loss causation, plaintiffs in securities-fraud cases need to isolate the extent to which a decline in stock price is due to fraud-related [] disclosures and not other factors."); *In re Flag Telecom Holdings*, 574 F.3d at 41 (no loss causation because "[p]laintiffs [] failed to demonstrate that any of the information that 'leaked' into the market . . . revealed the truth with respect to the specific misrepresentations alleged"); *In re Williams Sec. Litig.*, 558 F.3d 1130, 1138 (5th Cir. 2009) (there can be no loss causation unless the loss was "attributable to some form of revelation to the market of the wrongfully concealed information").

[24]    *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007).

For the reasons set forth above, E&Y's motion for summary judgment is GRANTED. The Clerk of the Court is direct to close this motion (Dkt. No. 201), and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      May 29, 2015
            New York, New York

12

## - Appearances -

**For Lead Plaintiffs:**

Samuel H. Rudman, Esq.
David A. Rosenfeld, Esq.
Mark T. Millkey, Esq.
Christopher M. Barrett, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

**For Defendant Ernst & Young:**

Stanley J. Parzen, Esq.
Dana S. Douglas, Esq.
Mayer Brown LLP (Chicago)
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600